Andrew G. Dietderich
Brian D. Glueckstein
Alexa J. Kranzley
Christian P. Jensen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Proposed Counsel to the Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re | Chapter 11 |
| LSC COMMUNICATIONS, INC., *et al.*,[1] | Case No. _____ (__) |
| Debtors. | Joint Administration Pending |

---

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING, BUT NOT DIRECTING, DEBTORS TO PAY
PREPETITION CLAIMS OF (A) CRITICAL VENDORS AND (B) POTENTIAL
LIEN CLAIMANTS, (II) CONFIRMING ADMINISTRATIVE EXPENSE
PRIORITY OF OUTSTANDING ORDERS, (III) AUTHORIZING APPLICABLE
BANKS AND OTHER FINANCIAL INSTITUTIONS TO HONOR AND PROCESS
RELATED CHECKS AND TRANSFERS AND (IV) GRANTING RELATED RELIEF**

LSC Communications, Inc. and certain of its affiliated debtors and debtors-in-

possession (collectively, the "Debtors") hereby submit this motion (the "Motion") for entry of an

---

[1]   The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  LSC Communications, Inc. (9580); Courier Communications LLC (2268); Courier Kendallville, Inc. (4679); Courier New Media, Inc. (1312); Dover Publications, Inc. (0853); LSC Communications Logistics, LLC (9496); LSC Communications MM LLC (5577); LSC Communications US, LLC (4157); LSC International Holdings, Inc. (4995); National Publishing Company (8213); Publishers Press, LLC (7265); Continuum Management Company, LLC (2627); Clark Distribution Systems, Inc. (5778); Clark Holdings Inc. (9172); Clark Worldwide Transportation, Inc. (5773); The Clark Group, Inc. (6223); Courier Companies, Inc. (7588); Courier Publishing, Inc. (3681); F.T.C. Transport, Inc. (8699); LibreDigital, Inc. (7160); LSC Communications Printing Company (7012); and Research & Education Association, Inc. (3922).  The Debtors' corporate headquarters is located at 191 N. Wacker Drive, Suite 1400, Chicago, IL 60606.

interim order, substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Interim Order</u>"), and a final order, substantially in the form attached hereto as <u>Exhibit B</u> (the "<u>Final Order</u>" and together with the Interim Order, the "<u>Orders</u>"), pursuant to sections 105(a), 363, 503(b)(9), 1107 and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "<u>Bankruptcy Code</u>") and rule 6003 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), (a) authorizing, but not directing, the Debtors, in their sole discretion, to pay prepetition claims of (i) Critical Vendors (as defined below) in an amount not to exceed $9.6 million on an interim basis and $19.3 million on a final basis and (ii) Potential Lien Claimants (as defined below, and together with the Critical Vendors, the "<u>Vendor Claimants</u>"), (b) confirming administrative expense priority of outstanding orders and authorizing payment, in the ordinary course of business, of all such amounts when they come due and owing, (c) authorizing applicable banks and other financial institutions to honor and process related checks and transfers and (d) granting certain related relief, including scheduling a hearing to consider approval of the Motion on a final basis (the "<u>Final Hearing</u>").  The facts and circumstances supporting this Motion are set forth in the concurrently filed *Declaration of Andrew B. Coxhead in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "<u>First Day Declaration</u>").  In further support of the Motion, the Debtors respectfully state as follows:

## **Background**

1.      LSC Communications, Inc. is a Delaware corporation established in 2016 with its headquarters located in Chicago, Illinois.  The Debtors offer a broad range of traditional and digital print products, print-related services and office products.

2.      On April 13, 2020 (the "<u>Petition Date</u>"), each of the Debtors filed with the Court a voluntary petition for relief under the Bankruptcy Code.  Each Debtor continues to operate its business and manage its properties as a debtor-in-possession pursuant to sections

-2-

1107(a) and 1108 of the Bankruptcy Code.  Concurrent with the filing of this Motion, the

Debtors filed a motion with the Court pursuant to Bankruptcy Rule 1015 seeking joint

administration of the Debtors' cases (the "Chapter 11 Cases").  No creditors' committee, trustee

or examiner has been appointed in these Chapter 11 Cases.

3.      Additional factual background relating to the Debtors' businesses and the

commencement of these Chapter 11 Cases is set forth in detail in the First Day Declaration.

### Facts Specific to the Relief Requested

4.      The Debtors are primarily in the business of providing printing, binding,

warehousing and logistics services to customers.  The lifeline of the Debtors' businesses is their

access to, and relationship with, their network of vendors and suppliers (the "Trade Creditors")

that manufacture, sell or deliver the goods, services and supplies (the "Raw Materials") the

Debtors use to operate their production facilities and ultimately, to produce customers' finished

products (*e.g.*, books, magazines, catalogs, office products) (the "Finished Products") and

generate revenue.

5.      Most of the Raw Materials are high-turnover production inputs of which

the Debtors' have limited inventories on hand.  If the Trade Creditors reduce the volume or

timeliness of deliveries, the Debtors will be unable to fulfill customer orders with the quality and

efficiency that customers demand in the competitive printing and print-related services industry.

If this were to happen, their customers—some of the largest book, magazine and catalog

publishers and well-known office supply retailers—will simply take their business to the

Debtors' competitors to the detriment of the Debtors' estates.

6.      Even minor disruptions in the Debtors' supply chain could have far-

reaching economic and operational impacts on the Debtors' businesses and irreparably harm the

goodwill the Debtors have earned over the years with their customers.  Such a disruption could

ultimately be felt by large and small businesses, consumers, students and educators and could accelerate the ongoing migration from print to digital delivery of content in the markets the Debtors serve; this would be detrimental to the Debtors' ongoing businesses.

7.     As of the Petition Date, the Debtors owe approximately $138.3 million on account of all accounts payable to the Debtors' Trade Creditors.  By this Motion, the Debtors are only seeking authority to pay an amount necessary to preserve the value of their estates, which (i) shall not exceed $9.6 million on an interim basis and $19.3 million on a final basis on account of prepetition claims held by Critical Vendors and accrued in the ordinary course of business (collectively, the "Critical Vendor Claims") and (ii) the Debtors estimate to be no greater than $34.5 million on account of Potential Lien Claims (as defined below, and together with Critical Vendor Claims, the "Vendor Obligations") accrued in the ordinary course of business.

8.     The Debtors are not seeking to pay all Vendor Obligations immediately; rather, if authorized by the Court to pay such claims, the Debtors will process such payments they have deemed in their business judgment to be critical in accordance with their normal accounts payable procedures, as they become due and payable in the ordinary course of the Debtors' businesses and consistent with past practice.  As of the Petition Date, the Debtors have approximately $24 million in cash on hand.  Cash maintained by the Debtors, combined with the requested postpetition financing and the cash generated in the ordinary course of business, will provide ample liquidity for the payment of the Vendor Obligations, as well as for the Debtors to conduct operations during these Chapter 11 Cases.

## I.     Critical Vendors

9.     The Debtors' supply chain consists of certain indispensable foreign and domestic Trade Creditors (collectively, the "Critical Vendors") that supply Raw Materials that

SC1:5176533.9

are essential to the Debtors' operations (collectively, the "Critical Products and Services").  The

Critical Products and Services fall into the following categories: (a) Raw Materials from

suppliers which are incorporated into the Finished Products that the Debtors manufacture for

and/or sell to customers and (b) outsourced services and goods that the Debtors are unable to

provide from internal resources, including back-office services, information technology,

specialized or overflow binding capacity and specialized parts, services and components used in

the operation of the production facilities or to create finished products, some of which are

required under customer contracts.  Without these Critical Products and Services, the Debtors

would be unable to meet the needs of their businesses, effectively serve their customers or

maintain their reputation within the competitive printing industry.

10.    The Debtors obtain the Critical Products and Services from a limited

number of highly-specialized vendors—often on an order-by-order basis and without long-term

contracts.  Because of the Debtors' financial position, the Debtors believe that the trade

relationships with the Critical Vendors may materially deteriorate if the Debtors are unable to

pay the Critical Vendor Claims.[2]  As such, it is essential that the Debtors retain the ability to pay

the portion of Critical Vendor Claims that are necessary to maintain the stability of the Debtors'

supply chain.  The Debtors and their advisors have spent significant time identifying potential

Critical Vendors and estimating the total amount of Critical Vendor Claims that the Debtors need

to pay in order to maintain stable business operations.  The Debtors estimate this amount to be

approximately $9.6 million on an interim basis and approximately $19.3 million on a final basis.

---

[2]    In most cases where the Debtors have existing contracts with the Critical Vendors, such contracts provide only a
framework for the issuance of purchase orders but do not require performance.  Thus, the Debtors' postpetition
ability to use the contracts to compel the Critical Vendors to continue to provide goods and services is limited.
In addition, certain Critical Vendors that are party to long-term written contracts may cease or delay
performance under such contracts postpetition, notwithstanding the application of the automatic stay, causing
irreversible harm to the Debtors' business.  The Debtors seek authority to pay such Critical Vendors as
necessary, in their business judgment, to ensure continued performance.

SC1:5176533.9

11.     The Debtors rely on the Critical Vendors to make future deliveries, and many of the Critical Products and Services are available only from one or a limited number of vendors.  Furthermore, a number of these suppliers are dependent on timely payment from the Debtors and are believed to be unable to financially sustain a delay in any payment of prepetition amounts due from the Debtors because sales to the Debtors account for such a significant percentage of such suppliers' overall sales.  Other Critical Vendors are local suppliers to specific plants that are often located in geographically remote areas and are not replaceable.

12.     Some of the Critical Vendors are foreign suppliers (the "Foreign Vendors") who are likely to be skeptical of the United States bankruptcy process and unfamiliar with vendor requirements under chapter 11.  Indeed, many of the Foreign Vendors may argue that they are not subject to the jurisdiction of the Bankruptcy Court or the provisions of the Bankruptcy Code that would otherwise protect the Debtors' assets and business operations.  As a result, there is a risk that Foreign Vendors could sue or otherwise initiate legal actions against the Debtors in foreign courts to recover prepetition amounts owed to them, if the Foreign Vendors' prepetition claims remain unpaid.  If the Foreign Vendors were successful in obtaining judgments against the Debtors, the Foreign Vendors could seek to exercise post-judgment remedies, including withholding vital supplies from the Debtors.  Accordingly, nonpayment of prepetition claims may cause the Foreign Vendors to delay shipment or stop filling the Debtors' orders.   The Debtors would have no practical ability to remedy this situation absent payment of prepetition claims, and their business operations would be irreparably harmed to the detriment of their estates and their creditors.

13.     Furthermore, the Debtors' directors and officers may be subject to lawsuits in certain foreign jurisdictions during the pendency of the Chapter 11 Cases on account

of nonpayment.  Such lawsuits would be a significant distraction for the Debtors at a time when they should be focused on the Debtors' efforts to stabilize their post-petition business operations to achieve their chapter 11 goals successfully.

14.     If the Critical Vendors ceased doing business with the Debtors, the Debtors may not be able to locate alternative sources for the Critical Products and Services on reasonable commercial terms, or at all.  Even a temporary halt of the provisions of Critical Products and Services would reduce the efficiency of the Debtors' operations and, in certain instances, could require the suspension of operations altogether.  This harm and disruption would far outweigh the costs of payment of the Critical Vendor Claims.  Accordingly, maintaining the ability to pay Critical Vendor Claims under the relief requested herein will help maintain stakeholder value.

15.     Finally, the Debtors pay most of the Critical Vendors within 30 days of the applicable invoice date.  As a result, many of the Debtors' Critical Vendors may have Critical Vendor Claims for goods that were delivered in the ordinary course of business within the 20-day period prior to the Petition Date, and which therefore may be afforded administrative priority under section 503(b)(9) of the Bankruptcy Code (collectively, the "Critical Vendor 503(b)(9) Claims" and such claimants, the "503(b)(9) Claimants").  As a result, for this subset of the Critical Vendor Claims, the relief sought herein will only affect the timing, but not the amount, of payment.  Of the total $19.3 million in Critical Vendor Claims, approximately $7.1 million would be Critical Vendor 503(b)(9) Claims, of which, approximately $2.83 million will be due and payable within the first 30 days of these Chapter 11 Cases.

II.    **Potential Lien Claimants**

16.    The Debtors' businesses serve the needs of publishers, merchandisers, retailers and other organizations worldwide with a service offering that includes, in addition to traditional printing and binding services, logistics, warehousing and fulfillment and supply chain management services.  Across the Debtors' range of print products and services, the Debtors' ability to win business over competitors is based largely on their ability to deliver customers' Finished Products for the lowest total cost to the locations where such customers direct, including the United States Postal Service ("USPS") and customers' warehouses and other facilities, distributors and retailers.  In fact, the Debtors are one of the largest providers of mail to the USPS.

17.    To accomplish this, the Debtors have negotiated favorable pricing terms with various shippers, common carriers, movers, consolidators, distributors, brokers and freight forwarders (collectively, the "Shippers" and their claims, the "Shipper Claims") to both ensure the timely delivery of Raw Materials that are used as production inputs and work-in-progress ("WIP" and together with the Raw Materials and Finished Products, the "Goods") across and between the Debtors' 48 production facilities and to facilitate on-time delivery of Finished Products from the Debtors' production facilities to the customers, the USPS, and in some cases, to the customers' end consumers.

18.    The Debtors' ability to obtain favorable pricing with these Shippers helps catalogers, retailers and magazine and book publishers reduce their overall cost of producing and distributing their products as postage expense often accounts for approximately half of these publishers' costs to produce and deliver a magazine or catalog.  In 2019, the Debtors shipped approximately 370,000 truckloads of Finished Products, totaling 4.5 billion pounds across 4.4

SC1:5176533.9

million orders.  Without the Debtors' logistics services, it would be virtually impossible for the

Debtors' customers to get their Finished Products delivered to newsstands, to the USPS for

mailing to consumers' homes, to newspapers for insertion, or to schools and other retail

locations.  As further evidence of the strength and importance of the Debtors' logistics network,

the Centers for Disease Control and Prevention recently arranged for delivery of over 100

million postcards through the Debtors' logistics services, with additional mailings of similar size

and scope planned, as part of an ongoing effort to provide critical health and safety information

regarding the COVID-19 virus to every U.S. household.

19.    Despite a general retraction in the printing business, the Debtors have been

growing their logistics revenue over the last several years.  A significant majority of that revenue

relies on a network of approximately 6,500 Shippers that handle the transportation and delivery

of the Finished Products, approximately 250 of which account for 90% of the volume of

shipments.  The Debtors' network of Shippers affords them a competitive advantage by allowing

the Debtors to obtain the lowest cost on the spot market from a large and geographically diverse

group, many of whom are small "mom & pop" Shippers that do business with the Debtors on a

purchase order basis and would not be able handle the disruption in cash flow if not paid on time.

20.    Some of the Goods also are routed through third-party warehousemen,

bailees, consignees, storage and consolidation facilities, distributors, loading and unloading

services and other storage providers for short- or long-term storage (collectively, the

"Warehousemen," and together with the Shippers, the "Potential Lien Claimants" and their

prepetition claims, collectively, the "Potential Lien Claims").

21.    In the event that the Debtors fail to reimburse the Potential Lien Claimants

for charges incurred in connection with the transport of Goods to and from the Debtors'

facilities, various state laws may permit the Potential Lien Claimants to assert liens against the

Goods in their possession that are subject to any delinquent charges, securing such charges and

potentially blocking the Debtors' and customers' access to the Goods, notwithstanding section

362 of the Bankruptcy Code.  Many of these Potential Lien Claimants currently have Goods in

their possession and if they refuse to deliver these Goods, the outcome could be catastrophic to

the Debtors' estates, as well as the Debtors' customers.

22.     If the Potential Lien Claimants retain the Debtors' Raw Materials or WIP

deliverable to Debtors' plants, the Debtors businesses would be unable to fulfill customer orders

on a timely basis, damaging the Debtors' reputation and depriving them of much needed income.

The Shippers also could assert liens on Finished Products.  If the Debtors do not deliver Finished

Products in a timely manner, the Finished Products may be worthless to the customer.  For

example, the April issue of a magazine must hit the newsstands on time in order to meet

customer requirements; if it is late the customers will not pay for the Finished Product.

Similarly, catalog customers often increase their staffing and acquire inventory with the

expectation that catalogs will be delivered on a particular date; if the catalogs are not delivered

on-time, some of these customers could be forced to reduce their workforce and may be unable

to adjust their inventory accordingly.  Such a situation could be ruinous to the Debtors'

businesses, depress revenue and potentially result in postpetition breaches of contract and

damages claims.

23.     Moreover, the value of the Goods in the possession of the Potential Lien

Claimants generally exceeds the value of the Shippers' respective prepetition claims.  In other

cases—such as with Finished Products that lose nearly all value after the intended distribution

date—pursuant to section 363(e) of the Bankruptcy Code, the Shippers may be entitled to

SC1:5176533.9

adequate protection of any valid possessory lien, which would further drain the Debtors' estates. In either event, the cost of such disruptions to the Debtors' estates caused by non-payment would likely be greater than the applicable claim.

24.     In light of the Debtors' prepetition financial condition, certain Potential Lien Claimants imposed additional commercial requirements on the Debtors as a condition of continued business and implemented onerous trade terms due to Debtors' perceived weakened liquidity position, including significantly reducing payment cycles and demanding cash in advance.  Accordingly, the Debtors have determined, in the exercise of their business judgment, that payment of the Potential Lien Claims is essential to avoid costly disruptions to their operations.  The Debtors estimate Potential Lien Claims to be approximately $34.5 million.

**III.    Outstanding Orders**

25.     Prior to the Petition Date, and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (the "Outstanding Orders").  To avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.  To prevent any disruption to the Debtors' business operations, and given that goods delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors seek an order (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors, in the Debtors' sole discretion, arising from the postpetition acceptance of goods subject to Outstanding Orders and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

IV.    **Trade Terms Conditions**

26.    Subject to the Court's approval, the Debtors intend to pay only those Vendor Obligations necessary to avoid disruption of the Debtors' supply chain and preserve their operations on a go-forward basis.  To that end, in return for paying a Vendor Obligation either in full or in part, the Debtors propose that they be authorized to require that a Vendor Claimant provide favorable trade terms for the postpetition procurement of goods and services from such Vendor Claimant.  Specifically, the Debtors seek authorization to condition payment of Vendor Obligations upon each Vendor Claimant's agreement to continue—or recommence—supplying goods and services to the Debtors in accordance with trade terms at least as favorable to the Debtors as those that were in place during the twelve months prior to the Petition Date, or on terms otherwise satisfactory to the Debtors in their reasonable discretion.

27.    Specifically, the Debtors propose that all payments made under the Orders be subject to the following conditions:

a.    The Debtors, in their discretion and subject to the terms set forth below, shall determine which Vendor Obligations, if any, will be paid pursuant to the Orders;

b.    Unless the parties agree to different terms and conditions, if a Vendor Claimant accepts payment, such Vendor Claimant is deemed to have agreed to continue to provide goods and/or services to the Debtors, on terms that are as good as or better than the terms and conditions (including credit terms) contained in any binding prepetition contract (including any master agreement covering purchase orders) with the Debtors or, in the absence of such contract, such terms and conditions that existed 120 days prior to the date of the commencement of these cases (collectively, the "Customary Terms"), during the pendency of these Chapter 11 Cases;

c.    In the event that a Vendor Claimant does not have a binding prepetition contract with the Debtors and the relationship between such Vendor Claimant accepting payment under this Motion and the Debtors does not extend to 120 days before the Petition Date, the Customary Terms shall mean the terms that the Vendor

-12-

Claimant generally extends to its customers or such terms as are acceptable to the Debtors in the reasonable exercise of their business judgment;

d. The Debtors may, in their discretion, require Vendor Claimants to acknowledge in writing that payment of their respective claims is conditioned on such Vendor Claimant's continuing to provide goods and/or services on Customary Terms during the pendency of these Chapter 11 Cases. The Debtors reserve the right to negotiate new trade terms with any Vendor Claimant as a condition to payment of any Vendor Obligation.

e. If a Vendor Claimant accepts payment and thereafter does not continue to provide goods and/or services on at least the Customary Terms (or as otherwise agreed by the Debtors) during the pendency of these Chapter 11 Cases, then the Debtors may, in their discretion, deem (i) any payment on a prepetition claim received by such Vendor Claimant to be an unauthorized voidable postpetition transfer under section 549 of the Bankruptcy Code and, therefore, (A) recoverable by the Debtors in cash upon written request and (B) upon recovery by the Debtors, any such prepetition claim shall be reinstated as if the payment had not been made; or (ii) such payment to apply instead to any postpetition amount that may be owing to such Vendor Claimant;

f. In consideration for the payment of any Vendor Obligation, each Vendor Claimant shall be deemed to agree not to file or otherwise assert against the Debtors, their estates or any other person or entity or any of their respective assets or property (real or personal) any lien (a "Lien"), claim for reclamation ("Reclamation Claim"), claim under Bankruptcy Code section 503(b)(9) (a "503(b)(9) Claim"), or any similar priority claim under the Bankruptcy Code or other statute (a "Priority Claim") regardless of the statute or other legal authority upon which such Lien, Reclamation Claim, 503(b)(9) Claim, or Priority Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to such Vendor Claimant by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date and, to the extent the Vendor Claimant has already obtained or otherwise asserted such a Lien, Reclamation Claim, 503(b)(9) Claim, or Priority Claim, such Vendor Claimant shall take (at the Vendor Claimant's own expense) whatever actions are necessary to remove such Lien or withdraw such Reclamation Claim, 503(b)(9) Claim, or Priority Claim;

g. If the Debtors seek to recover a payment from a Vendor Claimant because the Vendor Claimant does not continue to provide goods

-13-

and/or services to the Debtors on at least the Customary Terms during the pendency of and after these Chapter 11 Cases, the Vendor Claimant may contest such action by making a written request (a "Request") to the Debtors to schedule a hearing before this Court. Such Vendor Claimant must serve such Request via both mail and email on the following parties so that it is actually received: (i) LSC Communications, Inc., 191 North Wacker Drive, Suite 1400, Chicago, Illinois 60606, Attn: Suzanne Bettman, sue.bettman@lsccom.com, (ii) Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004, Attn: Andrew G. Dietderich and Christian P. Jensen, dietdericha@sullcrom.com and jensenc@sullcrom.com and (iii) counsel to any statutory committee appointed in these Chapter 11 Casese. If such a Request is properly served, the Debtors shall provide notice of a hearing on such Request to the Vendor Claimant making the Request and other interested parties in accordance with the Bankruptcy Code and the orders of this Court; and

h.   Prior to making a payment on disputed claims to a Vendor Claimant under the Orders, the Debtors may settle all or some of the disputed prepetition claims of such Vendor Claimant for less than their face amount without further notice or hearing.

## **Jurisdiction**

28.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicates for the relief requested herein are sections 105(a), 363, 503(b) 1107 and 1108 of the Bankruptcy Code and Bankruptcy Rule 6003.

## **Relief Requested**

29.     By this Motion, the Debtors request entry of the Interim and Final Orders, substantially in the forms attached hereto as Exhibit A and Exhibit B, respectively, (a) authorizing, but not directing, the Debtors, in their sole discretion, to pay prepetition claims of (i) Critical Vendors in an amount not to exceed $9.6 million on an interim basis and $19.3 million of a final basis and (ii) Potential Lien Claimants, (b) confirming administrative expense

-14-

priority of Outstanding Orders, (c) authorizing applicable banks and other financial institutions

to honor and process related checks and transfers and (d) granting certain related relief, including

scheduling the Final Hearing.  For the avoidance of doubt, pursuant to this Motion, the Debtors

seek authority to pay amounts only as they come due in the ordinary course of business or as

may be necessary to secure a Vendor Claimant's agreement to continue to conduct business with

the Debtors on Customary Terms and shall not otherwise seek to accelerate payment of amounts

that would not otherwise come due within the first 30 days of these Chapter 11 Cases.

**Basis for Relief**

I.    **Payment of the Vendor Obligations Is Appropriate Under Sections 105(a), 363(b), 1107(a) and 1108 of the Bankruptcy Code.**

30.    The relief requested is appropriate under sections 105(a), 363(b), 1107(a)

and 1108 of the Bankruptcy Code.  The Debtors are operating their business as debtors-in-

possession under sections 1107(a) and 1108 of the Bankruptcy Code, and they are therefore

fiduciaries "holding the bankruptcy estate[s] and operating the business for the benefit of . . .

[their] creditors and (if the value justifies) equity owners."  *In re CoServ, L.L.C.*, 273 B.R. 487,

497 (Bankr. N.D. Tex. 2002).  Implicit in the duties of a chapter 11 debtor-in-possession is the

duty "to protect and preserve the estate, including an operating business's going-concern value."

*Id.*  Consistent with a debtor's fiduciary duties to preserve the estate, courts have authorized

payment of prepetition obligations pursuant to sections 105(a) and 363(b) of the Bankruptcy

Code.  *See, e.g., In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (stating

that section 363(b) provides "broad flexibility" for a debtor to satisfy prepetition claims where

supported by a proper business justification); *In re Just for Feet, Inc.*, 242 B.R. 821, 824 (D. Del.

1999) ("Section 105(a) of the Code provides a statutory basis for the payment of pre-petition

claims.").  Indeed, courts have recognized that there are instances when a debtor's fiduciary duty

SC1:5176533.9

can "only be fulfilled by the preplan satisfaction of a prepetition claim." *In re CoServ, L.L.C.*, 273 B.R. at 497.

31.     Section 363(b) of the Bankruptcy Code empowers the Court to allow the debtor, in the exercise of its sound business judgment and after notice and a hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate." *See* 11 U.S.C. § 363(b)(1); *see also Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co.* v. *LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143, 145 (2d Cir. 1992) (holding that a court may approve an application under section 363(b) upon a showing of a good business reason for the disposition).  For a court to approve the use, sale, or lease of estate property under section 363(b) of the Bankruptcy Code, the debtor must "articulate some business justification, other than mere appeasement of major creditors . . . ." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175 (holding that the debtor's payment of prepetition claims was necessary to protect its business and to ensure successful reorganization).  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted).  Under this section, a court may authorize a debtor to pay certain prepetition claims.  *See In re Ionosphere Clubs, Inc.*, 98 B.R. at 175.

32.     Additionally, section 105(a) of the Bankruptcy Code authorizes the Court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."  *In re Ionosphere Clubs, Inc.*, 98

-16-

SC1:5176533.9

B.R. at 175.  Under section 105(a), the Court "can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor." *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992); *see also In re Just for Feet, Inc.*, 242 B.R. at 825 ("To invoke the necessity of payment doctrine, a debtor must show that payment of the pre-petition claims is critical to the debtor's reorganization").

33.    Courts in this district have recognized the "necessity of payment" doctrine.  *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. at 176 (recognizing "the existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is essential to the continued operation of the debtor" and stating that the necessity of payment doctrine "permits immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganizational claims shall have been paid"); *In re Fin. News Network, Inc.*, 134 B.R. 732, 736 (Bankr. S.D.N.Y. 1991) (stating that the doctrine of necessity "stands for the principle that a bankruptcy court may allow pre-plan payments of prepetition obligations where such payments are critical to the debtor's reorganization").

34.    The necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy of Chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 176; *In re Chateaugay Corp.*, 80 B.R. 279,  287 (S.D.N.Y. 1987)  (authorizing payment of prepetition workers' compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); *In re Just for Feet*, 242 B.R. at 826 (finding that payment of  prepetition claims to certain trade vendors was "essential to the

survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[A] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process").

35.    The relief requested in this Motion represents a sound exercise of the Debtors' business judgment and is necessary for the preservation of the resources and going concern values of their estates.  Payment of the Vendor Obligations as they become due in the ordinary course of business is critical to the Debtors' uninterrupted operations as such payments will facilitate the ongoing delivery of Goods to and from the Debtors' facilities as required to fulfill customer orders and provide much needed revenue to the Debtors' businesses. Nonpayment of Critical Vendor Claims would likely result in Critical Vendors refusing to provide essential goods and services and/or conditioning the delivery of such goods and services on compliance with onerous and commercially unreasonable terms.  Indeed, where a Critical Vendor may itself be facing financial hardship, the Debtors' failure to pay Critical Vendor Claims may leave such Critical Vendor with little choice but to stop working for and delivering to the Debtors.  Nonpayment of Potential Lienholder Claims could likewise result in Potential Lien Claimants retaining possession of Raw Materials and Finished Product and exercising their lien rights, notwithstanding the automatic stay.

36.    This chain of events could lead to a material disruption to the Debtors' operations and cause irreparable harm to the Debtors' businesses, goodwill and market share,

and ultimately, their ability to restructure pursuant to a confirmed plan.  Replacement vendors

and the search for such vendors, even to the extent available, would likely result in substantially

higher costs for the Debtors and subject the Debtors to risk of operational shutdowns and

noncompliance with state regulations.

37.      Moreover, the Debtors cannot rely on prosecuting motions to compel the

Vendor Claimants to perform to address any potential holdups as their primary means of

ensuring an uninterrupted supply of goods and services.  A disruption may occur before the

Debtors would be able to successfully bring an action in the Court to compel performance or

otherwise enforce the automatic stay.  In addition, the Debtors interact with the Vendor

Claimants pursuant to a variety of arrangements, including many arrangements that may not be

executory in nature.  The counterparty of such an arrangement may decide not to continue to do

business with the Debtors unless paid on account of prepetition amounts due from the Debtors,

and would be under no obligation to do so.

38.      Where, as here, debtors have shown that the payment of prepetition claims

is critical to maximize the value of their estates, courts in this district have routinely authorized

payments similar to those described in this Motion.  *See, e.g.*, *In re Windstream Holdings, Inc.*,

19-22312 (RDD) (Apr. 22, 2019), D.I. 377 (authorizing payments of up to $80 million in

prepetition claims to critical vendors and an additional $91 million for prepetition claims of lien

claimants); *In re Trident Holding Co., LLC*, 19-10384 (SHL) (Mar. 18, 2019), D.I. 219

(authorizing payment for prepetition claims of critical vendors and shippers); *In re Aegean

Marine Petrol. Network Inc.*, 18-13374 (MEW) (Dec. 6, 2018), D.I. 150 (approving the payment

of prepetition claims of, among others, certain essential vendors, foreign vendors and potential

lien claimants who could refuse to deliver or return the debtors' goods if prepetition claims were

not satisfied); *In re Sears Holding Corp.*, 18-23538 (RDD) (Nov. 16, 2018), D.I. 793

(authorizing payment of up to $90 million on a final basis on account of claims held by critical

vendors); *In re Tops Holding II Corp.*, 18-22279 (RDD) (Mar. 22, 2018), D.I. 183 (authorizing

payment of up to $36 million on account of claims held by critical vendors); *In re Avaya Inc.*,

17-10089 (SMB) (Feb. 10, 2017), D.I. 139 (authorizing payments of up to $39.5 million in

prepetition claims to critical vendors and $2.5 million in prepetition claims to carriers and

warehousemen).

39.     Allowing the Debtors to pay Vendor Obligations as set forth herein is

especially appropriate where, as here, doing so is consistent with the "two recognized policies"

of chapter 11 of the Bankruptcy Code—preserving going concern value and maximizing the

value of property available to satisfy creditors. *See Bank of Am. Nat'l Trust Savs. Ass'n v. 203

N. LaSalle St. P'Ship.*, 526 U.S. 434, 453 (1999). Based on these circumstances, the Debtors

submit that the relief requested herein represents a sound exercise of the Debtors' business

judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is

therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code.

## II.     Certain Critical Vendors Are Entitled to Administrative Expense Priority Under Section 503(b)(9) of the Bankruptcy Code and Payment of Critical Vendor 503(b)(9) Claims Should be Authorized.

40.     Certain Critical Vendor Claims relate to goods delivered to the Debtors

within the 20 days prior to the Petition Date. Section 503(b)(9) of the Bankruptcy Code

provides that such Critical Vendor Claims hold administrative expense priority against the

applicable Debtor's estate. Such Critical Vendor Claims, therefore, must be paid in full to

confirm a plan of reorganization. *See* 11 U.S.C. § 1129(a)(9)(A) (requiring payment in full of

claims entitled to priority). Consequently, payment of such claims now only provides such

parties with what they would be entitled to receive under a confirmed plan. Moreover, the

Bankruptcy Code does not prohibit a debtor from paying administrative claims prior to

confirmation. The Debtors believe that this relief is in the best interest of the Debtors' estates

and will prevent detrimental changes to trade terms or a refusal to do business altogether, thereby

preserving the Debtors' liquidity and operations.

41.     The Debtors' ongoing ability to obtain materials and products as provided

herein is key to their reorganization and necessary to preserve the value of their estates. Absent

the payment of the Critical Vendor 503(b)(9) Claims at the outset of these Chapter 11 Cases—

which may merely accelerate the timing of payment and not the ultimate treatment of such

claims—the Debtors could be denied access to materials and products necessary to maintain the

Debtors' business operations and maximize the value of the Debtors' estates.

42.     Instead of satisfying the Critical Vendor 503(b)(9) Claims after

confirmation of a plan of reorganization (at which time such payments may be too late to benefit

the Debtors' estates), the Debtors seek authority to pay these claims in the ordinary course of

business, while such payments can still induce 503(b)(9) Claimants to adhere to favorable trade

terms and do business with the Debtors on a go-forward basis. Failure to honor these claims in

the ordinary course of business may also cause the Debtors' vendor base to withhold support for

the Debtors during the chapter 11 process. Such vendors could accelerate or eliminate favorable

trade terms. The payment of Critical Vendor 503(b)(9) Claims is in the best interests of the

Debtors' estates because favorable trade terms will prevent material disruptions to the Debtors'

operations. Such costs and distractions could impair the Debtors' ability to stabilize their

operations at this critical juncture to the detriment of all stakeholders.

SC1:5176533.9

III.    **Failure to Make Timely Payment to Potential Lien Claimants Would Threaten the Debtors' Ability to Operate.**

43.    As noted above, certain Potential Lien Claimants may be entitled under applicable non-bankruptcy law to assert certain possessory liens on the Debtors' Goods or equipment in their possession (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claims.

44.    Without payment, the Potential Lien Claimants may be unwilling to release the Goods in their possession against which they may be entitled to assert liens because doing so may convert their claims against the Debtors from secured to unsecured. Pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting certain possessory liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay. As a result, the Debtors anticipate that certain of the Potential Lien Claimants may assert or perfect liens, refuse to turn over Goods in their possession or stop performing their ongoing obligations. Even absent a valid lien, to the extent certain Potential Lien Claimants have possession of the Debtors' Goods, mere possession or retention would be catastrophic to the Debtors' ongoing operations.

45.    Furthermore, paying the Potential Lien Claimants should not impair unsecured creditor recoveries in these Chapter 11 Cases. In instances where the amount owed to Potential Lien Claimants is less than the value of the goods that could be held to secure a shipping, such parties may be fully-secured creditors of the Debtors' estates. In such instances, payment now only provides such parties with what they might be entitled to receive under a plan of reorganization, only without any interest or adequate protection costs that might otherwise accrue during these chapter 11 cases. Conversely, all creditors will benefit from the seamless

-22-

transition of the Debtors' operations into bankruptcy and the ultimate delivery and sale of the Debtors' products to their customers.

46.     The relief requested in this Motion is appropriate under sections 363(b) and 105(a) of the Bankruptcy Code, as discussed above, represents a sound exercise of the Debtors' business judgment and is necessary for the preservation of the resources and going concern values of their estates.  Payment of the Potential Lien Claims as they become due in the ordinary course of business is critical to the Debtors' uninterrupted operations as such payments will facilitate the flow of goods among the Debtors production facilities, will help ensure prompt customer deliveries, and ultimately, maximize the value of the Debtors' estates.

47.     Where, as here, debtors have shown that the payment of Potential Lien Claims is critical to maximize the value of their estates, courts in this district have routinely authorized payments similar to those described in this motion.  *See, e.g.*, *In re Windstream Holdings, Inc.*, 19-22312 (RDD) (Apr. 22, 2019), D.I. 377 (authorizing the payment of prepetition claims of among others, lien claimants on the basis that they could cease to provide specialized services necessary to maintain the smooth operation of the debtors' business otherwise); *In re Aegean Marine Petroleum Network Inc.*, 18-13374 (MEW) (Dec. 6, 2018), D.I. 150 (same); *In re Nine West Holdings, Inc.*, 18-10497 (SCC) (May 7, 2018), D.I. 214 (approving the payment of prepetition claims of shippers, warehousemen, and other critical claimants on the basis that shippers and warehousemen could refuse to deliver or return the debtors' goods if prepetition claims were not satisfied); *In re Cenveo, Inc.*, 18-22178 (RDD) (Mar. 8, 2018), D.I. 169 (authorizing payment of certain lien claimants' prepetition claims when lien claimants are able to assert possessory liens on the debtors' goods in the event of non-payment); *In re Avaya*

*Inc.*, 17-10089 (SMB) (Feb. 10, 2017), D.I. 139 (approving payment of prepetition claims of shipper, warehousemen and other claimants).

## IV.  The Court Should Confirm that Outstanding Orders Are Administrative Expense Priority Claims and that Payment of Such Claims Is Authorized.

48.    Pursuant to section 503(b) of the Bankruptcy Code, most obligations that arise in connection with the postpetition delivery of goods and services, including goods ordered prepetition, are administrative expense priority claims because they benefit the estate postpetition. *See* 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and expenses of preserving the estate" are administrative expenses); *see also In re John Clay & Co.*, 43 B.R. 797, 809–10 (Bankr. D. Utah 1984) (holding that goods ordered prepetition but delivered postpetition are entitled to administrative priority). Thus, the granting of the relief sought herein with respect to the Outstanding Orders will not provide the suppliers with any greater priority than they would otherwise have if the relief requested herein were not granted, and will not prejudice any other party in interest.

49.    Absent the relief requested herein, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to provide the suppliers with assurance of such administrative priority.  Any disruption to the continuous and timely flow of goods to the Debtors could result in substantial delays in the Debtors' operations, which could lead to dissatisfied customers and reduced sales. Accordingly, the Debtors submit that the Court should confirm the administrative expense priority status of the Outstanding Orders and should authorize the Debtors to pay the Outstanding Orders in the ordinary course of business.

SC1:5176533.9

**V.**      **Cause Exists to Authorize Applicable Banks and/or Financial Institutions to Honor Checks and Electronic Fund Transfers.**

50.      The Debtors further request that the Court authorize and direct all applicable banks and other financial institutions (the "Banks") to receive, process, honor, and pay any and all checks drawn or electronic funds transfers requested to pay Critical Vendor Claims, whether such checks were presented prior to or after the Petition Date; *provided, however,* that such checks or electronic funds transfers are identified by the Debtors as relating directly to the authorized payment of the Critical Vendor Claims.  The Debtors also seek authority to issue new postpetition checks, or effect new electronic funds transfers, on account of such claims to replace any prepetition checks or electronic funds transfer requests that may be dishonored or rejected as a result of the commencement of these Chapter 11 Cases with respect to prepetition amounts owed in connection with any Critical Vendor Claims.

**Bankruptcy Rule 6003 Is Satisfied**

51.      In order for a debtor to obtain relief to make preplan payments within 21 days of the Petition Date, it must establish that making such payments satisfies the requirements mandated by Bankruptcy Rule 6003—namely, the relief requested is necessary to avoid "immediate and irreparable harm."  If a debtor's prospect of reorganizing is threatened, or swift diminution in value of the debtor's estate is likely absent the granting of the requested relief, immediate and irreparable harm likely exists.  *See In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 469 (Bankr. S.D.N.Y. 2009) (finding that relief requested by the debtors was necessary to avoid irreparable harm to the debtors and their estates because such relief was essential for the continued operation of the debtors' businesses).

52.      Immediate and irreparable harm would result if the relief requested herein is not granted.  As described above, if the Debtors are not authorized to pay Critical Vendors in

the ordinary course of business, Critical Vendors may refuse to provide goods and services to the

Debtors, which would impair the Debtors' ability to service their customers and disrupt their

operations.  These effects would undermine customers' confidence in the Debtors, thereby

causing immediate and irreparable harm.  Failure to receive the requested relief during the first

21 days of these Chapter 11 Cases would severely disrupt the Debtors' operations at this

important juncture.  For the reasons discussed herein, the relief requested is necessary for the

Debtors to operate their businesses in the ordinary course and preserve the ongoing value of the

Debtors' operations and maximize the value of their estates for the benefit of all stakeholders.

Accordingly, the Debtors respectfully submit that they have satisfied Bankruptcy Rule 6003 as it

relates to the relief requested herein.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

53.     Given the nature of the relief requested herein, the Debtors respectfully

request a waiver of (a) the notice requirements under Bankruptcy Rule 6004(a) and (b) the 14-

day stay under Bankruptcy Rule 6004(h).  Pursuant to Bankruptcy Rule 6004(h), "[a]n order

authorizing the use, sale, or lease of property other than cash collateral is stayed until expiration

of 14 days after entry of the order, unless the court orders otherwise."  For the reasons described

above, the relief requested is essential to prevent potentially irreparable damage to the Debtors'

operations, value and ability to reorganize.

## Reservation of Rights

54.     Nothing in this Motion: (a) is intended or shall be deemed to constitute an

assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as

to the validity of any claim against the Debtors or their estates; (b) shall impair, prejudice, waive,

or otherwise affect the rights of the Debtors or their estates to contest the validity, priority, or

amount of any claim against the Debtors or their estates; (c) shall impair, prejudice, waive, or

otherwise affect the rights of the Debtors or their estates with respect to any and all claims or

causes of action against any third party; or (d) shall be construed as a promise to pay a claim or

continue any applicable program postpetition, which decision shall be in the discretion of the

Debtors.  Any payment made pursuant to an order of the Court granting the relief requested

herein is not intended to be nor should it be construed as an admission as to the validity of any

claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Notice

55.    No creditors' committee, trustee, or examiner has been appointed in these

Chapter 11 Cases.  Notice of this Motion has been provided to: (a) the Office of the United

States Trustee for the Southern District of New York; (b) counsel to Bank of America, N.A., as

administrative agent for the Debtors' prepetition credit facility and DIP credit facility, Moore &

Van Allen PLLC, 100 North Tryon Street, Suite 4700, Charlotte, North Carolina 28202,

Attn: David L. Eades and Charles (Trey) R. Rayburn III; (c) the parties identified on the Debtors'

consolidated list of 50 largest unsecured creditors; (d) counsel to the ad hoc group of term

lenders, Arnold & Porter Kaye Scholer LLP, 70 West Madison Street, Suite 4200, Chicago, IL

60602-4231, Attn: Michael D. Messersmith and Sarah Gryll; (e) counsel to the ad hoc group of

secured noteholders, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the

Americas, New York, NY 10019-6064, Attn: Andrew N. Rosenberg and Alice B. Eaton; and (f)

to the extent not listed herein, those parties requesting notice pursuant to Bankruptcy Rule

2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further

notice need be provided.

## No Prior Request

56.    No prior motion for the relief requested herein has been made to this or

any other Court.

SC1:5176533.9

**Conclusion**

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request

that the Court (a) enter the Interim Order, substantially in the form attached hereto as Exhibit A,

(b) enter the Final Order, substantially in the form attached hereto as Exhibit B and (c) grant such

other and further relief as is just and proper.

Dated: April 13, 2020
New York, New York

/s/ Andrew G. Dietderich
Andrew G. Dietderich
Brian D. Glueckstein
Alexa J. Kranzley
Christian P. Jensen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
E-mail:       dietdericha@sullcrom.com
                  gluecksteinb@sullcrom.com
                  kranzleya@sullcrom.com
                  jensenc@sullcrom.com

*Proposed Counsel to the Debtors*

SC1:5176533.9

# EXHIBIT A

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

—————————————————————————— x
                                                              :
In re                                                         :        Chapter 11
                                                              :
                                                              :        Case No. _____ (___)
LSC COMMUNICATIONS, INC., *et al.*,[1]                        :
                                                              :        Jointly Administered
                              Debtors.                        :
                                                              :
                                                              :
—————————————————————————— x

**INTERIM ORDER (I) AUTHORIZING, BUT NOT DIRECTING, DEBTORS TO
PAY PREPETITION CLAIMS OF (A) CRITICAL VENDORS AND (B) POTENTIAL
LIEN CLAIMANTS, (II) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY
OF OUTSTANDING ORDERS, (III) AUTHORIZING APPLICABLE BANKS AND
OTHER  FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED
CHECKS AND TRANSFERS AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "<u>Motion</u>")[2] of LSC Communications, Inc. and certain of its

affiliated debtors and debtors-in-possession (collectively, the "<u>Debtors</u>") for entry of an order

(this "<u>Interim Order</u>") (a) authorizing, but not directing, the Debtors, in their sole discretion, to

pay prepetition claims of (i) Critical Vendors in an amount not to exceed $9.6 million on an

interim basis (the "<u>Interim Critical Vendor Cap</u>") and (ii) Potential Lien Claimants, (b)

confirming administrative expense priority of outstanding orders and authorizing payment, in the

ordinary course of business, all such amounts when they come due and owing, (c) authorizing

applicable banks and other financial institutions to honor and process related checks and

---

[1]     The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax
        identification number, are as follows:  LSC Communications, Inc. (9580); Courier Communications LLC
        (2268); Courier Kendallville, Inc. (4679); Courier New Media, Inc. (1312); Dover Publications, Inc. (0853);
        LSC Communications Logistics, LLC (9496); LSC Communications MM LLC (5577); LSC Communications
        US, LLC (4157); LSC International Holdings, Inc. (4995); National Publishing Company (8213); Publishers
        Press, LLC (7265); Continuum Management Company, LLC (2627); Clark Distribution Systems, Inc. (5778);
        Clark Holdings Inc. (9172); Clark Worldwide Transportation, Inc. (5773); The Clark Group, Inc. (6223);
        Courier Companies, Inc. (7588); Courier Publishing, Inc. (3681); F.T.C. Transport, Inc. (8699); LibreDigital,
        Inc. (7160); LSC Communications Printing Company (7012); and Research & Education Association, Inc.
        (3922).  The Debtors' corporate headquarters is located at 191 N. Wacker Drive, Suite 1400, Chicago, IL
        60606.

[2]     Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

transfers and (d) granting related relief; and this Court having jurisdiction to consider the Motion

pursuant to 28 U.S.C. §§ 157 and 1334; and venue of these Chapter 11 Cases and the Motion in

this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this matter being a core

proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that proper and adequate

notice of the Motion and the relief requested therein has been provided in accordance with the

Bankruptcy Rules and the Local Rules of the United States Bankruptcy Court for the Southern

District of New York (the "Local Rules"), and that, except as otherwise ordered herein, no other

or further notice is necessary; and any objections (if any) to the Motion having been withdrawn

or overruled on the merits; and a hearing having been held to consider the relief requested in the

Motion and upon the record of the hearing and all of the proceedings had before this Court; and

this Court having found and determined that the relief sought in the Motion is in the best

interests of the Debtors, their estates, their creditors and all other parties-in-interest; and that the

legal and factual bases set forth in the Motion establish just cause for the relief granted herein;

and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED on an interim basis as set forth herein.

2.    The Debtors are authorized, but not directed, in their sole discretion, to

pay Vendor Claimants on a postpetition basis in the ordinary course of business, in the case of

Critical Vendor Claims up to the Interim Critical Vendor Cap, if (i) the Debtors determine that in

the absence of making such payment, the Debtors would suffer a loss of value in excess of such

payment amount or (ii) the Debtors determine that failure to make such payment poses a threat to

health and public safety, subject to the following conditions:

SC1:5176533.9

a.  The Debtors, in their discretion and subject to the terms set forth below, shall determine which Vendor Obligations, if any, will be paid pursuant to this Interim Order;

b.  Unless the parties agree to different terms and conditions, if a Vendor Claimant accepts payment, such Vendor Claimant is deemed to have agreed to continue to provide goods and/or services to the Debtors, on terms that are as good as or better than the terms and conditions (including credit terms) contained in any binding prepetition contract (including any master agreement covering purchase orders) with the Debtors or, in the absence of such contract, such terms and conditions that existed 120 days prior to the date of the commencement of these cases (collectively, the "Customary Terms"), during the pendency of these Chapter 11 Cases;

c.  In the event that a Vendor Claimant does not have a binding prepetition contract with the Debtors and the relationship between such Vendor Claimant accepting payment under this Motion and the Debtors does not extend to 120 days before the Petition Date, the Customary Terms shall mean the terms that the Vendor Claimant generally extends to its customers or such terms as are acceptable to the Debtors in the reasonable exercise of their business judgment;

d.  The Debtor may, in their discretion, require Vendor Claimants to acknowledge in writing that payment of their respective claims is conditioned on such Vendor Claimant's continuing to provide goods and/or services on Customary Terms during the pendency of these Chapter 11 Cases.  The Debtors reserve the right to negotiate new trade terms with any Vendor Claimant as a condition to payment of any Vendor Obligation.

e.  If a Vendor Claimant accepts payment and thereafter does not continue to provide goods and/or services on at least the Customary Terms (or as otherwise agreed by the Debtors) during the pendency of these Chapter 11 Cases, then the Debtors may, in their discretion, deem (i) any payment on a prepetition claim received by such Vendor Claimant to be an unauthorized voidable postpetition transfer under section 549 of the Bankruptcy Code and, therefore, (A) recoverable by the Debtors in cash upon written request and (B) upon recovery by the Debtors, any such prepetition claim shall

be reinstated as if the payment had not been made; or (ii) such payment to apply instead to any postpetition amount that may be owing to such Vendor Claimant;

f.  In consideration for the payment of any Vendor Obligation, each Vendor Claimant shall be deemed to agree not to file or otherwise assert against the Debtors, their estates or any other person or entity or any of their respective assets or property (real or personal) any lien (a "Lien"), claim for reclamation ("Reclamation Claim"), claim under Bankruptcy Code section 503(b)(9) (a "503(b)(9) Claim"), or any similar priority claim under the Bankruptcy Code or other statute (a "Priority Claim") regardless of the statute or other legal authority upon which such Lien, Reclamation Claim, 503(b)(9) Claim, or Priority Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to such Vendor Claimant by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date and, to the extent the Vendor Claimant has already obtained or otherwise asserted such a Lien, Reclamation Claim, 503(b)(9) Claim, or Priority Claim, such Vendor Claimant shall take (at the Vendor Claimant's own expense) whatever actions are necessary to remove such Lien or withdraw such Reclamation Claim, 503(b)(9) Claim, or Priority Claim;

g.  If the Debtors seek to recover a payment from a Vendor Claimant because the Vendor Claimant does not continue to provide goods and/or services to the Debtors on at least the Customary Terms during the pendency of and after these Chapter 11 Cases, the Vendor Claimant may contest such action by making a written request (a "Request") to the Debtors to schedule a hearing before this Court.  Such Vendor Claimant must serve such Request via both mail and email on the following parties so that it is actually received:  (i) LSC Communications, Inc., 191 North Wacker Drive, Suite 1400, Chicago, Illinois 60606, Attn: Suzanne Bettman,  sue.bettman@lsccom.com, (ii) Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004, Attn:  Andrew G. Dietderich and Christian P. Jensen,  dietdericha@sullcrom.com and jensenc@sullcrom.com and (iii) counsel to any statutory committee appointed in these Chapter 11 Cases.  If such a Request is properly served, the Debtors shall provide notice of a hearing on such Request to the Vendor Claimant making the Request and other interested parties in

-4-

accordance with the Bankruptcy Code and the orders of this
Court; and

h.    Prior to making a payment on disputed claims to a Vendor
Claimant under this Interim Order, the Debtors may settle all or
some of the disputed prepetition claims of such Vendor Claimant
for less than their face amount without further notice or hearing.

3.    Any party that accepts payment from the Debtors on account of a Vendor

Obligation shall be deemed to have agreed to the terms and provisions of this Interim Order.

4.    Upon any refusal by a third party to release goods being held as security

for such party's unsatisfied prepetition claim, the Debtors shall be entitled to see an expedited

hearing, on no fewer than five days' notice, to compel the release of such property.

5.    The Debtors shall maintain a matrix summarizing payments made to

Critical Vendors pursuant to this Interim Order including (i) the name of each Critical Vendor

paid, (ii) the amount paid to each Critical Vendor on account of its Critical Vendor Claim and

(iii) the purpose of the payment.  The matrix will be provided on a weekly basis following the

entry of this Interim Order to (i) the Office of the United States Trustee for the Southern District

of New York (the "U.S. Trustee"); (ii) counsel to Bank of America, N.A., as administrative agent

for the Debtors' prepetition credit facility and DIP credit facility; (iii) counsel to the ad hoc

group of term lenders; (iii) counsel to the ad hoc group of secured noteholders and (iv) counsel

of any statutory committee appointed in these Chapter 11 Cases (the parties in (i) through (iv),

the "Recipients"); *provided*, that the matrix shall not be filed publicly and the Recipients shall

keep the matrix confidential and shall not disclose any of the information in the matrix to any

party, including, but not limited to, any member of any statutory committee, without the prior

written consent of the Debtors.

SC1:5176533.9

6.       Nothing in this Interim Order authorizes the Debtors to accelerate any payments not otherwise due prior to the date of the Final Hearing.

7.       The Debtors are authorized, but not directed, to treat any and all Outstanding Orders as an administrative expense priority and pay, in the ordinary course of business, all such amounts when they come due and owing.

8.       Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the Motion or a finding that any particular claim is an administrative expense or other priority claim; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the rights of any party in interest under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.

9.       The Debtors are authorized to issue postpetition checks, or to effect postpetition electronic fund transfers, in replacement of any checks or electronic fund transfers in respect of payments authorized by this Interim Order that are dishonored or rejected after the Petition Date.

SC1:5176533.9

10.     The Debtors are authorized and empowered to execute and deliver such documents, and to take and perform all actions necessary to implement and effectuate the relief granted in this Interim Order.

11.     In accordance with this Interim Order (or other order of this Court), each of the financial institutions at which the Debtors maintain their accounts relating to the payment of obligations described in the Motion are authorized, but not directed, to (a) receive, process, honor and pay all checks presented for payments and to honor all fund transfer requests made by the Debtors related thereto, to the extent that sufficient funds are on deposit in those accounts and (b) accept and rely on all representations made by the Debtors with respect to which checks, drafts, wires, or automated clearing house transfers should be honored or dishonored in accordance with this or any other order of this Court, whether such checks, drafts, wires or transfers are dated prior to, on or subsequent to the Petition Date, without any duty to inquire otherwise and without any liability for following the Debtors' instructions.

12.     Nothing in the Motion or this Interim Order, nor as a result of any payment made pursuant to this Interim Order, shall be deemed or construed as an admission as to the validity or priority of any claim against the Debtors, an approval or assumption of any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code or a waiver of the right of the Debtors or of any claims or causes of action which may exist against any Vendor Claimant, or shall impair the ability of the Debtors to contest or seek relief under any section of the Bankruptcy Code on account of the validity and amount of any payment made pursuant to this Interim Order.

13.     Notwithstanding anything to the contrary contained in this Interim Order or in the Motion, any payment, obligation or other relief authorized by this Interim Order shall be

-7-

subject to and limited by the requirements imposed by the Debtors under the terms of any interim and/or final orders regarding the use of cash collateral or the approval of postpetition financing (any such order, a "Financing Order"), or any budget in connection therewith, approved by the Court in these Chapter 11 Cases.  In the event of any conflict between the terms of this Interim Order and a Financing Order, the terms of the applicable Financing Order shall control (solely to the extent of such conflict).

14.     The requirements set forth in Local Rule 9013-1(b) are satisfied.

15.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.

16.     The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

17.     This Interim Order is immediately effective and enforceable, notwithstanding the possible applicability of Bankruptcy Rule 6004(h) or otherwise.

18.     This Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the Motion or the implementation of this Interim Order.

19.     The final hearing with respect to the relief requested in the Motion shall be held on _____, 2020 at _____ (prevailing Eastern Time) (the "Final Hearing").  Any objections or responses to entry of the proposed Final Order shall be filed on or before 4:00 p.m. (prevailing Eastern Time) on _____, 2020 and served on the following parties: (a) the Debtors, LSC Communications, Inc., 191 North Wacker Drive, Suite 1400, Chicago, Illinois 60606, Attn: Suzanne Bettman; (b) proposed counsel to the Debtors, Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004, Attn: Christian P. Jensen; (c) counsel to Bank of America, N.A., as administrative agent for the Debtors' prepetition credit facility and DIP credit facility, Moore & Van Allen PLLC, 100 North Tryon Street, Suite 4700, Charlotte, North

SC1:5176533.9

Carolina 28202, Attn: David L. Eades and Charles (Trey) R. Rayburn III; (d) counsel to the ad

hoc group of term lenders, Arnold & Porter Kaye Scholer LLP, 70 West Madison Street, Suite

4200, Chicago, IL 60602-4231, Attn: Michael D. Messersmith and Sarah Gryll; (e) counsel to

the ad hoc group of secured noteholders, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285

Avenue of the Americas, New York, NY 10019-6064, Attn: Andrew N. Rosenberg and Alice B.

Eaton; (f) counsel to any statutory committee appointed in these Chapter 11 Cases; (g) the Office

of the United States Trustee for the Southern District of New York; and (h) to the extent not

listed herein, those parties requesting notice pursuant to Bankruptcy Rule 2002.


Dated: _____

       New York, New York                               United States Bankruptcy Judge

-9-

## <u>EXHIBIT B</u>

**Proposed Final Order**

SC1:5176533.9

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————————— x
                                                    :
In re                                               :        Chapter 11
                                                    :
                                                    :        Case No. _____ (__)
LSC COMMUNICATIONS, INC., *et al.*,[1]              :
                                                    :        Jointly Administered
                    Debtors.                         :
                                                    :
                                                    :
————————————————————————— x

**FINAL ORDER (I) AUTHORIZING, BUT NOT DIRECTING, DEBTORS TO PAY**
**PREPETITION CLAIMS OF (A) CRITICAL VENDORS AND (B) POTENTIAL**
**LIEN CLAIMANTS, (II) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY**
**OF OUTSTANDING ORDERS, (III) AUTHORIZING APPLICABLE BANKS AND**
**OTHER FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED**
**CHECKS AND TRANSFERS AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of LSC Communications, Inc. and certain of its

affiliated debtors and debtors-in-possession (collectively, the "Debtors") for entry of an order

(this "Final Order") (a) authorizing, but not directing, the Debtors, in their sole discretion, to pay

prepetition claims of (i) Critical Vendors in an amount not to exceed $19.3 million on a final

basis (the "Final Critical Vendor Cap") and (ii) Potential Lien Claimants, (b) confirming

administrative expense priority of outstanding orders and authorizing payment, in the ordinary

course of business, all such amounts when they come due and owing, (c) authorizing applicable

banks and other financial institutions to honor and process related checks and transfers and (d)

---

[1]    The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax
       identification number, are as follows:  LSC Communications, Inc. (9580); Courier Communications LLC
       (2268); Courier Kendallville, Inc. (4679); Courier New Media, Inc. (1312); Dover Publications, Inc. (0853);
       LSC Communications Logistics, LLC (9496); LSC Communications MM LLC (5577); LSC Communications
       US, LLC (4157); LSC International Holdings, Inc. (4995); National Publishing Company (8213); Publishers
       Press, LLC (7265); Continuum Management Company, LLC (2627); Clark Distribution Systems, Inc. (5778);
       Clark Holdings Inc. (9172); Clark Worldwide Transportation, Inc. (5773); The Clark Group, Inc. (6223);
       Courier Companies, Inc. (7588); Courier Publishing, Inc. (3681); F.T.C. Transport, Inc. (8699); LibreDigital,
       Inc. (7160); LSC Communications Printing Company (7012); and Research & Education Association, Inc.
       (3922).  The Debtors' corporate headquarters is located at 191 N. Wacker Drive, Suite 1400, Chicago, IL
       60606.

[2]    Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

granting related relief; and this Court having entered the *Interim Order (I) Authorizing, But Not Directing, Debtors to Pay Prepetition Claims of (A) Critical Vendors and (B) Potential Lien Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, (III) Authorizing Applicable Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers and (IV) Granting Related Relief* [D.I. [•]]; and this Court having jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and venue of these Chapter 11 Cases and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that proper and adequate notice of the Motion and the relief requested therein has been provided in accordance with the Bankruptcy Rules and the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), and that, except as otherwise ordered herein, no other or further notice is necessary; and any objections (if any) to the Motion having been withdrawn or overruled on the merits; and a hearing having been held to consider the relief requested in the Motion and upon the record of the hearing and all of the proceedings had before this Court; and this Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, their creditors and all other parties-in-interest; and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      The Debtors are authorized, but not directed, in their sole discretion, to pay Vendor Claimants on a postpetition basis in the ordinary course of business, in the case of

Critical Vendor Claims up to the Final Critical Vendor Cap, if (i) the Debtors determine that in

the absence of making such payment, the Debtors would suffer a loss of value in excess of such

payment amount or (ii) the Debtors determine that failure to make such payment poses a threat to

health and public safety, subject to the following conditions:

a.   The Debtors, in their discretion and subject to the terms set forth below, shall determine which Vendor Obligations, if any, will be paid pursuant to this Final Order;

b.   Unless the parties agree to different terms and conditions, if a Vendor Claimant accepts payment, such Vendor Claimant is deemed to have agreed to continue to provide goods and/or services to the Debtors, on terms that are as good as or better than the terms and conditions (including credit terms) contained in any binding prepetition contract (including any master agreement covering purchase orders) with the Debtors or, in the absence of such contract, such terms and conditions that existed 120 days prior to the date of the commencement of these cases (collectively, the "Customary Terms"), during the pendency of these Chapter 11 Cases;

c.   In the event that a Vendor Claimant does not have a binding prepetition contract with the Debtors and the relationship between such Vendor Claimant accepting payment under this Motion and the Debtors does not extend to 120 days before the Petition Date, the Customary Terms shall mean the terms that the Vendor Claimant generally extends to its customers or such terms as are acceptable to the Debtors in the reasonable exercise of their business judgment;

d.   The Debtors may, in their discretion, require Vendor Claimants to acknowledge in writing that payment of their respective claims is conditioned on such Vendor Claimant's continuing to provide good and/or services on Customary Terms during the pendency of these Chapter 11 Cases.  The Debtors reserve the right to negotiate new trade terms with any Vendor Claimant as a condition to payment of any Vendor Obligation.

e.   If a Vendor Claimant accepts payment and thereafter does not continue to provide goods and/or services on at least the

Customary Terms (or as otherwise agreed by the Debtors) during the pendency of these Chapter 11 Cases, then the Debtors may, in their discretion, deem (i) any payment on a prepetition claim received by such Vendor Claimant to be an unauthorized voidable postpetition transfer under section 549 of the Bankruptcy Code and, therefore, (A) recoverable by the Debtors in cash upon written request and (B) upon recovery by the Debtors, any such prepetition claim shall be reinstated as if the payment had not been made; or (ii) such payment to apply instead to any postpetition amount that may be owing to such Vendor Claimant;

f.    In consideration for the payment of any Vendor Obligation, each Vendor Claimant shall be deemed to agree not to file or otherwise assert against the Debtors, their estates or any other person or entity or any of their respective assets or property (real or personal) any lien (a "Lien"), claim for reclamation ("Reclamation Claim"), claim under Bankruptcy Code section 503(b)(9) (a "503(b)(9) Claim"), or any similar priority claim under the Bankruptcy Code or other statute (a "Priority Claim") regardless of the statute or other legal authority upon which such Lien, Reclamation Claim, 503(b)(9) Claim, or Priority Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to such Vendor Claimant by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date and, to the extent the Vendor Claimant has already obtained or otherwise asserted such a Lien, Reclamation Claim, 503(b)(9) Claim, or Priority Claim, such Vendor Claimant shall take (at the Vendor Claimant's own expense) whatever actions are necessary to remove such Lien or withdraw such Reclamation Claim, 503(b)(9) Claim, or Priority Claim;

g.    If the Debtors seek to recover a payment from a Vendor Claimant because the Vendor Claimant does not continue to provide goods and/or services to the Debtors on at least the Customary Terms during the pendency of and after these Chapter 11 Cases, the Vendor Claimant may contest such action by making a written request (a "Request") to the Debtors to schedule a hearing before this Court. Such Vendor Claimant must serve such Request via both mail and email on the following parties so that it is actually received: (i) LSC Communications, Inc., 191 North Wacker Drive, Suite 1400, Chicago, Illinois 60606, Attn: Suzanne Bettman, sue.bettman@lsccom.com, (ii) Sullivan

-4-

& Cromwell LLP, 125 Broad Street, New York, New York 10004, Attn: Andrew G. Dietderich and Christian P. Jensen, dietdericha@sullcrom.com and jensenc@sullcrom.com and (iii) counsel to any statutory committee appointed in these Chapter 11 Cases. If such a Request is properly served, the Debtors shall provide notice of a hearing on such Request to the Vendor Claimant making the Request and other interested parties in accordance with the Bankruptcy Code and the orders of this Court; and

h. Prior to making a payment on disputed claims to a Vendor Claimant under this Final Order, the Debtors may settle all or some of the disputed prepetition claims of such Vendor Claimant for less than their face amount without further notice or hearing.

3.        Any party that accepts payment from the Debtors on account of a Vendor Obligation shall be deemed to have agreed to the terms and provisions of this Final Order.

4.        Upon any refusal by a third party to release goods being held as security for such party's unsatisfied prepetition claim, the Debtors shall be entitled to see an expedited hearing, on no fewer than five days' notice, to compel the release of such property.

5.        The Debtors shall maintain a matrix summarizing payments made to Critical Vendors pursuant to this Final Order including (i) the name of each Critical Vendor paid, (ii) the amount paid to each Critical Vendor on account of its Critical Vendor Claim and (iii) the purpose of the payment. The matrix will be provided on a monthly basis following the entry of this Final Order to (i) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"); (ii) counsel to Bank of America, N.A., as administrative agent for the Debtors' prepetition credit facility and DIP credit facility; (iii) counsel to the ad hoc group of term lenders; (iii) counsel to the ad hoc group of secured noteholders and (iv) counsel of any statutory committee appointed in these Chapter 11 Cases (the parties in (i) through (iv), the "Recipients"); *provided*, that the matrix shall not be filed publicly and the Recipients shall keep

the matrix confidential and shall not disclose any of the information in the matrix to any party, including, but not limited to, any member of any statutory committee, without the prior written consent of the Debtors.

6.      Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Final Order or the Motion or a finding that any particular claim is an administrative expense or other priority claim; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the rights of any party in interest under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.

7.      The Debtors are authorized, but not directed, to treat any and all Outstanding Orders as an administrative expense priority and pay, in the ordinary course of business, all such amounts when they come due and owing.

8.      The Debtors are authorized to issue postpetition checks, or to effect postpetition electronic fund transfers, in replacement of any checks or electronic fund transfers in respect of payments authorized by this Final Order that are dishonored or rejected after the Petition Date.

SC1:5176533.9

9.    The Debtors are authorized and empowered to execute and deliver such documents, and to take and perform all actions necessary to implement and effectuate the relief granted in this Final Order.

10.    In accordance with this Final Order (or other order of this Court), each of the financial institutions at which the Debtors maintain their accounts relating to the payment of obligations described in the Motion are authorized, but not directed, to (a) receive, process, honor and pay all checks presented for payments and to honor all fund transfer requests made by the Debtors related thereto, to the extent that sufficient funds are on deposit in those accounts and (b) accept and rely on all representations made by the Debtors with respect to which checks, drafts, wires, or automated clearing house transfers should be honored or dishonored in accordance with this or any other order of this Court, whether such checks, drafts, wires or transfers are dated prior to, on or subsequent to the Petition Date, without any duty to inquire otherwise and without any liability for following the Debtors' instructions.

11.    Nothing in the Motion or this Final Order, nor as a result of any payment made pursuant to this Final Order, shall be deemed or construed as an admission as to the validity or priority of any claim against the Debtors, an approval or assumption of any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code or a waiver of the right of the Debtors or of any claims or causes of action which may exist against any Critical Vendor, or shall impair the ability of the Debtors to contest or seek relief under any section of the Bankruptcy Code on account of the validity and amount of any payment made pursuant to this Final Order.

12.    Notwithstanding anything to the contrary contained in this Final Order or in the Motion, any payment, obligation or other relief authorized by this Final Order shall be

-7-

SC1:5176533.9

subject to and limited by the requirements imposed by the Debtors under the terms of any interim and/or final orders regarding the use of cash collateral or the approval of postpetition financing (any such order, a "Financing Order"), or any budget in connection therewith, approved by the Court in these Chapter 11 Cases.  In the event of any conflict between the terms of this Final Order and a Financing Order, the terms of the applicable Financing Order shall control (solely to the extent of such conflict).

   13. The requirements set forth in Local Rule 9013-1(b) are satisfied.

   14. The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

   15. This Final Order is immediately effective and enforceable, notwithstanding the possible applicability of Bankruptcy Rule 6004(h) or otherwise.

   16. This Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the Motion or the implementation of this Final Order.

Dated: _____

  New York, New York       United States Bankruptcy Judge

-8-

SC1:5176533.9