Andrew G. Dietderich
Brian D. Glueckstein
Alexa J. Kranzley
Christian P. Jensen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel to the Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re | Chapter 11 |
| LSC COMMUNICATIONS, INC., *et al.*,[1] | Case No. 20-10950 (SHL) |
| Debtors. | Jointly Administered |

**DISCLOSURE STATEMENT FOR DEBTORS'**
**JOINT CHAPTER 11 PLAN OF LIQUIDATION OF**
**LSC COMMUNICATIONS, INC. AND ITS DEBTOR AFFILIATES**

Dated: November 20, 2020
    New York, New York

---

[1]    The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  LSC Communications, Inc. (9580); Courier Communications LLC (2268); Courier Kendallville, Inc. (4679); Courier New Media, Inc. (1312); Dover Publications, Inc. (0853); LSC Communications Logistics, LLC (9496); LSC Communications MM LLC (5577); LSC Communications US, LLC (4157); LSC International Holdings, Inc. (4995); National Publishing Company (8213); Publishers Press, LLC (7265); Continuum Management Company, LLC (2627); Clark Distribution Systems, Inc. (5778); Clark Holdings Inc. (9172); Clark Worldwide Transportation, Inc. (5773); The Clark Group, Inc. (6223); Courier Companies, Inc. (7588); Courier Publishing, Inc. (3681); F.T.C. Transport, Inc. (8699); LibreDigital, Inc. (7160); LSC Communications Printing Company (7012); and Research & Education Association, Inc. (3922).  The Debtors' corporate headquarters is located at 4101 Winfield Road, Warrenville, IL 60555 (Attn: General Counsel).

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT.**

THE BOARD OF DIRECTORS (OR THE EQUIVALENT AUTHORIZED BODY) OF EACH OF THE DEBTORS HAS APPROVED THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN AND THE TRANSACTIONS CONTEMPLATED AND DESCRIBED HEREIN SUBJECT TO APPROVAL OF THIS DISCLOSURE STATEMENT BY THE COURT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE CHAPTER 11 PLAN IT DESCRIBES HEREIN.  NO PERSON SHOULD USE OR RELY ON THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT IS BEING DISTRIBUTED TO PARTIES-IN-INTEREST AS A SETTLEMENT PROPOSAL AND IS THEREFORE SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND OTHER APPLICABLE RULES, AND DOES NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER IN CONNECTION WITH ANY PENDING, THREATENED OR POTENTIAL LITIGATION, ARBITRATIONS OR DISPUTES.

IF THE BANKRUPTCY COURT DOES NOT CONFIRM THE CHAPTER 11 PLAN AND/OR THE CHAPTER 11 PLAN DOES NOT BECOME EFFECTIVE, NO PORTION OF THE CHAPTER 11 PLAN, INCLUDING ANY SETTLEMENTS, WILL BECOME EFFECTIVE.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN AND DOCUMENTS RELATED THERETO; STATUTORY PROVISIONS RELEVANT TO CONFIRMATION OF THE PLAN; EVENTS IN THESE CHAPTER 11 CASES AND FINANCIAL INFORMATION.  ALTHOUGH THE DEBTORS BELIEVE SUCH SUMMARIES ARE FAIR AND ACCURATE, THEY ARE QUALIFIED IN THEIR ENTIRETY BY SUCH DOCUMENTS AND STATUTORY PROVISIONS TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRETY OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.

FACTUAL INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO

4818-3242-6191 v.6

SO.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.

NO PERSON SHOULD RELY ON ANY INFORMATION OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED BY REFERENCE HEREIN.  THE DEBTORS HAVE NOT AUTHORIZED ANYONE TO PROVIDE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.

**TABLE OF CONTENTS**

1.   EXECUTIVE SUMMARY ..................................................................................................1

    A.   Purpose of This Disclosure Statement ..................................................................1
    B.   Recovery Analysis and Treatment of Claims and Interests ...................................2
    C.   Deemed Substantive Consolidation of the Debtors ...............................................5
    D.   Voting on the Plan ................................................................................................5
    E.   Confirmation of the Plan.......................................................................................7
    F.   Additional Information .........................................................................................8

2.   BACKGROUND ..............................................................................................................9

    A.   Overview of the Debtors' Businesses ....................................................................9
    B.   Products and Service Offerings ...........................................................................11
    C.   Financial Performance and Cash Position ...........................................................13
    D.   Prepetition Capital Structure...............................................................................13
    E.   Factors Leading to the Commencement of the Debtors' Chapter 11 Cases ..........15

3.   SIGNIFICANT EVENTS AND BUSINESS INITIATIVES IN THESE
    CHAPTER 11 CASES ....................................................................................................18

    A.   Overview of Chapter 11......................................................................................18
    B.   The Chapter 11 Cases .........................................................................................18
    C.   Sale Process .......................................................................................................22

4.   SUMMARY OF THE PLAN ...........................................................................................26

    A.   Classification, Treatment and Voting of Claims and Interests .............................27
    B.   Implementation of the Plan.................................................................................31
    C.   Provisions Governing Distributions.....................................................................42
    D.   Settlement, Release, Injunction and Related Provisions.......................................49

5.   STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN .................54

    A.   The Confirmation Hearing...................................................................................54
    B.   Confirmation Standards ......................................................................................54
    C.   Best Interests Test...............................................................................................56
    D.   Financial Feasibility............................................................................................58
    E.   Acceptance by Impaired Classes .........................................................................58
    F.   Confirmation Without Acceptance by All Impaired Classes.................................59

6.   VOTING PROCEDURES ...............................................................................................61

    A.   Parties-in-Interest Entitled to Vote .....................................................................62
    B.   Voluntary Releases Under the Plan .....................................................................62
    C.   Classes Under the Plan........................................................................................63
    D.   Solicitation Packages for Voting Classes ............................................................63

4818-3242-6191 v.6

|   | E. | Solicitation Packages for Non-Voting Classes | 64 |
|   | F. | Voting Procedures | 64 |

| 7. | | ADDITIONAL FACTORS TO BE CONSIDERED PRIOR TO VOTING | 66 |
|   | A. | Risks Related to These Chapter 11 Cases | 66 |
|   | B. | Risks Related to the Plan | 67 |
|   | C. | Additional Risks | 69 |

| 8. | | MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 72 |
|   | A. | Federal Income Tax Consequences to the Debtors and the Wind Down Estates | 73 |
|   | B. | Tax Consequences to U.S. Holders | 74 |
|   | C. | Tax Treatment of the Litigation Trust | 76 |
|   | D. | Tax Treatment of the Litigation Trust Reserve | 77 |
|   | E. | Tax Treatment of the Unsecured Claim Pool Reserve | 77 |
|   | F. | General Tax Reporting by the Litigation Trust and Litigation Trust Beneficiaries | 77 |
|   | G. | Withholding on Distributions and Information Reporting | 78 |

| 9. | | ALTERNATIVE TO CONFIRMATION OF THE PLAN | 79 |

| 10. | | DEBTORS' RECOMMENDATION | 80 |

4818-3242-6191 v.6

**Appendices**

Appendix A:  Debtors' Plan of Liquidation

Appendix B:  Solicitation Procedures Order

Appendix C:  Liquidation Analysis

4818-3242-6191 v.6

## 1.   EXECUTIVE SUMMARY

On April 13, 2020 (the "Petition Date"), LSC Communications, Inc. ("LSC") and its affiliated debtors and debtors-in-possession (together with LSC, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (the "Chapter 11 Cases").  Since the Petition Date, the Debtors have operated their business and managed their properties in the ordinary course of business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  Following the Debtors' entry into the Acquisition Agreement pursuant to which the Debtors will sell substantially all of their assets, the subsequent entry of the Sale Order by the Bankruptcy Court and the entry into the *Stipulation Regarding Sale and Plan* [D.I. 853] (the "Plan Stipulation"), the Debtors have been working with their key creditor constituencies on the development of the Plan, the continued orderly disposal of assets not being sold pursuant to the Acquisition Agreement and the administration and wind down of these Chapter 11 Cases.

Simultaneous with the filing of this Disclosure Statement, the Debtors are filing the *Joint Chapter 11 Plan of Liquidation of LSC Communications, Inc. and its Debtor Affiliates* (as may be further amended, supplemented or modified from time to time, including the Plan Supplement, and all other exhibits and schedules thereto, in each case, as they may be further amended, modified or supplemented from time to time, the "Plan"),[2] a copy of which is attached hereto as Appendix A.  The Plan and this Disclosure Statement are the result of extensive negotiations among the Debtors, the Consenting Junior Secured Creditors and the Committee, and have been approved by the Board of Directors and management of the Debtors, the Consenting Junior Secured Creditors and the Committee.

### A.   Purpose of This Disclosure Statement

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganizations and orderly liquidations.  Chapter 11 helps a company to maximize recovery to all stakeholders.  The consummation of a plan is the principal objective of a chapter 11 case.  A plan sets forth the means for satisfying claims against, and interests in, the debtors. Confirmation of a plan by a bankruptcy court binds the debtors and any creditor or interest holder of the debtors.  Subject to certain limited exceptions, the order approving confirmation of a plan enjoins parties from enforcing any debt that arose prior to the date of confirmation of the plan or from bringing any causes of action against the debtors in connection with such debt.

In general, a plan (a) divides claims and interests into separate classes, (b) specifies the property that each class is to receive under the plan and (c) contains provisions necessary to implement the plan.  Under the Bankruptcy Code, "claims" and "interests," rather than "creditors" and "equity holders," are classified because creditors and equity holders may hold claims and interests in more than one class.

The Debtors submit this *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Liquidation of LSC Communications, Inc. and its Debtor Affiliates* (as may be further

---

[2]   Capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

4818-3242-6191 v.6

amended, supplemented or modified from time to time and all other exhibits and schedules thereto, in each case, as they may be further amended, modified or supplemented from time to time, this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code for the purpose of soliciting votes on the proposed Plan.  The purpose of this Disclosure Statement is to provide the Holders of Claims who are entitled, and will be solicited, to vote on the Plan with adequate information to make an informed judgment about the Plan.  According to section 1125 of the Bankruptcy Code, acceptances of a chapter 11 plan may be solicited only after a Bankruptcy Court-approved written disclosure statement has been provided to each creditor or interest holder who is entitled to vote on the plan.

### B. Recovery Analysis and Treatment of Claims and Interests

The Plan organizes the Debtors' creditor and equity constituencies into groups called Classes.  For each Class, the Plan describes (a) the underlying Claim or Interest, (b) the recovery available to the Holders of Allowed Claims or Allowed Interests in that Class under the Plan, (c) whether the Class is Impaired under the Plan, meaning that each Holder will receive less than full value on account of its Allowed Claim or Allowed Interest or that the rights of Holders under law will be altered in some way and (d) the form of any consideration (*e.g.*, Cash, stock or a combination thereof) that Holders will receive on account of their respective Allowed Claims or Allowed Interests.

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims, 503(b)(9) Claims or Priority Tax Claims, which will generally be paid in Cash when approved by the Bankruptcy Court or in the ordinary course on or after the Effective Date.

The classification of Claims and Interests pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Junior Remaining Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Impaired | Deemed to Reject |
| 6 | Intercompany Interests | Impaired | Deemed to Reject |
| 7 | Subordinated  Claims | Impaired | Deemed to Reject |
| 8 | Equity Interests in LSC | Impaired | Deemed to Reject |

The table below provides a summary of the classification, treatment and estimated recoveries of Claims and Interests under the Plan.  This information is provided in summary form for illustrative purposes only, is subject to material change based on contingencies related to the claims reconciliation process, and is qualified in its entirety by reference to the provisions of the Plan.  For a more detailed description of the treatment of Claims and Interests under the Plan, see Section 4 below—Summary of the Plan.

2

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

**SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES[3]**

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY | |
|---|---|---|---|---|
| | | | **Plan** | **Liquidation** |
| Class 1 Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement and release of and in exchange for its Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes Allowed and (iii) such other date as may be ordered by the Bankruptcy Court. | $[•] | 100% | 100% |
| Class 2 Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement and release of and in exchange for its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the Plan Administrator: (i) payment in full in Cash; (ii) delivery of the collateral securing such Allowed Other Secured Claim or (iii) treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired. | $[•] | 100% | 100% |

---

[3] Figures are as of [•] and are subject to material change.

[4] Estimated aggregate amount of claims currently asserted against or scheduled by the Debtors, incorporating provisions of the Plan and excluding duplicative claims.

4818-3242-6191 v.6

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY | |
|---|---|---|---|---|
| | | | Plan | Liquidation |
| Class 3 Junior Remaining Claims | Except to the extent that a Holder of an Allowed Junior Remaining Claim agrees to a less favorable treatment, and in full and final satisfaction, settlement and release of and in exchange for its Allowed Junior Remaining Claim, each Holder of an Allowed Junior Remaining Claim shall receive its Pro Rata share of the Junior Remaining Claim Distribution Pool, subject to the Unsecured Claim Pool. | $[•] | [•]% | [•]% |
| Class 4 General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, and in full and final satisfaction, settlement and release of and in exchange for its Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive (i) its Pro Rata share of the Unsecured Claim Pool and (ii) its Pro Rata share of the Litigation Trust Interests. | $[•] | [•]% | [•]% |
| Class 5 Intercompany Claims | All Intercompany Claims shall be canceled, released or otherwise settled in full, and the Holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion under the Plan unless reasonably determined otherwise by the Debtors with the consent of the Committee and Requisite Junior Secured Creditors, such consent not to be unreasonably withheld, conditioned or delayed. | N/A | 0% | 0% |
| Class 6 Intercompany Interests | No Holder of an Intercompany Interest shall receive any Distributions on account of its Intercompany Interest.  On and after the Effective Date, all Intercompany Interests shall be canceled and shall be of no further force and effect, whether surrendered for cancelation or otherwise. | N/A | 0% | 0% |

4

4818-3242-6191 v.6

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY | |
|---|---|---|---|---|
| | | | Plan | Liquidation |
| Class 7 Subordinated Claims | No Holder of a Subordinated Claim shall receive any Distributions on account of its Subordinated Claim.  On and after the Effective Date, all Subordinated Claims shall be canceled, released and extinguished and shall be of no further force and effect, whether surrendered for cancelation or otherwise. | N/A | 0% | 0% |
| Class 8 Equity Interests in LSC | No Holder of an Equity Interest in LSC shall receive any Distributions on account of its Equity Interest.  On and after the Effective Date, all Equity Interests in LSC shall be canceled and shall be of no further force and effect, whether surrendered for cancelation or otherwise. | N/A | 0% | 0% |

### C.     Deemed Substantive Consolidation of the Debtors

The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order deeming the substantive consolidation of the Debtors' Estates into a single Estate for certain limited purposes related to the Plan, including Voting, Confirmation and Distribution. The deemed substantive consolidation of the Debtors' Estates for certain limited purposes is for administrative convenience only, and the Debtors do not contend that substantive consolidation is appropriate under the applicable legal standard.

As explained in Section 2.A below, the Debtors consist of LSC and 21 of its subsidiaries.  The Debtors are an integrated enterprise, managed across geographic boundaries and legal entities.  Holders of Allowed Claims against or Allowed Interests in each of the Debtors will receive the same recovery provided to other Holders of Allowed Claims or Allowed Interests in the applicable Class.  The Debtors believe that no creditor will receive a recovery inferior to that which it would receive if each Debtor proposed a plan of liquidation that was completely separate from that proposed by each other entity and, therefore, the Debtors do not believe that any creditor will be materially adversely affected by not Voting and receiving Distributions on an entity-by-entity basis.

### D.     Voting on the Plan

1.     *Parties-in-Interest Entitled to Vote*

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless: (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof; or

5

(b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, under section 1126(a) of the Bankruptcy Code, the holder of a claim or interest that is allowed under a plan is entitled to vote to accept or reject the plan if such claim or interest is impaired under the plan.  Under section 1126(f) of the Bankruptcy Code, the holder of a claim that is not impaired under a plan is deemed to have accepted the plan, and the plan proponent need not solicit such holder's vote.  Under section 1126(g) of the Bankruptcy Code, the holder of an impaired claim or impaired interest that will not receive any distribution under the plan in respect of such claim or interest is deemed to have rejected the plan and is not entitled to vote on the plan.  For a detailed description of the treatment of Claims and Interests under the Plan, refer to Section 4 below—Summary of the Plan.

Classes 1 and 2 are Unimpaired under, and deemed under section 1126(f) of the Bankruptcy Code to have accepted, the Plan, and are therefore, not entitled to vote on the Plan.

Classes 3 and 4 are Impaired under, and entitled to vote to accept or reject, the Plan.

Classes 5, 6, 7 and 8 are Impaired under, and deemed under section 1126(g) of the Bankruptcy Code to have rejected, the Plan, and are therefore, not entitled to vote on the Plan.

Except as described in Section 5 below, the Bankruptcy Code requires, as a condition to confirmation of the Plan, that each Impaired Class entitled to vote accept the Plan.  Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in such class that have voted to accept or reject the plan.  Holders of claims who fail to vote are deemed neither to accept nor to reject the plan.  For a more detailed description of the requirements for confirmation of the Plan, refer to Section 5 below—Statutory Requirements for Confirmation of the Plan.

Even if the Plan has not been accepted by all Impaired Classes entitled to vote, section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan, provided that the Plan has been accepted by at least one Impaired Class of creditors.  In such circumstances, the Plan can be confirmed by a procedure commonly known as cram-down, so long as the Plan does not "discriminate unfairly" and is "fair and equitable," for the purposes of the Bankruptcy Code, with respect to each Class of Claims or Interests that is Impaired under, and has not accepted, the Plan.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, refer to Section 5 below—Statutory Requirements for Confirmation of the Plan.

2.      *Submitting a Ballot*

Classes 3 and 4 are entitled to and are being solicited to vote to accept or reject the Plan.  If you are entitled to and are being solicited to vote, you should carefully review this Disclosure Statement, including the attached appendices and the instructions accompanying your

4818-3242-6191 v.6

Ballot or Ballots.  Then, indicate your acceptance or rejection of the Plan by voting for or against the Plan on the enclosed Ballot or Ballots and return the Ballot or Ballots to Prime Clerk LLC (the "Notice and Claims Agent").  For further information, refer to Section 6 below—Voting Procedures, and the Solicitation Procedures Order attached hereto as Appendix B.

Ballots cast by Holders in Classes entitled to vote must be received by the Notice and Claims Agent by 5:00 p.m. (Eastern Time) on January 20, 2021 (the "Voting Deadline"). For further information, refer to Section 6 below—Voting Procedures.

Ballots received after the Voting Deadline will not be counted, except in the Debtors' discretion.

The method of delivery of Ballots to be sent to the Notice and Claims Agent is at the election and risk of each Holder of a Claim.  Except as otherwise provided in the Plan or Solicitation Procedures Order, delivery of a Ballot will be deemed made only when the Ballot is actually received by the Notice and Claims Agent.  Sufficient time should be allowed to ensure timely delivery.

Delivery of a Ballot to the Notice and Claims Agent by facsimile, e-mail or any means not specifically described herein will not be accepted.[5]  No Ballot should be sent to the Debtors or the Debtors' financial or legal advisors, agents or representatives (other than the Notice and Claims Agent), and if so sent, will not be counted.

3.      *Recommendation*

**The Debtors recommend that all Holders of Claims entitled to vote on the Plan vote to accept it.**

E.     **Confirmation of the Plan**

1.      *Plan Objection Deadline*

Objections to Confirmation of the Plan must be filed with the Bankruptcy Court and served so as to be actually received on or before **4:00 p.m. (Eastern Time)** on **January 21, 2021**.

Unless objections to Confirmation are timely served and filed in compliance with the Solicitation Procedures Order, they will not be considered by the Bankruptcy Court.  For further information, refer to Section 5 below—Statutory Requirements for Confirmation of the Plan.

---

[5]      For the avoidance of doubt, a Ballot may be submitted via the online electronic ballot portal and, solely for nominees, via electronic mail to the Notice and Claims Agent at LSCBallots@primeclerk.com with a reference to "LSC Master Ballot" in the subject line.

7

2.      *Confirmation Hearing*

The Bankruptcy Court has scheduled the hearing to consider confirmation of the Plan (the "Confirmation Hearing") for **January 28, 2021 at 10:00 a.m. (Eastern Time)**.  The Confirmation Hearing may be adjourned by the Bankruptcy Court or the Debtors without further notice other than by announcement in open court and/or notice(s) of adjournment filed on the docket with the Bankruptcy Court's permission.

**F.      Additional Information**

The Debtors currently file annual, quarterly and current reports with, and furnish other information to, the Securities and Exchange Commission (the "SEC").  Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Company Filings" link or by visiting https://investor.lsccom.com/sec-filings.  Further information can be found in the following filings (but later information filed with the SEC that updates information in the following filings will update and supersede such information):

- Form 10-K for the fiscal year ended December 31, 2019, filed with the SEC on March 2, 2020 (the "2019 10-K");

- Forms 10-Q for the fiscal quarters ended March 31, 2020, June 30, 2020 and September 30, 2020, filed with the SEC on May 6, 2020, July 30, 2020 and October 29, 2020, respectively (the "2020 10-Qs"); and

- Form 8-Ks filed with the SEC during the pendency of these Chapter 11 Cases.

4818-3242-6191 v.6

## 2.   BACKGROUND

### A.   Overview of the Debtors' Businesses

LSC is a Delaware corporation with its headquarters located in Warrenville, Illinois.  LSC, together with the other Debtors and the Debtors' non-debtor affiliates (collectively, the "Company") offers a broad scope of traditional and digital print products, print-related services and office products.  The Company is a market leader in serving the needs of publishers, merchandisers and retailers worldwide, with a service offering that includes e-services, logistics, warehousing and fulfillment and supply chain management services.  The Company prints magazines, catalogs, directories, books and some direct mail products, and manufactures office products, including filing products, envelopes, note-taking products, binder products, and forms.  The Company utilizes a broad portfolio of technology capabilities, coupled with consultative attention to clients' needs, in order to increase speed to market, reduce costs, achieve postal savings and improve efficiencies.

LSC was formed on October 1, 2016 when it was spun-off (the "Spin-Off") from R.R. Donnelley & Sons Company ("RRD"), as part of a separation of RRD into three separate and independent publicly traded companies, including two new companies: (i) LSC, which became the owner of substantially all of the assets and liabilities relating to RRD's then-current publishing and retail-centric print services and office products business, and which is the parent entity of the Debtors, and (ii) Donnelley Financial Solutions, Inc., which became the owner of the assets and liabilities relating to RRD's then-current financial communications and data services business.  RRD retained the assets and liabilities associated with its customized multichannel communications management business.  In order to fund the Spin-Off and finance its operations independently, LSC issued the Senior Secured Notes and entered into the Credit Agreement Facilities (as defined below).  Substantially all of the net proceeds of the Senior Secured Notes and the Term Loan Facility were distributed to RRD in the form of a cash dividend.  In addition, LSC assumed certain of RRD's then-existing pension and other liabilities.

Prior to its suspension from trading in December 2019, LSC traded on the New York Stock Exchange under the ticker "LKSD."  It now trades on the OTC Pink Open Market under the same ticker.

The Company has offices, plants and other facilities in 28 states, as well as operations in Mexico, Canada and the United Kingdom.  The Company currently has approximately 15,770 total employees worldwide, of which approximately 12,990 employees are located in the United States.  The Company supplements its workforce by employing a large number of temporary workers, whose services are procured indirectly through third-party staffing agencies, and independent contractors.  Temporary workers constitute approximately 6% of the Company's U.S. workforce and are relied upon by the Company to fill positions on a consistent basis given a high level of annual turnover in and geographic remoteness of the Company's production plants.  The majority of the entities comprising the Company's U.S. business are Debtors in these Chapter 11 Cases; no non-U.S. subsidiary of LSC is a Debtor in the Chapter 11 Cases.

9

The corporate structure charts below provide a general overview of the relationship between and among the Debtors and their non-debtor affiliates.



10

4818-3242-6191 v.6



**LSC Communications, Inc. International Organizational Structure**

1. Print LSC Mexico, S. de R.L. de C.V. owns remaining 1% (60 units)
2. American Pad and Paper de Mexico S. de R.L. de C.V. owns 1 share representing 0.99% interest
3. Print LSC Mexico, S. de R.L. de C.V. owns remaining 0.99% (30 units)
4. Print LSC Mexico, S. de R.L. de C.V. owns 174 shares representing ~0.000924%
5. Election to treat as disregarded entity filed, awaiting IRS acceptance

Legend: 🟠65  65% of shares pledged under Credit Agreement

### B.    Products and Service Offerings

The Company is one of the largest producers of magazines and catalogs in North America.  These products are manufactured to customers' specifications using offset, digital or gravure printing processes in combination with either on-press finishing, saddle-stitch binding or patent binding.  The Company's catalog customers include retailers and other direct-to-buyer sellers and marketers who design their own catalogs and use the Company's production and logistics capabilities to print and distribute their catalogs to customers through the mail.  Magazine customers are publishers who design their own magazines and use the Company's production and logistics capabilities to print and distribute their magazines through the mail directly to their subscribers and through wholesalers to retailers and "newsstands" for purchase by non-subscribers.

Through a number of acquisitions in recent years, the Company's customers in the Magazines, Catalogs and Logistics segment have expanded to include financial services firms, direct marketers and other types of customers who utilize targeted, personalized digital and sheet-fed printing; business to business, trade and niche magazines; and customers seeking

11

4818-3242-6191 v.6

digital and print premedia capabilities including high-quality creative retouching, computer-generated imagery, mechanical creation, press-ready file preparation, and interactive production services.

In the United States, the Company has a network of production facilities enabling an optimal combination of both regional and national distribution. Additionally, the Company has production facilities in Mexico that efficiently produce goods for distribution in that country.

The Company provides logistics solutions and services, including mail services, both for products manufactured internally and for third parties in the United States. The Company acquired several businesses during 2017 and 2018 that expanded and enhanced its logistics offerings, including RRD's print logistics business, The Clark Group, Inc. and Fairrington Transportation Corp. The Logistics business is an integral part of the Company's competitive offering to Magazine and Catalog customers. The Company is one of the largest customers of the United States Postal Service ("USPS"), and works closely with the USPS to maximize postage savings for the Company's customers through mail sortation operations that rely on proprietary algorithms. In addition, the Company's Logistics business arranges for parcel shipments of books to customers' warehouses, distributors and end-consumers.

The Company is the largest producer of books in the United States. The Company's book customers generally are publishers who seek to print hardcover and softcover books for the education, trade, and religious sectors. The Company is well positioned to meet a variety of specific customer needs, including colors, page counts, trim size, binding styles and quantities. Consumer trade books are typically produced using either offset or digital printing processes, and are bound in a variety of formats. Educational books produced by the Company include softcover and traditional case-bound textbooks utilized by primary and secondary school and college students, as well as workbooks, teachers' editions, and other formats.

The Company produces directories, which are mainly phone directories that support local and small business advertising. Customers for directory printing are generally marketing solutions providers that publish information online as well as in printed directories.

In addition to printed products and logistics, the Company provides various print-related services. Among these services are: supply chain management services, including procurement, warehousing, distribution and inventory management for book publishers; e-book formatting and distribution services; print management and sourcing for customers looking to outsource non-core print functions and add scale to their marketing efforts; a premedia offering, which includes high-quality color retouching and other premedia services for both print and digitally delivered content for publishers and retailers; mail services, including list processing and mail sortation services that, combined with the Company's production scale, optimize postal costs for magazine and catalog customers; and cross-customer sortation that reduces postal costs for customers compared to what an individual customer could obtain. The Company also has a small publishing business unit that publishes trade books on a wide variety of subjects.

The Company produces and distributes a wide range of branded and private label office products to retailers, wholesalers and direct-to-consumer. Office products categories include filing products, envelopes, note-taking products (such as legal pads, journals, notebooks

12

and index cards), binder products and forms (including business forms, tax forms, message and memo pads, financial forms and recordkeeping materials).

### C.       Financial Performance and Cash Position

The Company's net loss for the fiscal year ended December 31, 2019 was $295 million, as compared to a net loss of $23 million in 2018.  The Company had approximately $1.65 billion in total assets as of December 31, 2019.  As of the Petition Date, the Debtors had approximately $24 million in cash on hand.  As of September 30, 2020, the Debtors had approximately $42 million in cash on hand.  Further financial information is available in the Company's 2019 10-K and the 2020 10-Qs.

### D.       Prepetition Capital Structure

As of the Petition Date, the Debtors had approximately $972 million in aggregate funded indebtedness, excluding accrued interest.  The following table summarizes the Debtors' prepetition indebtedness, and each category is described in greater detail below:

| Debt | Maturity | Approximate Principal Amount Excluding Interest (Millions) |
|---|---|---|
| Revolving Credit Facility | September 2021 | $299.8 |
| Term Loan Facility | September 2022 | $221.9 |
| Senior Secured Notes | October 2023 | $450.0 |
| **TOTAL** | | **$971.7** |

1.       *The Credit Agreement Facilities*

On September 30, 2016, LSC, as borrower, entered into a Credit Agreement (as amended, supplemented, or otherwise modified to date, the "Prepetition Credit Agreement") with the lenders party thereto and Bank of America, N.A., as administrative agent and collateral agent (in such capacities, the "Prepetition Agent").  The Prepetition Credit Agreement provided LSC with a revolving credit facility of up to $400 million, later reduced to up to $300 million (the "Revolving Credit Facility") and a term loan B facility with an initial outstanding principal amount of $375 million (the "Term Loan Facility" and together with the Revolving Credit Facility, the "Credit Agreement Facilities").

The Credit Agreement Facilities are guaranteed by certain of LSC's domestic subsidiaries (together with LSC, the "Loan Parties"), and existing and future subsidiaries meeting certain criteria are required to be joined as additional guarantors.  The obligations under the Credit Agreement Facilities are secured by a first-priority security interest (subject to certain permitted liens and certain exclusions, in each case as set forth in the Prepetition Credit Agreement and the "Loan Documents" (as defined therein), and the terms of the Intercreditor and Collateral Agency Agreement, dated as of September 30, 2016 (as amended, supplemented, or otherwise modified to date, the "Intercreditor Agreement"), among LSC, the other Loan Parties, the Prepetition Agent and the Prepetition Notes Collateral Agent (as defined below)) on substantially all of the assets of the Loan Parties (the "Collateral").

4818-3242-6191 v.6

The loans under the Credit Agreement Facilities bear interest at fluctuating rates measured by reference, at the option of LSC, to either adjusted LIBOR or an alternate base rate, in each case plus an applicable margin applicable to such loan.  The loans under the Revolving Credit Facility mature on September 30, 2021.  The loans under the Term Loan Facility (the "Term Loans") are entitled to quarterly repayments of principal in the amount of $10.625 million and mature on September 30, 2022.  As of the Petition Date, the outstanding principal amount under the Revolving Credit Facility was $249 million, with an additional $50.8 million of letter of credit obligations outstanding, and the outstanding principal amount under the Term Loan Facility was $221.9 million.

Based on final results of operations for the year ended December 31, 2019, the Company concluded it was not in compliance with the consolidated leverage ratio and minimum interest ratio covenants contained in the Prepetition Credit Agreement as of December 31, 2019.  On March 2, 2020, the Company entered into a Waiver, Forbearance Agreement and Fourth Amendment to Credit Agreement (the "Waiver and Forbearance Agreement") with lenders constituting a majority under the Prepetition Credit Agreement.  The Waiver and Forbearance Agreement waived the defaults or events of default that occurred as a result of the financial covenant noncompliance and prevented the lenders from directing the Prepetition Agent to accelerate the debt or exercise other remedies as a result of certain other potential defaults or events of default under the Prepetition Credit Agreement until May 14, 2020.

### 2.      *The Senior Secured Notes*

On September 30, 2016, LSC also entered into an Indenture (the "Prepetition Indenture"), among LSC, the other Loan Parties and Wells Fargo Bank, National Association ("Wells Fargo"), as trustee and collateral agent (following which Wilmington Trust, National Association replaced Wells Fargo as successor trustee and collateral agent) (the "Prepetition Notes Collateral Agent").  Pursuant to the Prepetition Indenture, LSC issued $450 million in principal amount of senior secured notes (the "Senior Secured Notes").

The Senior Secured Notes are guaranteed by the same Loan Parties as the Credit Agreement Facilities.  The obligations under the Senior Secured Notes are also secured by a first-priority security interest (subject to certain permitted liens and certain exclusions as set forth in the Prepetition Indenture and the "Notes Security Documents" (as defined therein), and the terms of the Intercreditor Agreement) on the Collateral.  The Senior Secured Notes bear interest at a rate of 8.75% annually and mature on October 15, 2023.

### 3.      *Intercreditor Arrangements*

LSC, the other Loan Parties, the Prepetition Agent and the Prepetition Notes Collateral Agent are all parties to an Intercreditor and Collateral Agency Agreement, dated as of September 30, 2016 (the "Intercreditor Agreement").  Pursuant to the Intercreditor Agreement (as well as related provisions of the Prepetition Credit Agreement as between the Revolving Credit Facility and the Term Loan Facility), the liens granted in connection with the Prepetition Credit Agreement and the Senior Secured Notes have an equal first-priority ranking with respect to the Collateral.  However, the obligations under the Revolving Credit Facility have a "first-out" priority and are entitled to any proceeds received in connection with the enforcement of remedies

14

against the Collateral prior to the Term Loan Facility or the Senior Secured Notes (together, the "Pari Passu Lien Indebtedness").  The Intercreditor Agreement also includes an acknowledgment among its parties that the liens granted to secure the Revolving Credit Facility are fundamentally different than those granted to secure the Pari Passu Lien Indebtedness, and that the Pari Passu Lien Indebtedness must be classified separately from the obligations under the Revolving Credit Facility in any bankruptcy or insolvency proceeding.

## E.      Factors Leading to the Commencement of the Debtors' Chapter 11 Cases

### 1.      *Printing Industry Trends*

Although the Company is a market leader in the printing and printing-related services industries, the Company's product and service offerings were adversely impacted by a number of long-term economic trends.  Digital migration has substantially impacted print production volume, in particular with respect to printed magazines as advertising spending continues to move away from print to electronic media.  Catalogs have experienced volume reductions as retailers and direct marketers allocate more of their spending to online advertising and marketing campaigns and some traditional retailers and director marketers go out of business in the face of increased competition from online retailers.  The Company saw an unprecedented drop in demand for magazines and catalogs in 2019, with the faster pace of decline in demand primarily due to the accelerating movement from printed platforms to digital platforms.

Demand for printed educational textbooks within the college market has been adversely impacted by electronic substitution and other trends such as textbook rental programs and free open source e-textbooks.  The K-12 educational sector has seen an increased focus on e-textbooks and e-learning programs, but there has been inconsistent adoption of these new technologies across school systems.  Consumer demand for e-books in trade and mass market has impacted overall print book volume, although e-book adoption rates have stabilized and industry-wide print book volume has been growing in recent years.  Electronic communication and transaction technology has also continued to drive electronic substitution in directory printing, in part driven by cost pressures at key customers and a migration of advertising spend away from print.

Tight labor markets and increased raw material prices as ongoing trends have also significantly impacted the Company's operating margins in the last several years.

### 2.      *Quad Merger*

On October 30, 2018, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement"), by and among Quad/Graphics, Inc. ("Quad"), QLC Merger Sub, Inc. and LSC, pursuant to which, subject to the satisfaction or waiver of certain conditions, LSC would be merged with QLC Merger Sub, Inc., and become a wholly owned subsidiary of Quad.

During the pendency of the merger transaction, LSC was prohibited under the Merger Agreement from implementing certain plant consolidation and footprint optimization steps identified in a comprehensive review of the business, as discussed further below.

4818-3242-6191 v.6

Additionally, customer uncertainty during the pendency of the merger made it difficult to attract new business, and certain customers chose not to renew contracts in part due to the expected merger with Quad. Finally, the Company faced challenges in attracting and retaining employees, who were concerned about how the merger would affect their future employment.

On June 20, 2019, the U.S. Department of Justice (the "DOJ"), after a seven month exhaustive review of the merger, filed a civil antitrust lawsuit in Chicago under Section 7 of the Clayton Act seeking to block the proposed merger. The lawsuit was filed after the parties were unable to alleviate the DOJ's concerns about the competitive effects of the merger, following completion of an expensive and time-consuming Second Request review process, and after intensive efforts to reach a negotiated settlement with the DOJ failed.

On July 22, 2019, after the DOJ sued to block the merger, Quad and LSC entered into a letter agreement, pursuant to which the parties agreed to terminate the Merger Agreement. Pursuant to the Letter Agreement, Quad agreed to pay LSC the reverse termination fee provided for in the Merger Agreement of $45 million in cash. The Company incurred transaction costs of approximately $26 million associated with the merger transaction, of which $5 million were incurred in 2018.

### 3. *Book Market Disruption*

Following the termination of the Quad merger and exacerbating ongoing declines in the Magazine and Catalogs businesses, the Company experienced a significant decline in book sales in the second half of 2019, with revenues falling by over 20% year-over-year in the fourth quarter of 2019 alone. This decline was largely attributable to higher inventory levels for existing education customers, driven by orders placed in late 2018 and early 2019 in anticipation of capacity constraints, as well as shifting consumer preferences for higher education course materials and declines in sales of religious volumes. The Book segment, as well as the Magazine and Catalogs businesses, was further impacted by a declining market price for paper by-products, which the Company normally sells for resale to Chinese purchasers but has seen a significant decrease in market demand due to the ongoing trade conflict between the United States and China.

### 4. *Operational Initiatives*

During late 2018 and early 2019, the Company conducted a comprehensive review of its operations to identify new revenue opportunities and cost savings initiatives. Named "Project EDGE," this review covered substantially all aspects of the Company – both operational and support functions – and involved key personnel from throughout the organization. The resulting revenue opportunities and cost-savings initiatives were approved by senior management in the first quarter of 2019, and the Company acted promptly to implement the identified revenue opportunities and cost-savings initiatives. The Company has already realized significant benefits from these initiatives and expects to realize substantial additional benefits over the next three years. The Company incurred approximately $10 million of expense during the year ended December 31, 2019 relating to the implementation of certain of the identified initiatives. As the Company continues to implement the identified initiatives, the Company expects to incur additional expense; however, the Company expects the resulting

16

benefits (additional recurring revenue and/or cost savings) to significantly exceed the additional one-time expense.

In addition to implementing Project EDGE, during the first half of 2019, the Company identified the need and developed a plan for significant plant consolidation and footprint optimization, primarily within its magazine and catalog manufacturing platform. However, the Merger Agreement prohibited much of this operational restructuring plan from being implemented while the merger was pending. Following the termination of the Merger Agreement, the Company acted quickly to announce and execute the strategic closures of nine manufacturing facilities. In addition, the Company undertook the rationalization or renegotiation of certain unprofitable customer contracts and took steps to reduce other costs and improve administrative efficiency.

5.      *Restructuring Discussions and Decision to File for Chapter 11*

In light of the challenges described above and expectations regarding the Company's financial performance for the year 2019, the Company hired legal, financial and restructuring advisors in late 2019 to review the Company's situation and recommend restructuring alternatives. Following their review, the advisors determined that the Company would likely need to enter into a transaction to restructure its balance sheet and reduce indebtedness.

In January 2020, the Company began discussions with its secured creditors regarding a potential balance sheet restructuring transaction, beginning with the Prepetition Agent and the lenders under the Revolving Credit Facility. These discussions included the negotiation of the Waiver and Forbearance Agreement, which allowed the Company to continue to speak to its various secured creditors regarding a potential restructuring transaction in which substantial equity of the Company would be issued to creditors in exchange for secured indebtedness. Following discussions in March 2020 with the Revolving Credit Facility lenders, as well as advisors representing certain of the Company's secured creditors, the Company concluded that it would be most appropriate to explore such a balance sheet restructuring in parallel with a marketing of its business so as to maximize its strategic options to preserve value for stakeholders.

During its March discussions with creditors, the Debtors began to see a significant decrease in their available liquidity, driven in part by the long-term industry trends discussed above and made acute by the severe economic impact of the COVID-19 pandemic. In order to address their anticipated liquidity needs, the Debtors and their advisors engaged with certain of the Revolving Credit Facility lenders, as well as other potential third-party financing sources, to discuss debtor-in-possession financing for a chapter 11 case. These discussions resulted in certain of the Revolving Credit Facility lenders offering to finance a debtor-in-possession credit facility. The terms of this debtor-in-possession credit facility required that the Debtors conduct a marketing process for the sale of substantially all of their assets.

4818-3242-6191 v.6

3.    **SIGNIFICANT EVENTS AND BUSINESS INITIATIVES IN THESE CHAPTER 11 CASES**

The following is a general summary of significant events in these Chapter 11 Cases, including a discussion of the Debtors' restructuring and business initiatives since the commencement of these Chapter 11 Cases.

A.    **Overview of Chapter 11**

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization and orderly liquidation. Chapter 11 helps a company to maximize recovery to all stakeholders. Chapter 11 promotes equality of treatment for similarly situated creditors and interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate comprising all property and all other legal and equitable interests of the debtor as of the date of the debtor's petition for chapter 11 protection. Chapter 11 allows the debtor to continue all business operations and remain in possession of all property of the estate as a "debtor-in-possession."

The United States Trustee for the Southern District of New York (the "U.S. Trustee") monitors the progress of a chapter 11 case and supervises its administration. In particular, the U.S. Trustee is responsible for monitoring the debtor-in-possession's operation of the business and the submission of operating reports and fees.

A chapter 11 case often culminates in the consummation of a chapter 11 plan. The plan includes a classification of claims against and interests in the debtor and specifies how each class will be treated. Among other things, the plan must be confirmed by the bankruptcy court before it is implemented.

B.    **The Chapter 11 Cases**

On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court, commencing the Chapter 11 Cases. Simultaneous to the filing, the Debtors filed the First Day Motions (as defined below) with the Bankruptcy Court.

1.    *First Day Relief*

On the Petition Date, the Debtors filed numerous motions seeking relief intended to ensure a seamless transition between the Debtors' prepetition and postpetition business operations, and to facilitate the administration of these Chapter 11 Cases (the "First Day Motions"). On April 15, 2020, the Bankruptcy Court entered orders approving the First Day Motions (the "First Day Orders"), with certain approvals being on an interim basis.

Among other things, the First Day Orders allowed the Debtors to continue certain normal business activities not specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior court approval. In particular, the First Day Orders authorized the Debtors to:

18

- pay prepetition claims of certain vendors and lienholders;

- pay prepetition compensation and reimbursable expenses, pay and honor benefits and other programs and continue workforce obligations;

- continue to use their prepetition cash management system, bank accounts and business forms;

- continue their insurance and surety bond programs;

- provide adequate assurance to utility providers; and

- pay prepetition taxes.

The First Day Motions approved on an interim basis were subsequently approved by the Bankruptcy Court on a final basis at hearings on May 12, 2020 and June 2, 2020.

In addition, the commencement of the Chapter 11 Cases triggered the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined all collection efforts and actions by creditors, the enforcement of all liens against property of the Debtors and the commencement or continuation of prepetition litigation against the Debtors. Subject to limited exceptions, the automatic stay will remain in effect until the Effective Date of the Plan.

2.      *Debtor-In-Possession Financing*

In addition to the other First Day Motions, simultaneous with the commencement of these Chapter 11 Cases, the Debtors filed a motion seeking authority to obtain postpetition financing of up to $100 million (the "DIP Facility") on a secured, superpriority basis [D.I. 14] (the "DIP Motion"). On April 15, 2020, the Bankruptcy Court approved the DIP Motion on an interim basis and entered an order [D.I. 35] authorizing, among other things, the Debtors to draw up to $27.5 million in aggregate principal amount of revolving loans and issue letters of credit in aggregate amount of up to $45 million, with $5 million of that amount being available for the issuance of new letters of credit.

At a final hearing on June 2, 2020, the Bankruptcy Court approved and, on June 5, 2020, subsequently entered the final DIP order [D.I. 321] authorizing the Debtors to access the entire $100 million DIP Facility, consisting of (i) revolving loans not to exceed an aggregate amount of $55 million and (ii) letters of credit not to exceed an aggregate amount of $45 million, with $5 million of that amount being available for the issuance of new letters of credit. The DIP Facility will mature on the earlier of (a) the Effective Date or (b) January 13, 2021.

3.      *Continuation of the Debtors' Operations*

Since the Petition Date, the Debtors have operated in the ordinary course of business. In accordance with the First Day Orders, the Debtors paid certain prepetition claims of vendors, lienholders and employees, and the Debtors continue to pay their vendors, lienholders

19

and employees in the ordinary course of business postpetition as amounts become due and payable.

Since the Debtors' entry into the Acquisition Agreement pursuant to which the Debtors will sell substantially all of their assets and the subsequent entry by the Bankruptcy Court of the Sale Order, the Debtors have been working with their key creditor constituencies on the development of the Plan, the continued orderly disposal of the Debtors' assets not being sold pursuant to the Acquisition Agreement and the administration and wind down of these Chapter 11 Cases.

4.    *The Committee*

On April 22, 2020, the U.S. Trustee appointed an official committee of unsecured creditors (the "Committee") [D.I. 90].  The seven members of the Committee are: (a) Flint Group North America Corp.; (b) A.J. Jersey, Inc.; (c) JB Hunt Transport, Inc.; (d) Pension Benefit Guaranty Corporation; (e) Graphic Communications Conference of the International Brotherhood of Teamsters National Pension Fund; (f) Charles L. Winchester; and (g) Scot H. Smith.  The Committee retained Stroock & Stroock & Lavan LLP as counsel [D.I. 329], Levenfeld Pearlstein, LLC as efficiency counsel [D.I. 326], Alvarez & Marsal North America, LLC as financial advisor [D.I. 330] and Jefferies LLC as investment banker [D.I. 327].

5.    *Retention of Debtor Professionals*

On April 21, 2020 and April 22, 2020, the Debtors filed applications to retain their primary restructuring professionals.  These included: (a) an application to retain Sullivan & Cromwell LLP as counsel to the Debtors [D.I. 84]; (b) an application to retain Young Conaway Stargatt & Taylor, LLP as co-counsel and conflicts counsel to the Debtors [D.I. 88]; (c) an application to retain Evercore Group L.L.C. as financial advisor and investment banker to the Debtors [D.I. 86]; (d) an application to retain AlixPartners, LLP as financial advisor to the Debtors [D.I. 87]; (e) an application to retain Prime Clerk LLC as the Debtors' administrative advisor [D.I. 85]; and (f) a motion to retain, compensate and reimburse professionals utilized in the ordinary course of business [D.I. 82] (collectively, the "Retention Applications").  Each of the Retention Applications was approved [D.I. 216, 218–221 and 236].

On April 21, 2020, the Debtors also filed a motion to establish procedures for the compensation and reimbursement of expenses of the Debtors' and the Committee's professionals on a monthly basis [D.I. 83] (the "Interim Compensation Procedures Motion").  An order approving the Interim Compensation Procedures Motion was entered on May 12, 2020 [D.I. 217], and the Bankruptcy Court entered a further amended order approving the Interim Compensation Procedures Motion on July 15, 2020 [D.I. 514].

6.    *Key Employee Plans*

On May 12, 2020, the Debtors filed a motion seeking authorization to implement (i) a proposed key employee incentive plan (the "KEIP") and (ii) a proposed key employee retention plan (the "KERP") [D.I. 225] (the "KEIP/KERP Motion").  The Bankruptcy Court entered an order approving the KEIP/KERP Motion on June 5, 2020 [D.I. 324].  This order is subject to an appeal taken by the U.S. Trustee, which appeal is currently pending.

20

The KEIP provided seven of the Debtors' key leaders (the "KEIP Employees") with the opportunity to earn awards based on a "dual-track" structure with an operational incentive component and a sale incentive component. The total size of the KEIP opportunity pool (the "KEIP Pool") at target performance was set at $6 million, thereby making the total size of the KEIP Pool at maximum levels of performance under the operational incentives $7.5 million. Awards under the KEIP are paid in cash. Payouts from the KEIP Pool depend on performance under each incentive component. For the operational incentive component, threshold and maximum performance ranges around target performance were established for each quarterly performance period. Actual awards to be paid to the KEIP Employees range from $0 for performance that falls below the threshold, to 75% of target for threshold levels of performance, to 125% of target for maximum levels of performance. For the sale incentive component, performance ranges were based on defined threshold cash proceeds from asset sales, with a cap of 200% of the amount paid at target. Approximately $3,964,004 in total awards have been paid to the KEIP Employees under the operational incentives as of October 31, 2020 and approximately $6,441,630 is expected to be paid in total to KEIP Employees prior to the termination of the KEIP.

The KERP includes approximately 190 of the Debtors' exempt, non-union, non-insider key employees (the "KERP Employees") and the aggregate maximum potential award amount under the KERP was set at approximately $8 million (the "KERP Pool"). Payments of the KERP Pool, subject to a 25% holdback while any amounts remain outstanding under either the DIP Facility or the Revolving Credit Facility, were scheduled to be made on each of the three-, six- and nine-month anniversaries of the date on which the KERP was approved by the Bankruptcy Court, along with an additional payment on the Effective Date of the Plan, in each case subject to the recipient's continued employment. Upon an involuntary termination of a KERP Employee's employment without cause or due to death or disability, a KERP Employee is entitled to his or her pro rata payment of any unpaid portion of the award through the date of termination or death or disability. Following the Sale, with respect to any KERP Employees that join Buyer, Buyer will assume the remaining KERP payments to such KERP Employees.

Ten percent of each award under the KERP (minus the 25% holdback) was payable on September 2, 2020, resulting in a total of $579,187.50 of the KERP Pool being distributed.

7.      *Schedules and Statements and 341 Meeting*

On June 11, 2020, the Debtors filed their schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") with the Bankruptcy Court. The Schedules and Statements are available for review at the Debtors' case information website, https://cases.primeclerk.com/LSC/.

On July 20, 2020, after the filing of the Schedules and Statements, the U.S. Trustee conducted a meeting of creditors pursuant to section 341 of the Bankruptcy Code.

21

4818-3242-6191 v.6

8.      *Bar Date and Claims Process*

On July 23, 2020, the Debtors filed a motion requesting entry of an order establishing bar dates for filing proofs of claim [D.I. 521].  On August 18, 2020, the Bankruptcy Court entered an order [D.I. 604] setting September 24, 2020 as the general bar date for the filing of proofs of claims against the Debtors.  Subject to certain exceptions, all persons and entities holding prepetition claims were required to file a proof of claim on or before the September 24, 2020 bar date.  As of the September 24, 2020 bar date, 3,046 proofs of claim were filed against the Debtors.

To facilitate the claims reconciliation process, on November 2, 2020, the Debtors filed a motion (the "Claims Objections Procedures Motion") for leave to file omnibus objections to claims and establishing related procedures [D.I. 936].  On [•], the Bankruptcy Court entered an order granting the Claims Objections Procedures Motion (the "Claims Objections Procedures Order") [D.I. [•]] authorizing the Debtors to file omnibus claims objections on various grounds.

9.      *Stay Relief*

During these Chapter 11 Cases, certain parties have filed motions seeking relief from the automatic stay.  Each of these motions have been resolved, including:

- On June 12, 2020, Hartford Fire Insurance Company ("Hartford") filed a motion for relief from the automatic stay to permit Hartford to cancel certain surety bonds issued on behalf of Debtor LSC Communications Logistics, LLC [D.I. 388].  On July 15, 2020, the Bankruptcy Court entered an agreed order proposed by the Debtors consensually resolving this motion [D.I. 510].

- On June 24, 2020, Packaging Corporation of America ("PCA") filed a motion for relief from the automatic stay to allow PCA to exercise setoff and recoupment rights against the Debtors [D.I. 436].  PCA subsequently withdrew the motion without prejudice [D.I. 475].

- On August 19, 2020, Kevin H. and Debbie A. Forry (the "Forrys") filed a motion for relief from the automatic stay to allow the Forrys to pursue their pending personal injury lawsuit against Debtor LSC Communications US, LLC [D.I. 618].  On September 4, 2020, the Debtors filed an objection to the motion [D.I. 732], and on September 23, 2020, the Bankruptcy Court entered an order denying the Forrys' motion [D.I. 813].

C.   **Sale Process**

1.      *Bid Procedures*

Following the chapter 11 filing, in consultation with their advisors, the Debtors determined that it was in the best interests of the Debtors and their estates to pursue a potential sale of substantially all of the Debtors' assets.  To comply with the milestones set forth in the

22

4818-3242-6191 v.6

DIP Credit Agreement, on May 12, 2020, the Debtors filed a motion with the Bankruptcy Court seeking approval of, among other things, bid procedures (the "Bid Procedures") for the marketing and potential sale of substantially all of the Debtors' assets [D.I. 223].  On June 5, 2020, the Bankruptcy Court entered an order approving the Bid Procedures [D.I. 322].

          2.    *Sale Process*

The Bid Procedures set forth the requirements and deadlines for potential bidders to submit bids for the Debtors' assets, certain of which were extended by the Debtors as permitted under the Bid Procedures in order to enhance the competitive bidding process, as well as the terms for an auction of the Debtors' assets.  Potential bidders were required to submit preliminary indications of interest by June 9, 2020 (the "Preliminary Bid Deadline") and qualified bids by July 30, 2020, which was subsequently extended with notice to the bidders to August 26, 2020 (the "Bid Deadline").  If the Debtors received one or more qualified bids for the same business segment(s), the Debtors were authorized to conduct an auction (the "Auction"). The Debtors were authorized to review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the transaction, and to choose the highest or otherwise best offer(s) for such business segment(s) (the "Successful Bidder") and alternative next highest or otherwise best offer(s).  Additionally, in order to incentivize a bidder (the "Stalking Horse Bidder") to serve as the stalking horse bid for one or more business segments, the Bid Procedures permitted the Debtors, subject to objections from the DIP Agent, the Junior Secured Creditors and/or the Committee, to offer a potential Stalking Horse Bidder (i) a breakup fee of up to 3.0% of the value of consideration to be paid by such Stalking Horse Bidder and (ii) expense reimbursement in an amount up to 1.0% of the value of the cash consideration to be paid, subject to a maximum reimbursement amount of $750,000 in the aggregate for all Stalking Horse Bidders.

Prior to the Bid Deadline, the Debtors, with the assistance of their advisors, engaged in discussions with numerous interested parties regarding a potential transaction.  On the Preliminary Bid Deadline, the Debtors received 14 preliminary bids.  Between the Preliminary Bid Deadline and the Bid Deadline, the Debtors, with the assistance of their advisors and in consultation with certain key creditor representatives designated under the Bid Procedures (the "Consulting Professionals"), continued to work with selected interested parties in preparation for the Bid Deadline and a potential auction.

The Debtors received five bids on or prior to the Bid Deadline.  The Debtors, with the assistance of their advisors and in consultation with the Consulting Professionals, reviewed the bids.  On September 15, 2020, the Debtors designated ACR III Libra Holdings LLC ("Buyer"), an entity affiliated with certain of the Debtors' secured creditors, as the Stalking Horse Bidder and entered into a Stock and Asset Purchase Agreement (the "Acquisition Agreement") with Buyer, for the sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code in exchange for (i) the Final Cash Consideration, (ii) a credit bid and release of each seller from the corresponding portion of the indebtedness related to the credit bid amount under each of the Term Loan Facility and the Senior Secured Notes, in an aggregate amount equal to $63.437 million, and (iii) the assumption of certain specified liabilities of the sellers, including obligations relating to the Debtors' single-employer qualified

23

pension plan [D.I. 773]. Notably, Buyer will also assume the Debtors' trade accounts payable that arose in the ordinary course and were incurred from and after the Petition Date, which eliminates a significant number of Claims that would otherwise be Administrative Claims. The Debtors determined that Buyer had made the highest and otherwise best offer for substantially all of the Debtors' assets and designated Buyer as the Successful Bidder, cancelling the Auction.

    3.  *Plan Stipulation*

    Under the Acquisition Agreement, Buyer is obligated to assume the Debtors' qualified pension plan at the closing of the Sale, unless (a) the Debtors, the Committee and certain creditors holding in aggregate at least two-thirds of the aggregate outstanding principal amount of Term Loans and Senior Secured Notes failed to enter into a stipulation to support the Sale and the key terms of a liquidating chapter 11 plan (an "Acceptable Stipulation") prior to the Sale Hearing (as defined below) and (b) Buyer delivered to the Debtors prior to the closing of the Sale a written notice, signed by Buyer, declining to assume the Debtors' pension plan, which notice was approved by certain creditors holding at least a majority of the aggregate outstanding principal amount of the Term Loans and Senior Secured Notes held by all such creditors that are party to that certain Amended and Restated Credit Bid Support Agreement, dated as of September 15, 2020, among ACR III Libra Parent LLC, the creditors identified on the signature pages thereto, Lapetus Capital III LLC and, for the purposes set forth therein, Atlas Capital Resources III LP and Atlas Capital Resources (P) III LP. On September 30, 2020, the Debtors filed the executed Plan Stipulation [D.I. 853], which is an Acceptable Stipulation. As a result, Buyer will be obligated to assume the pension plan upon the closing of the Sale.

    The Plan Stipulation, among other things, provides for the establishment of a $7,000,000 Unsecured Claim Pool and the formation of a Litigation Trust, funded with $1,000,000 from the Final Cash Consideration, for the purpose of pursuing certain potential claims related to the Spin-Off for the benefit of Holders of Allowed General Unsecured Claims, as described below in greater detail. On the Effective Date, the Litigation Trust will be vested with (a) $1,000,000 to pursue such litigation assets and fund the expenses of the Litigation Trust and (b) the Preserved Potential Claims (as defined below).

    4.  *Sale Hearing*

    On September 30, 2020, the Bankruptcy Court held a hearing to consider the proposed sale of the Debtors' assets to Buyer (the "Sale Hearing"). The Bankruptcy Court entered an order authorizing the Sale on October 7, 2020 [D.I. 876] (the "Sale Order"). In addition to authorizing the Sale, the Sale Order provides that Buyer shall be prohibited from prosecuting any Avoidance Actions (including any potential preference actions that may be asserted against vendors) that constitute Purchased Assets (as defined in the Sale Order). However, Buyer may pursue all defenses and claims, including Avoidance Actions, against any party that asserts affirmative causes of action against Buyer relating to or arising from any documents, instruments or any act or omission, transaction or any other activity of any kind or nature that occurred prior to the Closing Date (as defined in the Acquisition Agreement).

The sale to Buyer is expected to be consummated during the fourth quarter of 2020, subject to satisfaction of certain conditions to closing, which include approval of such sale by the Mexican Federal Competition Commission.

5.      *De Minimis Sales*

Prior to the Petition Date, the Debtors routinely and in the ordinary course of business sold or, when necessary, otherwise disposed of non-core assets that were obsolete, burdensome or of little or no usable value to the Debtors' estates and that were relatively *de minimis* in value compared to the Debtors' total asset base ("De Minimis Assets").  On May 13, 2020, the Debtors filed a motion with the Bankruptcy Court seeking approval of procedures for the sale or transfer of De Minimis Assets free and clear of liens, claims, interests and encumbrances [D.I. 228] (the "De Minimis Assets Sale Motion").  On June 5, 2020, the Bankruptcy Court entered an order approving the De Minimis Assets Sale Motion [D.I. 325] (the "De Minimis Assets Sale Order").  Since entry of the De Minimis Assets Sale Order by the Bankruptcy Court, the Debtors have filed monthly status reports describing the De Minimis Assets sold pursuant to the De Minimis Assets Sale Order [D.I. 548, 695, 847 and 928].  The Debtors have received approximately $650,000 in the aggregate from the sales of De Minimis Assets since the Petition Date.

4818-3242-6191 v.6

## 4.   SUMMARY OF THE PLAN

The Plan provides for the distribution of the proceeds (i) of the Sale and (ii) from the liquidation of the Debtors' assets that remain after consummation of the Sale.  The structure of the Plan is informed by the Debtors' expectation that the substantial majority of Claims asserted against the Debtors will be classified into one of three categories: (a) Other Secured Claims, comprised of Secured Claims that are not Junior Remaining Claims; (b) Junior Remaining Claims, comprised of all remaining indebtedness under the Term Loan Facility and the Senior Secured Notes *minus* the Credit Bid Amount; and (c) General Unsecured Claims, comprised of pension, trade and other unsecured claims.  Additionally, because Buyer will assume the Debtors' postpetition trade payables pursuant to the Acquisition Agreement, the Plan does not address treatment of postpetition Claims of trade creditors, which Claims will be assumed and paid in full by Buyer.

The Plan provides that all Other Secured Claims will be paid in full or otherwise Unimpaired.  Holders of Allowed Junior Remaining Claims will receive their Pro Rata share of the Junior Remaining Claim Distribution Pool.  Holders of Allowed General Unsecured Claims will receive their Pro Rata share of the Unsecured Claim Pool and the Litigation Trust Interests. The costs and expenses of administering the Plan after the Effective Date will be funded by the Wind Down Cash Proceeds.  For the avoidance of doubt, no Wind Down Cash Proceeds shall fund the Litigation Trust.

On the Effective Date, in partial satisfaction of Allowed General Unsecured Claims, the Litigation Trust will be established and funded with $1,000,000 from the Final Cash Consideration, and will be vested with the claims (and the Net Recoveries thereof) of the Debtors related to the Spin-Off against (a) RRD, (b) Donnelley Financial Solutions, Inc., and (c) with respect to the entities set forth in clauses (a) and (b), each of such entities' current and former directors, officers, advisors, professionals and agents (the "Preserved Potential Claims").  The Preserved Potential Claims shall not include any Claim or Cause of Action (i) under section 547 of the Bankruptcy Code or any similar state law, (ii) that would result in a liability to or obligation of Buyer or (iii) against directors and/or officers to the extent such Claim or Cause of Action is not fully covered by and payable exclusively from policy limits of the insurance maintained by RRD or Donnelley Financial Solutions, Inc. (or their affiliates) for the benefit of any such director or officer.  The Litigation Trustee has not conducted a thorough investigation of the Preserved Potential Claims and, accordingly, there can be no guarantee of any recovery from the Litigation Trust Assets.

The classification, treatment and voting of Claims and Interests and settlement, release, injunction and related provisions are summarized below.  For all other provisions relating to the Plan, including implementation of the Plan; treatment of Executory Contracts and Unexpired Leases; conditions precedent to effectiveness of the Plan; modification, revocation or withdrawal of the Plan and retention of jurisdiction, please refer to the Plan attached hereto as Appendix A.

4818-3242-6191 v.6

**A.      Classification, Treatment and Voting of Claims and Interests**

1.      *Classification of Claims and Interests*

All Claims and Interests except for Administrative Claims, 503(b)(9) Claims and Priority Tax Claims are classified in the Classes set forth in Article 4 of the Plan.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is Allowed as a Claim or Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

a.      Deemed Substantive Consolidation.  The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order deeming the substantive consolidation of the Debtors' Estates into a single Estate for certain limited purposes related to the Plan, including Voting, Confirmation and Distribution.  As a result of the deemed substantive consolidation of the Estates, each Class of Claims and Interests will be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors.  The Plan will not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to voting and distribution rights under the Plan.

b.      Summary of Classification and Treatment.  The classification of Claims and Interests pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
| :---: | :---: | :---: | :---: |
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Junior Remaining Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Impaired | Deemed to Reject |
| 6 | Intercompany Interests | Impaired | Deemed to Reject |
| 7 | Subordinated  Claims | Impaired | Deemed to Reject |
| 8 | Equity Interests in LSC | Impaired | Deemed to Reject |

2.      *Treatment of Claims and Interests*

Class 1 – Other Priority Claims

(a)      *Classification*:  Class 1 consists of all Other Priority Claims.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement and release of and in exchange for its

27

Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes Allowed and (iii) such other date as may be ordered by the Bankruptcy Court.

(c)     *Voting*:  Claims in Class 1 are Unimpaired.  Each Holder of an Other Priority Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of Other Priority Claims is entitled to vote to accept or reject the Plan.

Class 2 – Other Secured Claims

(a)     *Classification*:  Class 2 consists of Other Secured Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement and release of and in exchange for its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the Plan Administrator: (i) payment in full in Cash; (ii) delivery of the collateral securing such Allowed Other Secured Claim or (iii) treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired.

(c)     *Voting*:  Claims in Class 2 are Unimpaired.  Each Holder of an Other Secured Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of an Other Secured Claim is entitled to vote to accept or reject the Plan.

Class 3 – Junior Remaining Claims

(a)     *Classification*:  Class 3 consists of all Junior Remaining Claims.

(b)     *Allowance*:  The Junior Remaining Claims shall be Allowed in an aggregate amount equal to $[•], representing (i) $[•] in respect of the aggregate outstanding principal amount of the indebtedness under the Term Loan Facility, plus accrued and unpaid interest thereon at the non-default contractual rate up to and including the Petition Date *plus* (ii) $[•] in respect of the aggregate principal amount outstanding under the Senior Secured Notes plus accrued and unpaid interest thereon at the non-default contractual rate up to and including the Petition Date.

28

(c) *Treatment*:  Except to the extent that a Holder of an Allowed Junior Remaining Claim agrees to a less favorable treatment, and in full and final satisfaction, settlement and release of and in exchange for its Allowed Junior Remaining Claim, each Holder of an Allowed Junior Remaining Claim shall receive its Pro Rata share of the Junior Remaining Claim Distribution Pool, subject to the Unsecured Claim Pool.

(d) *Voting*:  Claims in Class 3 are Impaired and each Holder of a Junior Remaining Claim is entitled to vote to accept or reject the Plan.

Class 4 – General Unsecured Claims

(a) *Classification*:  Class 4 consists of all General Unsecured Claims.

(b) *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, and in full and final satisfaction, settlement and release of and in exchange for its Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive (i) its Pro Rata share of the Unsecured Claim Pool and (ii) its Pro Rata share of the Litigation Trust Interests.

(c) *Voting*:  Claims in Class 4 are Impaired and each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

Class 5 – Intercompany Claims

(a) *Classification*:  Class 5 consists of all Intercompany Claims.

(b) *Treatment*:  All Intercompany Claims shall be canceled, released or otherwise settled in full, and the Holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion under the Plan unless reasonably determined otherwise by the Debtors with the consent of the Committee and Requisite Junior Secured Creditors, such consent not to be unreasonably withheld, conditioned or delayed.

(c) *Voting*:  Claims in Class 5 are Impaired.  Each Holder of an Intercompany Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of an Intercompany Claim is entitled to vote to accept or reject the Plan.

29

Class 6 – Intercompany Interests

(a)     *Classification*:  Class 6 consists of all Intercompany Interests.

(b)     *Treatment*:  No Holder of an Intercompany Interest shall receive any Distributions on account of its Intercompany Interests.  On and after the Effective Date, all Intercompany Interest shall be canceled and shall be of no further force and effect, whether surrendered for cancelation or otherwise.

(c)     *Voting*:  Claims in Class 6 are Impaired.  Each Holder of an Intercompany Interest is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of an Intercompany Interest is entitled to vote to accept or reject the Plan.

Class 7 – Subordinated Claims

(a)     *Classification*:  Class 7 consists of all Subordinated Claims.

(b)     *Treatment*:  No Holder of a Subordinated Claim shall receive any Distributions on account of its Subordinated Claim.  On and after the Effective Date, all Subordinated Claims shall be canceled, released and extinguished and shall be of no further force and effect, whether surrendered for cancelation or otherwise.

(c)     *Voting*:  Claims in Class 7 are Impaired.  Each Holder of a Subordinated Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of a Subordinated Claim is entitled to vote to accept or reject the Plan.

Class 8 – Equity Interests in LSC

(a)     *Classification*:  Class 8 consists of all Equity Interests in LSC.

(b)     *Treatment*:  No Holder of an Equity Interest in LSC shall receive any Distributions on account of its Equity Interest.  On and after the Effective Date, all Equity Interests in LSC shall be canceled and shall be of no further force and effect, whether surrendered for cancelation or otherwise.

(c)     *Voting*:  Claims in Class 8 are Impaired.  Each Holder of an Equity Interest in LSC is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of an Equity Interest in LSC is entitled to vote to accept or reject the Plan.

30

4818-3242-6191 v.6

3.     *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, the Plan shall not affect the Debtors' or the Plan Administrator's rights in respect of any Unimpaired Claims, including legal and equitable defenses or setoff or recoupment rights with respect thereto.

4.     *Acceptance by Impaired Classes*

An Impaired Class of Claims shall have accepted the Plan if: (i) the Holders (other than any Holder designated under § 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Claims entitled to vote actually voting in such Class have voted to accept the Plan; and (ii) the Holders (other than any Holder designated under § 1126(e) of the Bankruptcy Code) of more than one-half in number of the Claims entitled to vote actually voting in such Class have voted to accept the Plan.

5.     *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or an Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purpose of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

6.     *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class of Claims or Interests is eligible to vote and no Holder of Claims or Interests, as applicable, in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.  Classes 1 and 2 are deemed to have accepted the Plan and are not entitled to vote.

7.     *Confirmation Pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy Code*

For purposes of Confirmation, section 1129(a)(10) of the Bankruptcy Code shall be satisfied if any one of Classes 3 or 4 accepts the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class or Classes of Claims and Interests.  Classes 5, 6, 7 and 8 are deemed to reject the Plan.

**B.    Implementation of the Plan**

1.     *Operations Between the Confirmation Date and Effective Date*

During the period from the Confirmation Date through and until the Effective Date, the Debtors may continue to operate their businesses as debtors-in-possession, subject to all applicable orders of the Bankruptcy Court.

4818-3242-6191 v.6

2.      *Wind Down Estates*

The purpose of the Wind Down Estates is to monetize and distribute the Plan Assets, with no objective to continue or engage in the conduct of a trade or business.  The Plan Administrator shall be vested with all powers and authority set forth in the Plan and the Plan Administration Agreement, shall be deemed to have been appointed as the Debtors' Estates' representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, and shall have the duties of a trustee set forth in sections 704(a)(1), 704(a)(2) and 704(a)(5) of the Bankruptcy Code.

3.      *Modifications to Wind Down Budget*

Modification to the (a) Professional Fee Reserve Amount or Wind Down Budget that reduces the amounts budgeted for Professionals of the Committee or (b) Wind Down Budget generally, where such modification either individually or in the aggregate with other modifications could reasonably result in an amount less than $7,000,000 becoming available to fund the Unsecured Claim Pool, shall require the consent of the Committee, such consent not to be unreasonably withheld, conditioned or delayed.

4.      *Plan Funding Mechanism*

Distributions under the Plan shall be funded from Cash on hand, Wind Down Cash Proceeds and any other Plan Assets, except as expressly set forth in the Plan.

5.      *Plan Administrator*

a.    Appointment; Duties.  Not less than 10 days prior to the Confirmation Hearing and subject to Bankruptcy Court approval in connection with Confirmation of the Plan, the Requisite Junior Secured Creditors and the Committee shall designate the Person who initially will serve as the Plan Administrator, which Person shall be reasonably acceptable to the Debtors.

b.    Plan Administration Agreement.  The Plan Administrator shall be a fiduciary of the Wind Down Estates and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the Plan Administration Agreement.

c.    Powers and Duties of Plan Administrator.  The Plan Administrator shall have no duties until the occurrence of the Effective Date, and on and after the Effective Date shall be a fiduciary of each of the Wind Down Estates.  If the Plan is withdrawn or otherwise abandoned prior to the occurrence of the Effective Date, the Plan Administrator position shall never be established.  From and after the Effective Date, pursuant to the Wind Down Budget and the terms and provisions of the Plan and the Plan Administration Agreement, the Plan Administrator shall be empowered and directed to: (a) take all steps and execute all instruments and documents necessary to make Distributions to Holders

32

of Allowed Claims and to perform the duties assigned to the Plan Administrator under the Plan or the Plan Administration Agreement; (b) comply with the Plan and the obligations hereunder; (c) employ, retain or replace Professionals to represent him or her with respect to his or her responsibilities; (d) object to Claims as provided in the Plan, and prosecute such objections; (e) compromise and settle any issue or dispute regarding the amount, validity, priority, treatment or allowance of any Claim; (f) establish, replenish or release any reserves as provided in the Plan, as applicable; (g) exercise such other powers as may be vested in the Plan Administrator pursuant to the Plan, the Plan Administration Agreement or any other order of the Bankruptcy Court, including the Confirmation Order, or otherwise act on behalf of the Wind Down Estates from and after the Effective Date; (h) file applicable tax returns for any of the Debtors; (i) prosecute, compromise, resolve or withdraw any of the Causes of Action preserved in the Wind Down Estates; (j) liquidate, receive, hold, invest, supervise and protect the Plan Assets; (k) promptly after completing their wind-down, take any actions necessary to voluntarily dissolve each of the Debtors or allow the applicable Secretary of State to involuntarily dissolve each of the Debtors or; and (l) following the wind-down and dissolution of the Debtors, entry of a final decree in the Chapter 11 Cases, and closing of the Litigation Trust, liquidate any remaining or later-discovered Plan Assets; *provided*, *however*, that the Plan Administrator shall not have the authority to take any of the foregoing actions with respect to any Preserved Potential Claim or any RRD Claim without the consent of the Litigation Trustee (in the case of RRD Claims, such consent not to be unreasonably withheld, conditioned or delayed).  The Plan Administrator may, without the need for further Bankruptcy Court approval but subject to the provisions set forth in Article 3.4 of the Plan, retain legal counsel and financial advisors to advise him or her in the performance of his or her duties.

6.  *Plan Oversight Committee*

a.  Creation of the Plan Oversight Committee.  Not less than 10 days prior to the Confirmation Hearing and subject to Bankruptcy Court approval in connection with Confirmation of the Plan, the Requisite Junior Secured Creditors and the Committee shall designate the Plan Oversight Committee Members, which members shall be reasonably acceptable to the Debtors.  Each Plan Oversight Committee Member shall be authorized to act in accordance with the Plan and the Plan Administration Agreement.  Plan Oversight Committee Members shall serve without compensation and shall be entitled to reimbursement of actual, reasonable and documented expenses incurred in the course of

33

discharging their responsibilities as Plan Oversight Committee Members.

b. <u>Function and Duration of the Plan Oversight Committee</u>. The Plan Oversight Committee shall have the rights and responsibilities set forth in the Plan and the Plan Administration Agreement, including, among other things, instructing and supervising the Plan Administrator with respect to its responsibilities under the Plan and the Plan Administration Agreement. The Plan Oversight Committee shall remain in existence until such time as the final Distributions under the Plan have been made.

7. *Litigation Trust*

a. <u>Establishment of Litigation Trust</u>. On or before the Effective Date, the Debtors, on their own behalf and on behalf of the beneficiaries thereof, the Committee and the Litigation Trustee shall execute the Litigation Trust Agreement and take all necessary steps to establish the Litigation Trust. The Litigation Trust shall be established for the sole purpose of receiving the Litigation Trust Assets and maximizing the value of the Litigation Trust Interests, with no objective to continue or engage in the conduct of a trade or business. The Litigation Trustee shall be a disinterested fiduciary designated by the Committee (subject to the consent of the Debtors, such consent not to be unreasonably withheld) with duties solely to the Holders of Allowed General Unsecured Claims. The establishment of the Litigation Trust is not a determination that any Preserved Potential Claims are colorable or valuable. The Litigation Trustee shall have no duty to bring any litigation and may decline to pursue any litigation as and to the extent it determines that such litigation is not in the best interests of the Holders of Allowed General Unsecured Claims. The Litigation Trustee shall have the authority to retain any advisors for the purpose of carrying out its duties under the Litigation Trust Agreement, and shall be vested with all powers and authorities set forth in the Plan and the Litigation Trust Agreement. Notwithstanding the foregoing, prior to the Effective Date, any settlement, compromise, waiver and/or release of any of the Preserved Potential Claims must be approved by the Committee, in its sole discretion, and any Net Recoveries of such settlement, compromise, wavier and/or release shall be distributed solely to holders of Allowed General Unsecured Claims on a Pro Rata basis. To the extent the Committee reaches a settlement on account of the Preserved Potential Claims prior to the Effective Date, then the Committee may determine, in its sole discretion, that no Litigation Trust shall be established, and the Litigation Trust Funding Amount and any Net Recoveries shall be added to the Unsecured Claim Pool and be

34

available for Distribution to Holders of Allowed General Unsecured Claims.

b.   <u>Funding of Litigation Trust.</u>  On the Effective Date, the Litigation Trust shall be funded with the Litigation Trust Funding Amount.  The Litigation Trust shall receive no further funds from the Debtors or their Estates.  The Litigation Trust Funding Amount shall be used solely to fund the administration of the Litigation Trust and to fund distributions to the Litigation Trust Beneficiaries.

c.   <u>Litigation Trust Recoveries</u>.  The reasonable costs and expenses of the Litigation Trust shall be funded out of the Litigation Trust Funding Amount.  The Litigation Trust shall reimburse the Buyer for any reasonable and documented out-of-pocket expenses, including reasonable and documented attorneys' fees and expenses, incurred in connection with responding to any discovery requests made in connection with any litigation brought by the Litigation Trust.  Litigation Trust Distributable Cash shall be available for Distribution to Holders of Allowed General Unsecured Claims.  In pursuing any Preserved Potential Claims against directors and/or officers, the Litigation Trust shall expressly forego enforcement of any final judgment against any defendant to the extent such judgment is not fully covered by and payable exclusively from policy limits of the insurance maintained by R.R. Donnelley & Sons Company or Donnelley Financial Solutions, Inc. (or their affiliates) for the benefit of any such director or officer.

d.   <u>Taxation of Litigation Trust</u>.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Litigation Trust is intended to be treated as a "liquidating trust" for U.S. federal income tax purposes pursuant to section 301.7701-4(d) of the U.S. Treasury Regulations.  Further, the Litigation Trust will be designed and intended to meet the criteria set out in Rev. Proc. 94-45 for qualifying as a grantor trust for U.S. tax purposes, and the Litigation Trust Beneficiaries shall be treated as the grantors of the Litigation Trust and as the deemed owners of the Litigation Trust Assets.  Accordingly, both the Litigation Trustee and relevant Holders shall, for U.S. tax purposes, treat Holders of the Allowed General Unsecured Claims as receiving all of the assets of the Litigation Trust on the Effective Date in exchange for their Allowed General Unsecured Claims and thereafter (a) earning all items of interest or other income earned by the Litigation Trust and (b) incurring any expenses or losses incurred by the Litigation Trust.  The Litigation Trustee shall file grantor trust tax returns for the Litigation Trust in accordance with the above and send Holders of Allowed General Unsecured Claims

35

appropriate statements regarding their allocable shares of the income, expense or loss referenced above.

For U.S. federal income tax purposes, the transfer of assets to the Litigation Trust will be deemed to occur as (a) a first-step transfer of the Litigation Trust Assets to the Litigation Trust Beneficiaries and, to the extent the Litigation Trust Assets are allocable to Disputed Claims that are General Unsecured Claims, to the Litigation Trust Reserve described in the subsequent paragraph, and (b) a second-step transfer by such Litigation Trust Beneficiaries of Litigation Trust Assets (other than the Litigation Trust Assets allocable to the Litigation Trust Reserve) to the Litigation Trust. As a result, the transfer of the Litigation Trust Assets to the Litigation Trust should be a taxable transaction. As soon as possible after the transfer of the Litigation Trust Assets to the Litigation Trust, the Litigation Trustee shall make a good faith valuation of the Litigation Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, Litigation Trustee, and the Litigation Trust Beneficiaries shall take consistent positions with respect to the valuation of the Litigation Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes. The Litigation Trust shall in no event be dissolved later than five years from the creation of such Litigation Trust unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five years without a private letter ruling from the IRS or an opinion of counsel satisfactory to the Litigation Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Litigation Trust Assets.

With respect to amounts, if any, in the Litigation Trust Reserve, it is expected that the Litigation Trust Reserve will be treated as a "disputed ownership fund" governed by section 1.468B-9 of the U.S. Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate U.S. federal income tax return shall be filed with the IRS for the Litigation Trust Reserve, and it will be subject to tax annually on a separate entity basis. Any taxes (including with respect to interest, if any, earned in the Litigation Trust Reserve, or any recovery on the portion of assets allocable to the Litigation Trust Reserve in excess of its basis in such assets) imposed on the Litigation Trust Reserve shall be paid out of the

36

assets of the Litigation Trust Reserve (and reductions shall be made to amounts disbursed therefrom to account for the need to pay such taxes).

See Section 8 of this Disclosure Statement for an additional discussion of certain U.S. federal income tax matters in connection with the Litigation Trust and the Litigation Trust Reserve.

e.   Books and Records.  The Litigation Trust shall have reasonable access to the Debtors' books and records for the purpose of investigating and pursuing the Preserved Potential Claims.

f.   Administration of the Litigation Trust.  The Litigation Trust shall be administered by the Litigation Trustee with oversight by the Litigation Trust Advisory Board pursuant to the Litigation Trust Agreement.  In the event of any inconsistency solely between Article 5.7.6 of the Plan and the Litigation Trust Agreement, the Litigation Trust Agreement shall control, with the Plan controlling in all other cases.  All compensation for the Litigation Trustee and other costs of administration for the Litigation Trust shall be paid by the Litigation Trust in accordance with the Plan and the Litigation Trust Agreement. The Litigation Trust Agreement generally will provide for, among other things: (a) the payment of the expenses of the Litigation Trust, including the cost of pursuing the Preserved Potential Claims; (b) the retention of counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; (c) the investment of Cash by the Litigation Trustee within certain limitations, including those specified in the Plan; (d) the orderly liquidation of the Litigation Trust Assets; and (e) litigation of any Preserved Potential Claims, which may include the prosecution, settlement, abandonment or dismissal of any such Preserved Potential Claims.

g.   Powers and Duties.  In furtherance of and consistent with the purpose of the Litigation Trust and the Plan, and subject to the terms of the Litigation Trust Agreement, the Litigation Trustee, for the benefit of the Litigation Trust, shall (a) hold the Litigation Trust Assets for the benefit of the Litigation Trust Beneficiaries, (b) make distributions of the Litigation Trust Assets as provided in the Litigation Trust Agreement, (c) have the power and authority to commence, prosecute, and resolve any Preserved Potential Claims and (d) have the power and authority to compromise and settle any RRD Claims, with the consent of the Plan Administrator, such consent not to be unreasonably withheld.  The Litigation Trustee shall be responsible for all decisions and duties with respect to the Litigation Trust and the Litigation Trust Assets, except as otherwise provided in the Litigation Trust Agreement. In all circumstances, the Litigation Trustee shall act in the best interests of the Litigation Trust Beneficiaries.  The Litigation Trustee, on behalf of the Litigation Trust, may employ, without further order of the

37

Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of those professionals without further order of the Bankruptcy Court from the Litigation Trust Assets in accordance with the Plan and the Litigation Trust Agreement.

h.   Litigation Trust Advisory Board.  The Litigation Trust Advisory Board shall have the authority to oversee, review and guide the activities and performance of the Litigation Trustee.  The members of the Litigation Trust Advisory Board shall not be entitled to compensation for their services but will be entitled to reimbursement from the Litigation Trust for reasonable and documented out-of-pocket expenses.

i.   Litigation Trust Reserve.  At the time of any Distributions of Litigation Trust Distributable Cash to Holders of Allowed General Unsecured Claims by the Litigation Trustee, the Litigation Trustee shall set aside in the Litigation Trust Reserve the amount of Litigation Trust Distributable Cash that the Litigation Trustee determines would likely have been distributed to the Holders of all Disputed Claims that are General Unsecured Claims as if such Disputed Claims had been Allowed on the Effective Date, with the amount of such Claims to be determined, solely for the purposes of establishing reserves and for maximum Distribution purposes, to be the lesser of (i) the asserted amount of the Claim filed with the Bankruptcy Court as set forth in the non-duplicative Proof of Claim, or (if no proof of such Claim was filed) listed by the Debtors in the Schedules, (ii) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code or ordered by other order of the Bankruptcy Court or (iii) the amount otherwise agreed to by the Plan Administrator and the Holder of such Claim for Distribution purposes.

The Litigation Trustee may adjust the Litigation Trust Reserve to reflect all earnings thereon (net of any expenses relating thereto, such expenses including any taxes imposed thereon or otherwise payable by the reserve), to be distributed on the Distribution Dates, as required by the Plan.  The Litigation Trustee shall hold in the Litigation Trust Reserve all dividends, payments and other distributions made on account of, as well as any obligations arising from, the property held in the Litigation Trust Reserve, to the extent that such property continues to be so held at the time such distributions are made or such obligations arise.  The taxes imposed on the Litigation Trust Reserve (if any) shall be paid by the Litigation Trustee from the property held in the Litigation Trust Reserve, and the Litigation Trustee shall have no liability for such taxes.

To the extent after the Effective Date that a Disputed Claim becomes an Allowed General Unsecured Claim, the Litigation Trustee will, out of

38

the Litigation Trust Reserve, distribute to the Holder thereof the amount of Litigation Trust Distributable Cash, if any, to which such Holder is entitled in accordance with Article 4.2.4(b) of the Plan. Subject to the Plan, all Distributions of Litigation Trust Distributable Cash made under this paragraph on account of Allowed General Unsecured Claims will be made together with any dividends, payments or other Distributions made on account of, as well as any obligations arising from, the distributed property then held in the Litigation Trust Reserve as if such Allowed General Unsecured Claim had been an Allowed Claim on the dates Distributions were previously made to Holders of Litigation Trust Interests under the Plan.

8. *Vesting of Assets*

a. Wind Down Estates' Assets. As of the Effective Date, all Plan Assets shall vest in the Wind Down Estates free and clear of all Liens, Claims, charges or other encumbrances or interests to the extent permitted by section 1141 of the Bankruptcy Code. For the avoidance of doubt, all property held for Distribution pursuant to the Plan (except the Litigation Trust Assets) will be held by the Plan Administrator solely in trust for the Holders of Allowed Claims and to pay expenses of administration of the Wind Down Estates, and will not be deemed property of the Debtors or Wind Down Estates.

b. Litigation Trust Assets. As of the Effective Date, the Litigation Trust Assets and the Debtors' rights, title and interests to such Litigation Trust Assets shall vest in the Litigation Trust free and clear of all Liens, Claims, charges or other encumbrances or interests to the extent permitted by section 1141 of the Bankruptcy Code, subject only to the Litigation Trust Interests; *provided, however* that the Litigation Trust Assets and the Debtors' rights, title and interests to such Litigation Trust Assets may not be transferred or assigned by the Litigation Trust to any party. Notwithstanding anything in the Plan to the contrary, the transfer of the Litigation Trust Assets to the Litigation Trust shall not diminish, and fully preserves, any defenses a Debtor or Wind Down Estate would have if such Litigation Trust Assets had been retained by the Debtors or Wind Down Estates. For the avoidance of doubt, the Litigation Trust Assets held for Distribution pursuant to the Plan will be held by the Litigation Trustee solely in trust for the Holders of Allowed Claims in accordance with the Plan, and will not be deemed property of the Debtors or Wind Down Estates.

9. *D&O Policies.*

As of the Effective Date, the Debtors shall be deemed to have assumed all of the Debtors' D&O Policies pursuant to sections 105 and 365(a) of the Bankruptcy Code, and coverage for defense and indemnity under any of the D&O Policies shall remain available within

39

the definition of "Insured" in any of the D&O Policies subject to the terms and conditions of the D&O Policies.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each D&O Policy.  Notwithstanding anything to the contrary contained in the Plan, and except as otherwise may be provided in an order of the Bankruptcy Court, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption of the D&O Policies, and each such obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.  For the avoidance of doubt, the D&O Policies (i) are prefunded and will not require any additional premiums on or after the Effective Date and (ii) provide coverage for those insureds currently covered by such policies for the remaining term of such policies and runoff or tail coverage after the Effective Date to the fullest extent permitted by such policies.

### 10.    *Cancellation of Existing Agreements, Notes and Interests*

On the Effective Date, except as otherwise specifically provided for in the Plan or any agreement, instrument, or other document incorporated in the Plan, the obligations of the Debtors under each of the DIP Credit Agreement, the Prepetition Credit Documents, the Prepetition Notes Documents and any other Certificate, Interest, share, note, bond, indenture, purchase right, option, warrant, intercreditor agreement, guaranty, indemnity or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest, shall be canceled solely as to the Debtors, and the Debtors shall not have any continuing obligations thereunder and shall be released therefrom, and the DIP Agent, the Prepetition Agent and the Prepetition Notes Collateral Agent shall be automatically and fully released and discharged from all duties and obligations under the DIP Credit Agreement, Prepetition Credit Documents and Prepetition Notes Documents, respectively (in each case, other than the express duties of the Prepetition Agent and Prepetition Notes Collateral Agent to make distributions under the Plan as provided therein); *provided* that notwithstanding Confirmation or the occurrence of the Effective Date, or anything set forth in the Plan or the Confirmation Order, the L/C Agreement shall continue in effect without limitation until terminated in accordance with its terms and the Prepetition Credit Documents, the Prepetition Notes Documents and any other agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of:  (i) enabling Holders of Allowed Claims to receive distributions under the Sale Order, the Credit Bid Support Agreement (as defined in the Acquisition Agreement), the Plan as provided therein, or any other order of the Bankruptcy Court; (ii) permitting each of the Agents to seek and/or receive compensation and/or reimbursement of fees and expenses in accordance with the Plan, the Final DIP Order, or any other order of the Bankruptcy Court; (iii) permitting the Prepetition Notes Collateral Agent to exercise its Prepetition Notes Collateral Agent Charging Lien against distributions to the Prepetition Noteholders in accordance with the Prepetition Notes Documents; (iv) preserving all rights, remedies, indemnities, powers, and protections of the Agents against any person (other than the Debtors), including with respect to indemnification or contribution from the Prepetition Revolver Lenders, the Prepetition Term Loan Lenders, or the Prepetition Noteholders, as applicable (which rights to indemnification or contribution shall not be released under the Plan or Confirmation Order), or any exculpations of the Agents, pursuant to and subject to the terms of the Prepetition Credit Documents or the Prepetition Notes Documents, as applicable; (v) permitting each Agent to enforce any obligation owed to such Agent under the Final DIP

40

Order, the Plan, or the Confirmation Order; (vi) permitting each of the Agents to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; and (vii) permitting each of the Agents to perform any functions that are necessary to effectuate the foregoing.  As a condition precedent to receiving any distribution on account of its Allowed Junior Remaining Claim, each Prepetition Noteholder shall be deemed to have surrendered its Senior Secured Notes and other documentation underlying its Senior Secured Notes, and all such surrendered Senior Secured Notes and other documentation shall be deemed to be cancelled pursuant to this section, except to the extent otherwise provided in the Plan (including for the purpose of receiving further distributions as described in this paragraph).

11. *Section 1146 Exemption from Certain Transfer Taxes and Recording Fees*

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any transfers from the Debtors to the Wind Down Estates or to any other Person, pursuant to, in contemplation of, or in connection with the Plan (including any transfer pursuant to: (a) the Distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (b) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, sales and use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local government officials or agents shall, and shall be directed to, forgo the collection of any such tax, recordation fee or government assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or government assessment.  The Bankruptcy Court shall retain specific jurisdiction with respect to these matters.

12. *Preservation of Causes of Action*

Except as otherwise provided in Article 10 or the other provisions of the Plan, each Cause of Action, including, without limitation, the Preserved Potential Claims, of a Debtor shall be preserved and, along with the exclusive right to enforce such Cause of Action, shall vest exclusively in the Wind Down Estates or the Litigation Trust, as applicable, as of the Effective Date.  Unless a Cause of Action is expressly waived, relinquished, released or compromised in the Plan or an order of the Bankruptcy Court, the Plan Administrator or Litigation Trustee, as applicable, expressly reserves such Cause of Action for later adjudication and, accordingly, no doctrine of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), laches or other preclusion doctrine shall apply to such Cause of Action as a consequence of Confirmation, the Plan, the vesting of such Cause of Action in the Wind Down Estates or Litigation Trust, as applicable, any order of the Bankruptcy Court or these Chapter 11 Cases.  **No Person may rely on the absence of a specific reference in the Plan or this Disclosure Statement to any Cause of Action against them as an indication that the Debtors, the Plan Administrator or the Litigation Trustee, as applicable, will not pursue such Cause of Action.**

41

13.   *Effectuating Documents and Further Transactions*

The Debtors, the Plan Administrator or the Litigation Trustee, as applicable, may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.  The secretary, any assistant secretary or any other appropriate officer of each Debtor shall be authorized to certify or attest to any of the foregoing actions.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtors shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable law, and without any requirement of further action by the shareholders, directors, managers or partners of the Debtors, or the need for any approvals, authorizations, actions or consents.

## C.   Provisions Governing Distributions

1.   *Distributions on the Initial Distribution Date*

On the Initial Distribution Date, the Distribution Agent shall commence Distributions under the Plan on account of each Claim that is Allowed on or prior to the Effective Date; *provided* that Distributions on account of Allowed Junior Remaining Claims and Allowed General Unsecured Claims (solely from the Unsecured Claim Pool) shall be subject to the availability of Wind Down Cash Proceeds on the Initial Distribution Date.  Notwithstanding the foregoing, Distributions of the Litigation Trust Interests or, if no Litigation Trust is established pursuant to Article 5.7 of the Plan, the Litigation Trust Funding Amount and any Net Recoveries, to Holders of Allowed General Unsecured Claims shall commence on the Initial Distribution Date.

2.   *Distributions on Subsequent Distribution Dates*

a.   Subsequent Distribution Dates.  Other than with respect to Distributions to Holders of Allowed General Unsecured Claims, the Plan Administrator shall identify, in his or her reasonable discretion and in accordance with the Plan Administration Agreement, periodic dates after the Initial Distribution Date to be Subsequent Distribution Dates for purposes of making additional Distributions under the Plan.  Each Subsequent Distribution Date shall be a Business Day, and the period between any Subsequent Distribution Date and the prior Distribution Date shall not exceed 180 days.

b.   Distributions to Holders of Junior Remaining Claims.

1.   Distributions of Junior Secured Allocation of Wind Down Cash Proceeds.  On any Distribution Date, the Plan Administrator may direct the Distribution Agent to Distribute to the Holders of Allowed Junior Remaining Claims the Wind Down Cash

42

Proceeds that the Plan Administrator, in his or her reasonable discretion and in accordance with the Plan Administration Agreement, determines are Wind Down Cash Proceeds that belong to the Junior Remaining Claim Distribution Pool, in accordance with Article 4.2.4 of the Plan.

2.   Final Distribution at Closing of the Cases.  On or prior to the closing of the Chapter 11 Cases, the Plan Administrator shall Distribute all remaining Wind Down Cash Proceeds to the Holders of Allowed Junior Remaining Claims in accordance with Article 4.2.3 of the Plan.

c.   Distributions of Holders of Allowed General Unsecured Claims.  The Plan Administrator may direct the Distribution Agent to Distribute subsequently available portions of the Unsecured Claim Pool to Holders of Allowed General Unsecured Claims, and the Litigation Trustee may Distribute Litigation Trust Distributable Cash to Holders of Litigation Trust Interests at any time after the Effective Date, each in its reasonable discretion and in accordance with the Plan Administration Agreement or Litigation Trust Agreement, as applicable.  Each Subsequent Distribution Date shall be a Business Day, and the period between any Subsequent Distribution Date and the prior Distribution Date shall not exceed 180 days.  If the Plan Administrator directs the Distribution Agent to Distribute Cash to Holders of Allowed General Unsecured Claims from the Unsecured Claim Pool Reserve, or the Litigation Trustee Distributes Litigation Trust Distributable Cash to Holders of Allowed General Unsecured Claims from the Litigation Trust Reserve,  including because a Claim for which Distributions have been held in the Unsecured Claim Pool Reserve or the Litigation Trust Reserve, as applicable, has been finally disallowed or resolved for a lesser amount than had been reserved with respect to such claim, thereby freeing up amounts for Distribution to other Holders, the Distribution Agent or the Litigation Trustee, as applicable, shall make an additional Distribution to each Holder of an Allowed General Unsecured Claim in accordance with Article 4.2.4 of the Plan.  All Distributions of Litigation Trust Distributable Cash to Holders of the Litigation Trust Interests shall be made by, or at the direction of, the Litigation Trustee in accordance with the terms of the Litigation Trust Agreement.

d.   Distributions to Holders of Claims Allowed After the Effective Date.  The Distribution Agent shall make Distributions to Holders of Claims Allowed after the Effective Date in accordance with the applicable provision of Article 4 of the Plan on the first Subsequent Distribution Date after such Claim is Allowed.  Unless the Plan Administrator otherwise agrees, no partial Distribution shall be made with respect to

43

such Claim until all disputes in connection with such Claim have been resolved by Final Order of the Bankruptcy Court.

3.  *Record Date and Delivery of Distributions*

   a.  Record Date for Distributions.  On the Distributions Record Date, the Claims Register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distributions Record Date.  If a Claim is transferred 20 or fewer days before the Distributions Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical, and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

   b.  Delivery of Distributions in General.  Except as otherwise provided in the Plan, the Distribution Agent, at the direction of the Plan Administrator or the Litigation Trustee, as applicable, shall make all Distributions required under the Plan to Holders of Allowed Claims. Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, Distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distributions Record Date by the Distribution Agent, as appropriate: (a) to the signatory set forth on any of the Proofs of Claim filed by such Holder or other representative identified therein (or at the last known address of such Holder if no Proof of Claim is filed or if the Debtors, the Plan Administrator, the Litigation Trustee or the Distribution Agent have been notified in writing of a change of address); (b) at the address set forth in any written notice of change of address delivered to the Notice and Claims Agent; (c) at the address reflected in the Schedules if no Proof of Claim has been filed and the Notice and Claims Agent has not received a written notice of a change of address; or (d) in the case of Junior Remaining Claims arising from obligations under the Term Loan Facility, to the Entities set forth on the register provided to the Distribution Agent by the Prepetition Agent.  The Debtors, the Plan Administrator, the Litigation Trustee, the Distribution Agent and the Notice and Claims Agent shall not incur any liability whatsoever on account of the delivery of any Distributions under the Plan.

   c.  Delivery of Distributions to Holders of Junior Remaining Claims Arising from the Senior Secured Notes.  The Prepetition Notes Collateral Agent shall be deemed to be the Holder of all Junior Remaining Claims arising from obligations under the Prepetition Indenture.  All Distributions on account of such Allowed Claims shall be made to or on behalf of the Prepetition Notes Collateral Agent.  The Prepetition Notes Collateral Agent shall hold or direct such

44

Distributions for the benefit of the Holders of such Allowed Claims.  At the expense of the Debtors or the Plan Administrator, as soon as practicable following compliance with the other requirements set forth in Article 7 of the Plan, the Prepetition Notes Collateral Agent shall arrange to deliver such Distributions to, or on behalf of, the Holders of such Allowed Claims, subject to the Prepetition Notes Collateral Agent Charging Lien.  Any such Distributions that are Unclaimed Distributions for a period of six months shall be deemed unclaimed property and shall vest in the Wind Down Estates in accordance with Article 7.7 of the Plan.  The Prepetition Notes Collateral Agent shall promptly report to the Plan Administrator or Distribution Agent, as applicable, any Unclaimed Distributions six months after receipt of any Distribution.  For the avoidance of doubt, the Prepetition Notes Collateral Agent shall only be required to act to make Distributions in accordance with the terms of the Plan.  The Plan Administrator's obligations to make Distributions to the Holders of the Junior Remaining Claims arising from obligations under the Prepetition Indenture in accordance with the Plan shall be deemed satisfied upon delivery of Distributions to the Prepetition Notes Collateral Agent or, if the consent of the Prepetition Notes Collateral Agent is given, to the Distribution Agent on behalf of the Prepetition Notes Collateral Agent, as provided for in the Plan.

d.   <u>Foreign Currency Exchange Rate</u>.  Except as otherwise provided in the Plan, an order of the Bankruptcy Court or as agreed to by the Holder and the Debtors or the Plan Administrator, as applicable, with respect to any Claim asserted in a currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollars at the Exchange Rate.

4.   *Distribution Agent*

The Plan Administrator shall have the authority, in its sole discretion, to enter into an agreement with a Distribution Agent to facilitate the Distributions required under the Plan. To the extent the Plan Administrator determines to utilize a Distribution Agent to facilitate the Distributions, such Distribution Agent would first be required to: (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or Distributions required under the Plan and (c) waive any right or ability to set off, deduct from or assert any Lien or other encumbrance against the Distributions required under the Plan to be distributed by such Distribution Agent; *provided* that in no event shall the Prepetition Notes Collateral Agent be required to waive its Prepetition Notes Collateral Agent Charging Lien, and nothing in the Plan shall be deemed to impair, waive, or discharge the Prepetition Notes Collateral Agent Charging Lien.

The Plan Administrator shall pay to the Distribution Agent all of its reasonable and documented fees and expenses without the need for any approvals, authorizations, actions or consents of the Bankruptcy Court or otherwise.  The Distribution Agent shall submit detailed

45

4818-3242-6191 v.6

invoices to the Plan Administrator for all fees and expenses for which the Distribution Agent seeks reimbursement, and the Plan Administrator shall pay those amounts that it, in its sole discretion, deems reasonable, and shall object in writing to those fees and expenses, if any, that the Plan Administrator deems to be unreasonable. In the event that the Plan Administrator objects to all or any portion of the amounts requested to be reimbursed in the Distribution Agent's invoice, the Plan Administrator and the Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses. In the event that the Plan Administrator and the Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

Notwithstanding any policies, practices, or procedures of DTC, DTC shall cooperate with and take all actions reasonably requested by a Distribution Agent or an indenture trustee to facilitate Distributions to Holders of Allowed Claims without requiring that such Distributions be characterized as repayments of principal or interest. No Distribution Agent or indenture trustee shall be required to provide indemnification or other security to DTC in connection with any Distributions to Holders of Allowed Claims through the facilities of DTC.

5.      *Fractional and De Minimis Distributions*

Notwithstanding anything in the Plan to the contrary, the Plan Administrator and the Distribution Agent shall not be required to make Cash Distributions or payments of less than $50.00. Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than $50.00 shall be forever barred from asserting such Claim against the Estates.

6.      *Undeliverable Distributions*

In the event that any Distribution to any Holder is returned as undeliverable, or no address for such Holder is found in the Debtors' records, no further Distribution to such Holder shall be made unless and until the Plan Administrator, the Litigation Trustee or the Distribution Agent is notified in writing of the then-current address of such Holder, at which time such Distribution shall be made to such Holder not less than 30 days thereafter. Undeliverable Distributions shall remain in the possession of the Plan Administrator, the Litigation Trustee or the Distribution Agent until such time as such Distribution becomes deliverable or such Distribution reverts to the Wind Down Estates or is canceled pursuant to Article 7.10 of the Plan and shall not be supplemented with any interest, dividends or other accruals of any kind.

7.      *Reversion*

Any Distribution under the Plan, including Distributions made by the Agents in accordance with Article 7.1 of the Plan, that is an Unclaimed Distribution for a period of six months thereafter, shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and such Unclaimed Distribution shall revest in the (i) Wind Down Estates as Plan Assets with respect to Unclaimed Distributions on account of Claims other than General Unsecured Claims and, if applicable, (ii) Litigation Trust with respect to Unclaimed Distributions on account of General Unsecured Claims. Upon such revesting, the Claim of any Holder or its

46

successors and assigns with respect to such property shall be canceled and forever barred, notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary.  The provisions of the Plan regarding undeliverable Distributions and Unclaimed Distributions shall apply with equal force to Distributions that are issued by the Plan Administrator, the Litigation Trustee or the Distribution Agent made pursuant to any indenture or Certificate, notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned or unclaimed property law.

Nothing contained in the Plan shall require the Plan Administrator or the Litigation Trustee to attempt to locate any Holder of an Allowed Claim whose Distribution is declared an undeliverable or Unclaimed Distribution.

8.      *Surrender of Canceled Instruments or Securities*

Except as otherwise provided in the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, each holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent.  Subject to the foregoing sentence, regardless of any actual surrender of a Certificate, the deemed surrender shall have the same effect as if its Holder had actually surrendered such Certificate, and such Holder shall be deemed to have relinquished all rights, Claims and Interests with respect to such Certificate. Notwithstanding the foregoing paragraph, Article 7.8 of the Plan shall not apply to any Claims reinstated pursuant to the terms of the Plan.

9.      *Compliance with Tax Requirements and Allocations to Principal and Interest*

In connection with the Plan, to the extent applicable, the Debtors, the Plan Administrator, the Litigation Trustee and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any tax law, and all Distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Plan Administrator, the Litigation Trustee and the Distribution Agent shall be authorized to take all actions reasonably necessary or appropriate to comply with such withholding and reporting requirements, including withholding in kind, liquidating a portion of the Distributions to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms that are reasonable and appropriate.  For purposes of the Plan, any withheld amount (or property) shall be treated as if paid to the applicable claimant.  The Plan Administrator and the Litigation Trustee each reserves the right to allocate all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.  Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to trust fund-type taxes, then to other taxes and then to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that has accrued on such Claims.

47

10.     *Setoffs*

Except as otherwise provided in the Plan, a Final Order of the Bankruptcy Court, or as agreed to by the Holder and the Debtors, the Plan Administrator or the Litigation Trustee, as applicable, each Debtor or the Plan Administrator, as applicable, pursuant to the Bankruptcy Code (including section 553 thereof), applicable non-bankruptcy law, or such terms as may be agreed to by the Holder and the Debtors may, without any further notice to, or action, order or approval of the Bankruptcy Court, set off against any Allowed Claim and the Distributions to be made on account of such Allowed Claim (before any Distribution is made on account of such Allowed Claim), any claims, rights and Causes of Action of any nature that such Debtor or the Plan Administrator, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided* that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or the Plan Administrator of any such Claims, rights and Causes of Action that such Debtor or the Plan Administrator may possess against such Holder.  In no event shall any Holder of a Claim be entitled to set off any Claim against any Claim, right, or Cause of Action of a Debtor or the Plan Administrator, as applicable, unless such Holder has filed a Proof of Claim in these Chapter 11 Cases by the applicable Claims Bar Date preserving such setoff and a Final Order of the Bankruptcy Court has been entered, authorizing and approving such setoff.

11.     *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, required by applicable law, or agreed to by the Plan Administrator, no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date with respect to such Claim, notwithstanding any dispute or other delay with respect to any Distribution.

12.     *No Payment Over the Full Amount*

In no event shall a Holder of a Claim receive more than the full payment of such Claim.  To the extent any Holder has received payment in full with respect to a Claim, such Claim shall be disallowed and expunged without an objection to such Claim having been filed and without any further notice to or action, order or approval of the Bankruptcy Court.

13.     *Tax Identification and OFAC Certifications*

Any Holder entitled to receive any property under the Plan shall, upon request, deliver to the Distribution Agent or such other Entity designated by the Plan Administrator: (a) a completed IRS Form W-9 or appropriate IRS Form W-8, as applicable; and (b) a certification that the Holder is not a person or entity with whom it is illegal for a U.S. person to do business under Office of Foreign Assets Control sanctions regulations and/or the list of Specially Designated Nationals and Blocked Persons (collectively, the "Pre-Distribution Certifications"). If a request for Pre-Distribution Certifications has not been satisfied within 30 days thereafter, a second request shall be sent.  If such requests for Pre-Distribution Certifications are made with a reasonable basis for cause by the Plan Administrator, the Distribution Agent or such other Entity

4818-3242-6191 v.6

designated by the Plan Administrator and the Holder fails to comply before the date that is 60 days after a second request is made, such Holder shall be deemed to have forfeited its right to receive Distributions, and shall be forever barred and enjoined from asserting any right to Distributions made prior to the Plan Administrator receiving its executed Pre-Distribution Certifications (if such Holder is a Holder of an Allowed Class 4 General Unsecured Claim, it will only be entitled to a Pro Rata share of remaining future Distributions, if any); *provided*, that, notwithstanding the foregoing, in no event shall any Holder of Junior Remaining Claims arising out of the Term Loan Facility that fails to comply with all requests made of it for Pre-Distribution Certifications be deemed to have forfeited its right to receive Distributions, nor shall such Holder be forever barred and enjoined from asserting any right to Distributions made prior to the Plan Administrator receiving such Holder's executed Pre-Distribution Certifications; *provided*, *however*, that any such Holder shall not be entitled to receive any Distributions under the Plan until such Holder has provided its Pre-Distribution Certifications.  Any Distributions that are forfeited pursuant to this provision will be returned to the Plan Administrator and become property of the Wind Down Estates.  Notwithstanding anything to the contrary in Article 7.13 of the Plan, the provisions of Article 7.13 of the Plan, including the requirement to provide Pre-Distribution Certifications, shall not apply to Holders of Junior Remaining Claims arising out of the Senior Secured Notes.

## D.     Settlement, Release, Injunction and Related Provisions

### 1.     *Compromise and Settlement*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim, or any Distribution to be made on account of such Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors and their Estates and is fair, equitable and reasonable.

### 2.     *Subordinated Claims*

The allowance, classification and treatment of all Allowed Claims and Interests and the respective Distributions and treatments under the Plan take into account, conform to and satisfy the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto; however, the Debtors reserve the right to reclassify or modify the treatment of any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto, unless otherwise provided in a settlement agreement concerning such Allowed Claim or Interest.

4818-3242-6191 v.6

3.       *Non-Discharge of Debtors; Resolution of Claims and Termination of Interests*

In accordance with section 1141(d)(3) of the Bankruptcy Code, the Confirmation Order will not discharge the Debtors.  However, no Holder of a Claim may receive any payment from, or seek recourse against, the Wind Down Estates or any Plan Assets that are to be distributed under the Plan other than Plan Assets required to be distributed to that Holder pursuant to the Plan.  Pursuant to and to the fullest extent permitted by the Bankruptcy Code, except as otherwise specifically provided in the Plan or the Confirmation Order, the treatment of Claims and Interests under the Plan shall be in full and final satisfaction, settlement, release, and termination, as of the Effective Date, of all Claims of any nature whatsoever, whether known or unknown, against, and Interests in, the Debtors, any property of the Estates, the Plan Administrator or any property of the Wind Down Estates, including all Claims of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim or Interest based upon such Claim, debt, right or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such Claim, liability, obligation or Interest is Allowed pursuant to section 502 of the Bankruptcy Code or (c) the Holder of such a Claim, liability, obligation or Interest has accepted the Plan. Except as otherwise provided in the Plan, any default by the Debtors or their Affiliates with respect to any Claim that existed immediately prior to or on account of the filing of these Chapter 11 Cases shall be deemed cured on the Effective Date.

4.       *Release of Liens*

**Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and all of the rights, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Wind Down Estates and their successors and assigns; *provided* that, for the avoidance of doubt, the Lien and security interest granted pursuant to the L/C Agreement shall remain in full force and effect until released in accordance with the terms of the L/C Agreement.**

5.       *Debtor Release*

**Except as otherwise specifically provided in the Plan with respect to Preserved Potential Claims, for good and valuable consideration, including the service of the Released Parties to facilitate the administration of the Chapter 11 Cases and the implementation of the orderly liquidation contemplated by the Plan, on and after the Effective Date, to the fullest extent permitted by applicable law, the Released Parties are hereby conclusively, absolutely, unconditionally, irrevocably and forever released, waived and discharged by the Debtors, the Plan Administrator and the Estates, including any successor and assign to the Debtors or any Estate representative, from all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor, and its successors, assigns and representatives, whether known or unknown, foreseen or**

50

unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including, those that any of the Debtors, the Plan Administrator or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the businesses of the Debtors, these Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors, the release of any mortgage, lien or security interest, the distribution of proceeds, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the Prepetition Credit Documents, the Prepetition Notes Documents, the administration of Claims and Interests prior to or during these Chapter 11 Cases, the negotiation, formulation or preparation of the Acquisition Agreement, the Sale, the Plan, the Plan Supplement, the Disclosure Statement or, in each case, related agreements, instruments or other documents, any action or omission with respect to Intercompany Claims, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted gross negligence, willful misconduct, fraud or a criminal act; *provided*, *however*, the release under Article 10.5 of the Plan shall not apply to any Preserved Potential Claims to the extent such Preserved Potential Claims are brought by and for the benefit of the Litigation Trust with the approval of the Litigation Trustee.

6.    *Voluntary Release by Holders of Claims and Interests*

For good and valuable consideration, including the service of the Released Parties to facilitate the administration of the Chapter 11 Cases, the implementation of the orderly liquidation contemplated by the Plan and the release of mortgages, liens and security interests on property of the Estates, the distribution of proceeds, on and after the Effective Date, to the fullest extent permitted by applicable law, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to conclusively, absolutely, unconditionally, irrevocably and forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor, and its successors, assigns, and representatives, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including, those that any of the Debtors, the Plan Administrator or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the businesses of the Debtors, these Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or

51

**Interest that is treated in the Plan, the Prepetition Credit Documents, the Prepetition Notes Documents, the administration of Claims and Interests prior to or during these Chapter 11 Cases, the negotiation, formulation or preparation of the Acquisition Agreement, the Sale, the Plan, the Plan Supplement, the Disclosure Statement or, in each case, related agreements, instruments or other documents, any action or omission with respect to Intercompany Claims, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted gross negligence, willful misconduct, fraud, or a criminal act.  For the avoidance of doubt, nothing in Article 10.6 of the Plan will cause the release of Preserved Potential Claims that are otherwise transferred to, and may be prosecuted by, the Litigation Trust pursuant to the terms of the Plan.**

7.    *Scope of Releases*

**Each Person providing releases under the Plan, including the Debtors, the Plan Administrator, the Estates and the Releasing Parties, shall be deemed to have granted the releases set forth in the Plan notwithstanding that such Person may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Person expressly waives any and all rights that it may have under any statute or common law principle which would limit the effect of such releases to those claims or causes of action actually known or suspected to exist at the time of execution of such release.**

8.    *Exculpation*

**Notwithstanding anything in the Plan to the contrary, as of the Effective Date, the Debtors and their directors, officers, employees, attorneys, investment bankers, financial advisors, restructuring advisors and other professional advisors, representatives and agents will be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with the solicitation.**

**The Exculpated Parties shall neither have nor incur any liability arising on or after the Petition Date to any Entity for any act or omission in connection with these Chapter 11 Cases, including (a) the operation of the Debtors' businesses during the pendency of these Chapter 11 Cases; (b) the administration of Claims and Interests during these Chapter 11 Cases; (c) formulating, negotiating, preparing, disseminating, implementing, administering, confirming and/or effecting the Disclosure Statement and the Plan, the Plan Supplement, and any related contract, instrument, release or other agreement or document created or entered into in connection therewith (including the solicitation of votes for the Plan and other actions taken in furtherance of Confirmation and Consummation of the Plan); (d) the offer and issuance of any securities under or in**

52

**connection with the Plan; or (e) the administration and adjudication of Claims, other than liability resulting from any act or omission that is determined by Final Order to have constituted gross negligence, willful misconduct, fraud or a criminal act.**

9.   *Injunction*

**Except as otherwise expressly provided in the Plan or Confirmation Order with respect to Preserved Potential Claims, the satisfaction and release pursuant to Article 10 of the Plan shall also act as a permanent injunction against any Person who has held, holds or may hold Claims, Interests or Causes of Action against commencing or continuing any action to collect, enforce, offset, recoup or recover any Claim, Interest or Cause of Action released under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including to the extent provided for or authorized by sections 524 and 1141 thereof.  Notwithstanding anything to the contrary in the Plan, all Holders of Claims, Interests or Causes of Action are enjoined from interfering with the Distributions contemplated by the Plan.**

10.   *Limitations on Exculpations and Releases*

**Notwithstanding anything to the contrary in the Plan, none of the releases or exculpations set forth in the Plan shall operate to waive or release any obligation or Causes of Action of any Person or Entity:  (a) arising under any contract, instrument, agreement, release or document delivered pursuant to the Plan or documents, agreements or instruments executed in connection therewith, including all post Effective Date obligations or (b) expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, including the Preserved Potential Claims.  For the avoidance of doubt, nothing in the Plan shall release or limit the liability of attorneys to their respective clients for malpractice pursuant to rule 1.8(h) of the New York Rules of Professional Conduct.**

11.   *Limitations on Recovery with Respect to D&O Actions*

Any recovery by or on behalf of the Litigation Trust (and the beneficiaries thereof) on account of any Preserved Potential Claim against the current or former directors or officers of R.R. Donnelley & Sons Company or Donnelley Financial Solutions, Inc., including in each case by way of settlement or judgment, shall be limited to the combined limits of the insurance policies maintained by each of R.R. Donnelley & Sons Company or Donnelley Financial Solutions, Inc. (and their affiliates) for the benefit of any of their respective directors or officers.  The Litigation Trust shall expressly forego enforcement of any final judgment against any director or officer to the extent such judgment is not fully covered by and payable exclusively from the policy limits of the insurance maintained by R.R. Donnelley & Sons Company or Donnelley Financial Solutions, Inc. (and their affiliates) for the benefit of any such director or officer.

## 5.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the process of confirmation of the Plan. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

### A.    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing at which the Debtors will seek confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan.

**THE CONFIRMATION HEARING IS SCHEDULED TO BE HELD ON JANUARY 28, 2021 AT 10:00 A.M. (EASTERN TIME), TELEPHONICALLY, UNTIL FURTHER NOTICE, BEFORE THE HONORABLE SEAN H. LANE, UNITED STATES BANKRUPTCY JUDGE.  THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT OR THE DEBTORS WITHOUT FURTHER NOTICE OTHER THAN BY ANNOUNCEMENT IN OPEN COURT AND/OR NOTICE(S) OF ADJOURNMENT FILED ON THE DOCKET WITH THE BANKRUPTCY COURT'S PERMISSION.**

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE APPLICABLE PARTIES SO AS TO BE ACTUALLY RECEIVED ON OR BEFORE 4:00 P.M. (EASTERN TIME) ON JANUARY 21, 2021, IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER.  UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION PROCEDURES ORDER, THEY WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### B.    Confirmation Standards

To confirm the Plan, the Bankruptcy Court must find that the requirements of section 1129 of the Bankruptcy Code have been satisfied.  The Debtors believe that section 1129 has been satisfied because, among other things:

a.    the Plan complies with the applicable provisions of the Bankruptcy Code;

b.    the Debtors, as plan proponents, have complied with the applicable provisions of the Bankruptcy Code;

c.    the Plan has been proposed in good faith and not by any means forbidden by law;

d.    any payment made or promised under the Plan for services or for costs and expenses in or in connection with these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter

54

4818-3242-6191 v.6

11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

e.   with respect to each Class of Impaired Claims or Interests, each Holder of a Claim or Interest in such Class has either accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code (*see* Section 5.C below – Best Interests Test);

f.   each Class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such class pursuant to section 1129(b) of the Bankruptcy Code;

g.   except to the extent that the Holder of a particular General Administrative Claim has agreed or will agree to a different treatment of such Claim, the Plan provides that Allowed General Administrative Claims will be paid in full in Cash on the Effective Date;

h.   except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement and release of and in exchange for its Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes Allowed and (iii) such other date as may be ordered by the Bankruptcy Court;

i.   at least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of that Class;

j.   Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless

55

4818-3242-6191 v.6

such liquidation or reorganization is proposed in the Plan (*see* Section 5.D below – Financial Feasibility); and

k.      all fees payable under section 1930 of title 28 of the United States Code will be paid as of the Effective Date of the Plan.

## C.      Best Interests Test

### 1.      *Explanation of the Best Interests Test*

Pursuant to section 1129(a)(7) of the Bankruptcy Code, Confirmation of the Plan requires that, with respect to each Class of Impaired Claims or Interests, each Holder of a Claim or Interest in such Class either (a) accepts the Plan or (b) receives or retains under the Plan on account of such Claim or Interest property of value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code (this latter clause is known as the "Best Interests Test").

To determine the probable distribution to Holders of Claims and Interests in each Impaired Class if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation.

The Debtors' chapter 7 liquidation value would consist primarily of the unencumbered and unrestricted cash held by the Debtors at the time of the conversion to a chapter 7 liquidation, the proceeds resulting from the sale of the Debtors' remaining unencumbered assets and properties by a chapter 7 trustee and Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised or settled.  The gross cash available for distribution would be reduced by the costs and expenses of the chapter 7 liquidation and any additional Administrative Claims that might arise as a result of the chapter 7 cases.  Costs and expenses incurred as a result of the chapter 7 liquidation would include, among other things, the fees payable to a trustee in bankruptcy and the fees payable to attorneys and other professionals engaged by such trustee.  Additional Administrative Claims could arise by reason of, among other things, the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of these Chapter 11 Cases.  Such Administrative Claims and any other Administrative Claims that might arise in a liquidation case or result from these Chapter 11 Cases, such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Claims.

To determine if the Plan is in the best interests of each Impaired Class, the present value of the distributions from the proceeds of a chapter 7 liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and Administrative Claims associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired Classes under the Plan.  If the hypothetical chapter 7 liquidation distribution to Holders of Claims or Interests in any non-consenting Impaired Class is greater than the distributions to be received by such parties under the Plan, then the Plan is not in the best interests of the Holders of Claims or Interests in such Impaired Class.

56

4818-3242-6191 v.6

2.      *Liquidation Analysis of the Debtors*

Amounts that a Holder of Claims and Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtors prepared by the Debtors' management with the assistance of their restructuring advisors, attached to this Disclosure Statement as Appendix C (the "Liquidation Analysis").

As described in the Liquidation Analysis, underlying this analysis is the extensive use of estimates and assumptions that, although considered reasonable by the Debtors' management, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors.  The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change.  Actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis.

The Liquidation Analysis was developed solely for purposes of the formulation and negotiation of the Plan and to enable Holders of Claims entitled to vote under the Plan to make an informed judgment about the Plan, and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors or any of their Affiliates.

Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner.  The Debtors do not intend and do not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events.  Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of actual future results.

In deciding whether to vote to accept or reject the Plan, Holders of Claims must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

3.      *Application of the Best Interests Test to the Liquidation Analysis of the Debtors*

Notwithstanding the difficulties in quantifying with precision the recoveries to Holders of Claims and Interests, the Debtors believe that, based on a comparison between the recoveries under the Plan and the Liquidation Analysis, the Debtors' proposed Plan satisfies the requirements of the Best Interests Test.  As the following table indicates, non-consenting members of each Impaired Class will receive more (or no less) under the Plan than they would through a liquidation of the Debtors in a hypothetical chapter 7 case.

| CLASS | DESCRIPTION | ESTIMATED RECOVERY | |
| --- | --- | --- | --- |
| | | PLAN | LIQUIDATION |
| 1 | Other Priority Claims | 100% | 100% |

57

4818-3242-6191 v.6

| CLASS | DESCRIPTION | ESTIMATED RECOVERY | |
| --- | --- | --- | --- |
| | | PLAN | LIQUIDATION |
| 2 | Other Secured Claims | 100% | 100% |
| 3 | Junior Remaining Claims | [•]% | [•]% |
| 4 | General Unsecured Claims | [•]% | [•]% |
| 5 | Intercompany Claims | 0% | 0% |
| 6 | Intercompany Interests | 0% | 0% |
| 7 | Subordinated Claims | 0% | 0% |
| 8 | Equity Interests in LSC | 0% | 0% |

Accordingly, the Debtors believe that the Plan will allow the realization of greater value for their respective Impaired Classes than a hypothetical liquidation.

## D.    Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to confirmation of the Plan, that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless such liquidation or reorganization is contemplated by the Plan.

The ability to make the distributions described in the Plan does not depend on future earnings or operations of the Debtors, but only on the orderly wind down of the Debtors' remaining assets.  Accordingly, the Debtors believe that the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

## E.    Acceptance by Impaired Classes

Except as described in Section 5.F below, the Bankruptcy Code requires, as a condition to confirmation of the Plan, that each Impaired Class accept the Plan.  A class of claims that is unimpaired under the plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  Under section 1124 of the Bankruptcy Code, a class is impaired under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class; only those holders that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number that actually vote cast their ballots in favor of acceptance.  Holders of claims who fail to vote are deemed neither to accept nor to reject the plan.

58

4818-3242-6191 v.6

**F.      Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan, provided that the Plan has been accepted by at least one Impaired Class of creditors. Notwithstanding the failure of an Impaired Class to accept the Plan, the Plan will be confirmed in a procedure commonly known as cram-down, so long as the Plan does not "discriminate unfairly" and is "fair and equitable," for the purposes of the Bankruptcy Code, with respect to each Class of Claims or Interests that is Impaired under, and has not accepted, the Plan. Pursuant to Article 4.7 of the Plan, the Debtors reserve the right to seek confirmation under section 1129(b) of the Bankruptcy Code if necessary.

1.      *Unfair Discrimination*

The Plan does not "discriminate unfairly" for the purposes of section 1129 of the Bankruptcy Code if the Plan gives substantially equivalent treatment to each Class of equal rank; in determining whether a plan discriminates unfairly, courts take into account a number of factors, including the effect of applicable subordination agreements between parties.

2.      *Fair and Equitable*

The "fair and equitable" test applies to Classes of different priority and status and includes the general requirement that no Class of Claims receives more than 100% of the Allowed amount of the Claims in such Class. The condition that the Plan be fair and equitable also includes the following requirements, as applicable:

a.      with respect to a non-accepting Class of Secured Claims, that: (i) the Holders of such Secured Claims retain the Liens securing such Claims to the extent of the Allowed amount of the Secured Claims, whether the property subject to the liens is retained by the Debtors or transferred to another entity under the Plan, and (ii) each Holder of a Secured Claim in the Class receives deferred cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date, at least equivalent to the value of such Secured Claim Holder's interest in the Debtors' property subject to the Liens;

b.      with respect to a non-accepting Class of General Unsecured Claims, that either: (i) the Plan provides that each Claim Holder in such Class receive or retain, on account of such Claim, property of a value, as of the Effective Date, equal to the Allowed amount of such Claim or (ii) no Holder of any Claim or Interest that is junior to the Claims or Interests of such Class receives or retains any property under the Plan on account of such junior Claim or Interest; and

c.      with respect to a non-accepting Class of Interests, that either: (i) the Plan provides that each Holder of an Interest in such Class receives or retains under the Plan, on account of such Interest,

59

4818-3242-6191 v.6

property of value, as of the Effective Date, equal to the greater of: (1) the Allowed amount of any fixed liquidation preference to which such Holder is entitled; (2) any fixed redemption price to which such Holder is entitled; or (3) the value of such Interest or (ii) if the Class does not receive property in the amount required under (i), no Class of Interests junior to the non-accepting Class receives a distribution under the Plan.

3.    *Confirmation of the Plan Pursuant to Section 1129(b)*

The Debtors may seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Impaired Class presumed to reject the Plan, and reserve the right to do so with respect to any other rejecting Class of Claims, and/or to modify the Plan. Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation of the Plan by the acceptance of the Plan by at least one Class that is Impaired under the Plan.

The Debtors submit that the Plan does not "discriminate unfairly" for the purposes of section 1129(b) of the Bankruptcy Code because there are no Classes of equal rank that are receiving different treatment under the Plan.

The Debtors submit that the Plan is "fair and equitable" for the purposes of section 1129(b) of the Bankruptcy Code because, as set forth above and in the Plan, the Holders of Claims in Classes 1 and 2 are Unimpaired and therefore deemed to have accepted the Plan. Further, no Class will receive more than 100% of the Allowed amount of the Claims in such Class under the Plan. The Holders of Claims in Classes 3 and 4 may not receive, and Holders of Claims or Interests in Classes 5, 6, 7 and 8 will not receive, a distribution equal to the Allowed amount of their Claims or Interests, but no Holders of Claims or Interests junior to these Classes will receive a distribution under the Plan on account of such junior Claims or Interests.

Therefore, the requirements of section 1129(b) of the Bankruptcy Code would be satisfied in the event that the Debtors seek to cram down a rejecting Impaired Class.

4818-3242-6191 v.6

## 6.   VOTING PROCEDURES

On [•], the Bankruptcy Court entered an order, among other things, approving this Disclosure Statement, approving procedures for soliciting votes on the Plan, approving the form of the solicitation documents and various other notices, setting the voting record date, the Voting Deadline and the date of the Confirmation Hearing and establishing the relevant objection deadlines and procedures associated with Confirmation of the Plan (the "Solicitation Procedures Order") [D.I. [•]].[6]

The Solicitation Procedures Order, a copy of which is attached hereto as Appendix B, is hereby incorporated by reference as though fully set forth herein.  The Solicitation Procedures Order should be read in conjunction with this Section 6 of this Disclosure Statement.

If you have any questions about: (a) the procedures for voting your Claim or with respect to materials that you have received or (b) the amount of your Claim or Interest, or wish to obtain (at no charge) an additional copy of the Plan, this Disclosure Statement or other solicitation documents, please contact:

> LSC Ballot Processing
> c/o Prime Clerk LLC
> One Grand Central Place
> 60 East 42nd Street, Suite 1440
> New York, NY 10165
> Domestic Toll-Free: (877) 429-6615
> International: 1 (646) 214-8838
> https://cases.primeclerk.com/LSC/

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code.  In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law and, under Bankruptcy Rule 3020(b)(2), it may make such a determination without receiving evidence if no objection is timely filed.

In particular, and as described in more detail below, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that:  (a) the Plan has been accepted by the requisite votes of all Classes of Impaired Claims unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more of such Classes; (b) the Plan is "feasible," meaning there is a reasonable probability that the Debtors will be able to perform their obligations under the Plan; and (c) the Plan is in the "best interests" of all Holders of Claims and Interests, meaning that all such Holders will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

---

[6]   Capitalized terms in this Section 6 not otherwise defined in this Disclosure Statement or the Plan shall have the meanings ascribed to them in the Solicitation Procedures Order.

4818-3242-6191 v.6

The Bankruptcy Court must find that all conditions mentioned above are met before it can confirm the Plan.  Thus, even if all classes of Impaired Claims accept the Plan by the requisite votes, the Bankruptcy Court must still make an independent finding that the Plan satisfies these requirements of the Bankruptcy Code, that the Plan is feasible, and that the Plan is in the best interests of the Holders of Claims against and Interests in the Debtors.

UNLESS THE BALLOT BEING FURNISHED IS TIMELY RECEIVED BY THE NOTICE AND CLAIMS AGENT ON OR PRIOR TO **JANUARY 20, 2021** AT **5:00 P.M. (EASTERN TIME)** TOGETHER WITH ANY OTHER DOCUMENTS REQUIRED TO BE SUBMITTED WITH SUCH BALLOT, THE DEBTORS MAY REJECT SUCH BALLOT AS INVALID AND, ACCORDINGLY, DECLINE TO COUNT IT AS AN ACCEPTANCE OR REJECTION OF THE PLAN.  IN NO CASE SHOULD A BALLOT OR ANY OF THE CERTIFICATES BE DELIVERED TO THE DEBTORS OR ANY OF THEIR ADVISORS.

### A.    Parties-in-Interest Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless:  (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, under section 1126(a) of the Bankruptcy Code, the holder of a claim or interest that is allowed under a plan is entitled to vote to accept or reject the plan if such claim or interest is impaired under the plan.  Under section 1126(f) of the Bankruptcy Code, the holder of a claim that is not impaired under a plan is deemed to have accepted the plan, and the plan proponent need not solicit such holder's vote.  Under section 1126(g) of the Bankruptcy Code, the holder of an impaired claim or impaired interest that will not receive any distribution under the plan in respect of such claim or interest is deemed to have rejected the plan and is not entitled to vote on the plan.  For a detailed description of the treatment of Claims and Interests under the Plan, refer to Section 4 above—Summary of the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  The Solicitation Procedures Order also sets forth assumptions and procedures for tabulating Ballots, including Ballots that are not completed fully or correctly.

### B.    Voluntary Releases Under the Plan

The third-party release and injunction language in Article 10 of the Plan is described above in Section 4 of this Disclosure Statement.

**HOLDERS OF CLAIMS OR INTERESTS WILL EITHER RECEIVE A BALLOT OR ELECTION FORM, IN EACH CASE, TO ALLOW SUCH HOLDER TO OPT-IN TO THE RELEASES CONTAINED IN SECTION 10.6 OF THE PLAN BY**

4818-3242-6191 v.6

**CLEARLY MARKING THE "OPT-IN" BOX ON THE BALLOT PROVIDED TO SUCH HOLDER.  ASSUMING SUCH BALLOT OR ELECTION FORM, AS APPLICABLE, IS TIMELY RECEIVED AND IN PROPER FORM, HOLDERS OF CLAIMS OR INTERESTS WHO CHECK THE "OPT-IN" BOX ON THE BALLOT OR ELECTION FORM WILL BE DEEMED RELEASING PARTIES FOR PURPOSES OF SECTION 10.6 OF THE PLAN.**

###### C.     Classes Under the Plan

1.     *Voting Impaired Classes*

Classes 3 and 4 are Impaired under, and entitled to vote to accept or reject, the Plan.

2.     *Unimpaired Classes of Claims*

Classes 1 and 2 are Unimpaired under the Plan and deemed under section 1126(f) of the Bankruptcy Code to have accepted the Plan.

3.     *Non-Voting Impaired Classes*

Classes 5, 6, 7 and 8 receive no distributions under the Plan and are deemed under section 1126(g) of the Bankruptcy Code to have rejected the Plan.

###### D.     Solicitation Packages for Voting Classes

As set forth in the Solicitation Procedures Order, the Debtors will distribute or cause to be distributed a solicitation package to each Holder of a Claim entitled to vote on the Plan (a "Solicitation Package").  The Solicitation Packages will contain:

    a.   a cover letter (i) describing the contents of the Solicitation Package, the contents of the enclosed USB and instructions for obtaining hard copies of materials provided on USB, and (ii) informing the Holders of the Debtors' recommendation to accept the Plan;

    b.   a Confirmation Hearing notice;

    c.   a printed Ballot, together with a pre-addressed, postage prepaid return envelope for submitting such Ballot;

    d.   the Disclosure Statement (together with all exhibits thereto, including the Plan and all exhibits to the Plan) in electronic format on a USB;

    e.   the entered Solicitation Procedures Order (without exhibits) in electronic format on a USB; and

    f.   such other materials as the Bankruptcy Court may direct.

4818-3242-6191 v.6

In addition, Holders of General Unsecured Claims will also receive a copy of the Committee Letter, recommending that unsecured creditors vote to accept the Plan.

### E.      Solicitation Packages for Non-Voting Classes

####       1.      *Unimpaired Classes of Claims Not Eligible to Vote*

Under section 1126(f) of the Bankruptcy Code, classes that are not impaired under a plan are deemed to accept the plan.  Classes 1 and 2 are Unimpaired under the Plan and deemed under section 1126(f) of the Bankruptcy Code to accept the Plan.  Their votes to accept or reject the Plan will not be solicited.  Pursuant to the Solicitation Procedures Order, these parties will only receive a notice of the Confirmation Hearing, a notice of non-voting status and an Election Form.

####       2.      *Classes Not Eligible to Vote*

Under section 1126(g) of the Bankruptcy Code, classes that are not entitled to receive or retain property under a plan are deemed to reject.  Classes 5, 6, 7 and 8 are not receiving any distributions under the Plan and under section 1126(g) are deemed to reject the Plan.  Their votes to accept or reject the Plan will not be solicited.  Pursuant to the Solicitation Procedures Order, these parties will only receive a notice of Confirmation Hearing, a notice of non-voting status and an Election Form.

### F.      Voting Procedures

Ballots cast by Holders in Classes entitled to vote and Election Forms must be received by the Notice and Claims Agent by the Voting Deadline at the following address or, with respect to Ballots and Election Forms eligible to be cast electronically, through the E-Ballot platform at the website below:

**If by First-Class Mail, Courier or Hand Delivery:**

LSC Ballot Processing
c/o Prime Clerk LLC
One Grand Central Place
60 East 42nd Street, Suite 1440
New York, NY 10165

**If Electronically by the E-Ballot Platform:**

Visit the Notice and Claims Agent's website at https://cases.primeclerk.com/LSC/, click on the "Submit E-Ballot" link and follow the instructions set forth on the website to submit your Ballot or Election Form.

IF YOU HAVE ANY QUESTIONS ON THE VOTING PROCEDURES, PLEASE CALL THE NOTICE AND CLAIMS AGENT AT (877) 429-6615 (DOMESTIC

4818-3242-6191 v.6

TOLL-FREE) OR 1 (646) 214-8838 (INTERNATIONAL), OR CONTACT THE NOTICE AND CLAIMS AGENT AT LSCBALLOTS@PRIMECLERK.COM.

Ballots received after the Voting Deadline will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected.  The method of delivery of Ballots and Election Forms to be sent to the Notice and Claims Agent is at the election and risk of each Holder of a Claim or an Interest.  Except as otherwise provided in the Plan, such delivery will be deemed made only when the Ballot or Election Form is actually received by the Notice and Claims Agent.  Sufficient time should be allowed to ensure timely delivery.  Ballots must be signed and legible, and must be clearly marked to either accept or reject the Plan (but not both).  If a Ballot or Election Form is signed by a trustee, executor, administrator, guardian, attorney-in-fact or other person acting in a fiduciary or representative capacity, such person must indicate such capacity when signing the Ballot.  Delivery of a Ballot or Election Form to the Notice and Claims Agent by facsimile, e-mail or any other means not specifically provided for herein will not be accepted; *provided* that, for the avoidance of doubt, a Ballot or Election Form may be submitted via the online electronic ballot portal and, solely for nominees, via electronic mail to the Notice and Claims Agent at LSCBallots@primeclerk.com with a reference to "LSC Master Ballot" in the subject line.  No Ballot or Election Form should be sent to the Debtors or the Debtors' financial or legal advisors, agents or representatives (other than the Notice and Claims Agent), and if so sent, will not be counted.

Any voter that has delivered a valid Ballot may not change its vote, except in accordance with the Disclosure Statement and Solicitation Procedures Order.  In the case where more than one timely, properly completed Ballot voting the same Claim(s) or Interest(s) is received by the Notice and Claims Agent, only the Ballot that bears the latest date shall be counted unless the Holder of the Claim or Interest receives Bankruptcy Court approval to have the Ballot that bears an earlier date counted; *provided*, *however*, if a Holder of Claim(s) or Interest(s) submits both a paper Ballot and an electronic Ballot (an "E-Ballot") on account of the same Claim(s) or Interest(s), the E-Ballot shall supersede the paper Ballot, unless the Holder receives Bankruptcy Court approval otherwise.

Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and those restrictions on modifications set forth in the Plan, the Debtors or the Plan Administrator, as applicable, may alter, amend or modify the Plan, without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  If the Debtors make changes in the terms of the Plan materially adverse to any Holder of Claims or Interests or if the Debtors waive a material condition to the effectiveness of the Plan described in Article 11 of the Plan, the Debtors will disseminate additional solicitation materials to such affected Class and will extend the solicitation period, in each case to the extent directed by the Bankruptcy Court.  After the Confirmation Date and prior to substantial consummation of the Plan, the Debtors may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, this Disclosure Statement or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of the Plan.

4818-3242-6191 v.6

**7. ADDITIONAL FACTORS TO BE CONSIDERED PRIOR TO VOTING**

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS AND INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN OR ITS IMPLEMENTATION.

### A. Risks Related to These Chapter 11 Cases

#### 1. *General*

It is impossible to predict with certainty the amount of time that it will take to wind down the Chapter 11 Cases or to assure parties in interest that the Plan will be confirmed. A delay in the bankruptcy proceedings to confirm the Plan will also involve additional expense.

#### 2. *The Debtors Will Be Subject to Risks and Uncertainties Associated with These Chapter 11 Cases*

For the remainder of these Chapter 11 Cases, the Debtors' ability to operate, develop and execute a chapter 11 plan will be subject to the risks and uncertainties associated with chapter 11. These risks include the following: (a) ability to develop, confirm and consummate the Plan; (b) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee or to convert the Chapter 11 Cases to chapter 7 proceedings; and (c) the actions and decisions of the Debtors' creditors and other third parties who have interests in these Chapter 11 Cases that may be inconsistent with the Debtors' plans. Because of the risks and uncertainties associated with these Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the remainder of these Chapter 11 Cases that may be inconsistent with the Debtors' plans.

#### 3. *Undue Delay in Confirmation May Result in Additional Costs*

If Confirmation and Consummation of the Plan do not occur expeditiously, these Chapter 11 Cases could result in, among other things, increased costs for professional fees and similar expenses.

66

**B.**      **Risks Related to the Plan**

1.      *Holders of Claims and Interests May Object to the Classification of Claims*

Section 1122 of the Bankruptcy Code requires that the Plan classify claims against, and interests in, the Debtors.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek (a) to modify the Plan to provide for whatever classification might be required for Confirmation and (b) to use the acceptances received from any Holder of Claims or Interests pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could materially adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.

2.      *The Debtors May Fail to Satisfy the Solicitation Requirements Requiring a Re-Solicitation*

To satisfy the requirements of Bankruptcy Code section 1126(b) and Bankruptcy Rule 3018(b), the Debtors will be delivering the Solicitation Materials to all Holders of Claims as of the voting record date in the Classes entitled to vote.  Accordingly, the Debtors believe that the solicitation is proper under section 1125 of the Bankruptcy Code.  The Debtors cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court, and if such approval is not obtained, the Confirmation of the Plan could be denied.  If the Bankruptcy Court were to conclude that the Debtors did not satisfy the solicitation requirements, then the Debtors may seek to re-solicit votes to accept or reject the Plan or to solicit votes from one or more Classes that were not previously solicited.  The Debtors cannot provide any assurances that such a re-solicitation would be successful.  Re-solicitation could delay or jeopardize confirmation of the Plan.  Non-confirmation of the Plan could result in protracted chapter 11 cases.

4818-3242-6191 v.6

3. *Certain Creditors May Bring Litigation Against the Debtors*

Certain of the Debtors' creditors may bring litigation against the Debtors during the course of these Chapter 11 Cases, the outcome of which is uncertain. Although the Debtors believe the Plan satisfies all of the requirements necessary for Confirmation by the Bankruptcy Court, creditors and other parties-in-interest may bring objections to challenge Confirmation of the Plan.

4. *The Bankruptcy Court May Not Grant the Debtors' Request for Nonconsensual Confirmation*

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, the Bankruptcy Court may nevertheless confirm a plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting class. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

5. *The Results of an Actual Chapter 7 Liquidation May Be Different from the Liquidation Analysis*

Conversion to chapter 7 liquidation would, in the view of the Debtors, produce a less favorable outcome for Holders of Claims and Interests than would the Plan. However, underlying the Liquidation Analysis is the extensive use of estimates and assumptions that, although considered reasonable by the Debtors' management, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors. The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change. Actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis. Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed or, alternatively, may have been unanticipated.

6. *Plan Releases May Not Be Approved*

There can be no assurance that the Plan releases, as provided in Article 10 of the Plan, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a plan of liquidation that differs from the Plan or the Plan not being confirmed.

7.      *The Plan May Not Be Confirmed*

The Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan.  Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.

Even if the Bankruptcy Court determines that this Disclosure Statement and the balloting procedures and results are appropriate, the Bankruptcy Court may still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met.  Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications will not necessitate the re-solicitation of votes.  If the Plan is not confirmed, it is unclear what Distributions Holders of Claims or Interests would ultimately receive with respect to their Allowed Claims or Allowed Interests in a subsequent plan of reorganization or liquidation.

8.      *The Sale May Not Be Consummated in Accordance with the Acquisition Agreement and Other Conditions Precedent to the Plan Becoming Effective May Not Be Satisfied*

Although the Debtors believe that the Effective Date of the Plan will occur soon after the Confirmation Date, there can be no assurance as to such timing or as to the occurrence of the Effective Date.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions precedent to the effectiveness of the Plan will be met or that the other conditions to Consummation, if any, will be satisfied or sufficiently waived.  Specifically, there can be no assurance that the Sale will be consummated in accordance with the Acquisition Agreement, which is a condition precedent to the effectiveness of the Plan.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.

9.      *The Amount and Timing of Available Distributions, if Any, May Vary*

While the Debtors have attempted to project what they believe are likely Distributions, if any, to be made to parties holding Allowed Claims, there can be no certainty that the projections will be accurate and that Holders will receive the Distributions described in the Plan.  The projections will necessarily be affected by, among other things, recoveries generated in connection with the liquidation of all of the Debtors' remaining assets (including, without limitation, the recoveries, if any, on account of the Preserved Potential Claims), the outcome of objections to Claims, and the cost and expenses of such actions and generally administering and winding down the Wind Down Estates.  Additionally, the timing of actual Distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.  Therefore, the Debtors cannot guarantee the timing of any recovery on account of Allowed Claims.

C.      **Additional Risks**

1.      *Claims Could Be More Than Projected*

69

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of Distributions in one or more Classes to be reduced substantially.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.  Therefore, the actual amount of Allowed Claims may vary from the assumptions underlying the projected recoveries discussed in this Disclosure Statement, and the variation may be material.

2. *The Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

3. *No Representations Outside This Disclosure Statement Are Authorized*

No representations concerning or related to the Debtors, these Chapter 11 Cases, once commenced, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

4. *Forward-Looking Statements Are Not Assured, and Actual Results May Vary*

This Disclosure Statement contains forward-looking statements.  These forward-looking statements include factors that could cause actual results to differ materially, such as: those factors described in this Section 7 of this Disclosure Statement; the Debtors' ability to obtain Bankruptcy Court approval with respect to motions in these Chapter 11 Cases; the effects of the Bankruptcy Court rulings in these Chapter 11 Cases and the outcome of the cases in general; the length of time the Debtors will remain in these Chapter 11 Cases; the pursuit by the Debtors' various creditors, equity holders and other constituents of their interests in these Chapter 11 Cases; risks associated with third-party motions in these Chapter 11 Cases, which may interfere with the ability to consummate the Plan; the increased administrative and restructuring costs related to these Chapter 11 Cases; and the payments of Allowed Claims and the amount of expenses projected to recognize recoveries and reconcile such Claims.

5. *No Legal or Tax Advice Is Provided to You by This Disclosure Statement*

The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each Holder of Claims and Interests against the Debtors should consult his, her or its own legal counsel and accountants as to legal, tax and other matters concerning such Holder's Claims and Interests.  This Disclosure Statement is not legal advice to you and may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

4818-3242-6191 v.6

6.      *Governmental Laws, Regulations and Actions Could Adversely Affect the Debtors*

The Debtors are subject to various federal, state and local laws, orders and regulations. Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal fines and penalties or the imposition of injunctive relief.

Future compliance with laws and regulations, including environmental, production, transportation, sales, rate and tax rules and regulations, and any changes to such laws or regulations, may reduce the Debtors' profitability and have a material adverse effect on their financial position, liquidity and cash flows. Such laws and regulations may require more stringent and costly measures.

7.      *No Admission Is Made*

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or Holders of Claims or Interests.

4818-3242-6191 v.6

## **8.** **MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

The following discussion is a summary of certain U.S. federal income tax consequences of the Consummation of the Plan to the Debtors, the Wind Down Estates, and certain Holders entitled to vote on the Plan.  Except as otherwise indicated, this discussion assumes that the Sale is consummated pursuant to the Acquisition Agreement.  The following summary does not address the U.S. federal income tax consequences to Holders who are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or Holders who will not receive any Distribution and are deemed to reject the Plan.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), U.S. Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change (including pursuant to any potential future legislation that may be enacted in response to the spread of COVID-19) or differing interpretations (possibly with retroactive effect).  The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties.  The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions.  This summary does not address non-U.S., state, or local tax consequences of the contemplated transactions, nor does it address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (e.g., non-U.S. taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, Holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that elect to use the mark-to-market method of tax accounting for their securities, and persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction).  In addition, this discussion does not address the Foreign Account Tax Compliance Act, the alternative minimum tax, the "Medicare" tax on net investment income, or U.S. federal taxes other than income taxes.  Unless otherwise indicated, this discussion assumes that all Claims are held as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the Tax Code and that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their respective forms.

*The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances.  All Holders are urged to consult their tax advisors for the U.S. federal, state, local and other tax consequences applicable under the Plan.*

72

### A.      Federal Income Tax Consequences to the Debtors and the Wind Down Estates

For U.S. federal income tax purposes, LSC is the common parent of an affiliated group of companies that files a single consolidated U.S. federal income tax return (the "Tax Group"), of which some of the other Debtors are members or are disregarded entities, directly or indirectly, wholly-owned by a member of the Tax Group. The Debtors believe that the Tax Group has material net operating losses ("NOLs") and other tax attributes (collectively, the "Tax Assets"). The amount of any such Tax Assets remain subject to audit and adjustment by the IRS.

*Tax Consequences of Sale and Wind Down*

The Sale should be treated as a taxable transaction for U.S. federal income tax purposes and we are assuming for purposes of this discussion that it will be. Gain or loss, if any, will be recognized based on the difference between the tax basis in the assets that were disposed of in that transaction and the sale price allocable to such assets. The character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including which assets of the Debtors are held as capital assets and whether and to what extent any gain on their sale represents the recapture of prior depreciation or amortization. To the extent that no limitations would apply to the Tax Assets, as described below, the Debtors will use the Tax Assets to offset some of the gain from the Sale, if any.

To the extent the Debtors own any assets that are sold or otherwise collected upon following the implementation of the Sale (i.e., during the existence of the Wind Down Estates), the sale or collection upon such assets will give rise to taxable income or loss, as the case may be, depending upon the Debtors' tax basis in such assets. So long as such sales or collections occur prior to the end of the tax year in which Claims against the Debtors are discharged, any remaining Tax Assets (and tax basis) will be available to offset any resulting taxable income (see discussion below under "*COD Income*").

*Limitation on Tax Attributes After an Ownership Change*

Under the Tax Code, if a corporation (or consolidated group) has tax attributes at the time of an "ownership change" within the meaning of section 382 of the Tax Code ("Pre-Change Attributes"), any Pre-Change Attributes may be subject to an annual limitation ("Attribute Limitation"). Any such Attribute Limitation applies in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from COD Income, as described below.

In connection with the implementation of the Plan and the consummation of the Sale, the Debtors expect to use a significant amount of the Tax Assets. Equity trading activity and certain other actions prior to the Effective Date could result in an ownership change of the Tax Group within the meaning of section 382 of the Tax Code. To the extent Attribute Limitations apply, the Debtors could incur significant tax liability as a result of the Sale, which would reduce the amount of Cash the Debtors would have to pay in respect of Claims.

73

4818-3242-6191 v.6

In an attempt to minimize the likelihood of such an ownership change occurring, the Debtors obtained an interim order (and, subsequently, a final order) from the Bankruptcy Court authorizing certain protective equity trading procedures [D.I. 45 and 213]. The Debtors expect that they will not have undergone an "ownership change" within the meaning of section 382 of the Tax Code prior to the Sale.

*COD Income*

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

A taxpayer is not required to include COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case. Instead, the taxpayer must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to the rule described in the preceding sentence. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (including the amount of gain or loss recognized by the Debtors with respect to the Sale and any gain or loss recognized by the Wind Down Estates, to the extent recognized in the same taxable year as the debt discharge or a prior taxable year). In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets. Any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and generally has no other U.S. federal income tax impact.

As a general matter, the rules related to COD Income will only be relevant to the Debtors and Wind Down Estates to the extent that taxable income is recognized following the conclusion of the tax year during which the COD Income was recognized. For example, the Debtors' existing tax attributes would, to the extent they are subject to reduction as a result of the rules described above, be unavailable to offset any taxable income arising from the wind down of the Wind Down Estates after the conclusion of the tax year during which the COD Income was recognized.

## B.     Tax Consequences to U.S. Holders

As used herein, the term "U.S. Holder" means a beneficial owner of Claims that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

74

4818-3242-6191 v.6

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Claims, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership.  If you are a partner in such a partnership holding any of such instruments, you should consult your own tax advisor.

Generally, a U.S. Holder will recognize gain or loss with respect to its Allowed Claim in an amount equal to the difference between (i) the amount of any Cash received (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the Holder's taxable income).

The character of gain or loss recognized by a U.S. Holder as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including (i) the tax status of the Holder, (ii) whether the Claim constitutes a capital asset in the hands of the Holder and how long it has been held, (iii) whether the Claim was acquired at a market discount, and (iv) whether and to what extent the Holder previously claimed a bad debt deduction.

U.S. Holders are urged to consult their tax advisors regarding the possible application (and the ability to elect out) of the "installment method" of reporting any gain that may be recognized by such Holders in respect of their Claims due to the receipt of Cash in a taxable year subsequent to the taxable year in which the Effective Date occurs.  This discussion assumes that the installment method does not apply, either because the exchange is not eligible or because the Holder elects out of such treatment.

A Holder that purchased its Claims at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code.  A Holder that purchased its Claim from a prior Holder will be considered to have purchased such Claim with "market discount" if the Holder's adjusted tax basis in its Claim is less than the stated redemption price of such Claim at maturity by at least a de minimis amount.  Under these rules, any gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the Holder, on

75

4818-3242-6191 v.6

a constant yield basis) during the Holder's period of ownership, unless the Holder elected to include the market discount in income as it accrued. If a Holder did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange.

In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income). Conversely, a U.S. Holder may be entitled to recognize a deductible loss to the extent any accrued interest or amortized original issue discount was previously included in its gross income and is not paid in full.

The Plan provides that consideration received in respect of a Claim is generally allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to any Claim for accrued but unpaid interest. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. Holders are urged to consult their own tax advisor regarding the allocation of consideration received under the Plan and the taxation or deductibility of unpaid interest for tax purposes.

### C. Tax Treatment of the Litigation Trust

As described above in Section 4(b)(7)(d) of this Disclosure Statement, the Litigation Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (*i.e.*, the liquidating trust beneficiaries are deemed to own the assets of the trust, and all of the trust's income and loss is taxed directly to the liquidating trust beneficiaries). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Litigation Trust will be structured to comply with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Plan Administrator and Holders of Allowed General Unsecured Claims) will be required to treat, for U.S. federal income tax purposes, the Litigation Trust as a grantor trust of which the Litigation Trust Beneficiaries are the owners and grantors. The following discussion assumes that the Litigation Trust will be so respected for U.S. federal income tax purposes. However, no opinion of counsel has been requested, and the Litigation Trustee may or may not obtain a ruling from the IRS, concerning the tax status of the Litigation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully the classification of the Litigation Trust, the U.S. federal income tax consequences to the Litigation Trust could vary from those discussed herein (including the potential for imposition of tax on the net income of the Litigation Trust at the entity level, rather than at the level of the Litigation Trust Beneficiaries).

4818-3242-6191 v.6

### D.   Tax Treatment of the Litigation Trust Reserve

As described above in Section 4(B)(7)(d) of this Disclosure Statement, subject to definitive guidance from the IRS to the contrary, the Litigation Trustee will treat the assets comprising the Litigation Trust Reserve for U.S. federal income tax purposes as a "disputed ownership fund" governed by section 1.468B-9 of the U.S. Treasury Regulations, and will treat it consistently for state and local tax purposes to the extent permitted by applicable law. Accordingly, the Litigation Trustee will in effect treat the Litigation Trust Reserve as a separate entity for U.S. tax purposes, and this entity will be subject to tax on its net income at the entity level.  The Litigation Trustee will in this regard cause there to be filed appropriate federal, state and local tax returns and pay tax accordingly out of the assets of the Litigation Trust Reserve, and such tax will be treated as reducing the amount that is distributable to Litigation Trust Beneficiaries from the Litigation Trust Assets.

### E.   Tax Treatment of the Unsecured Claim Pool Reserve

Subject to definitive guidance from the IRS to the contrary, the Plan Administrator will treat the Unsecured Claim Pool Reserve in the same manner as, and will act in accordance with, the treatment described above with respect to the Litigation Trust Reserve.

### F.   General Tax Reporting by the Litigation Trust and Litigation Trust Beneficiaries

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Litigation Trustee and Holders of Allowed General Unsecured Claims) will treat the transfer of the assets to the Litigation Trust in accordance with the terms of the Plan. Pursuant to the Plan, the Litigation Trust Assets will be treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those assets (including any obligations to Holders of Disputed Claims), directly to the Litigation Trust Beneficiaries (with each beneficiary receiving an undivided interest in such assets in accordance with its economic interests in such assets), followed by the transfer by the Litigation Trust Beneficiaries (subject to any obligations to Holders of Disputed Claims) to the Litigation Trust, and, to the extent the Litigation Trust Assets are allocable to Disputed Claims that are General Unsecured Claims, to the Litigation Trust Reserve.  Accordingly, all parties shall treat the Litigation Trust as a grantor trust of which the Litigation Trust Beneficiaries are the owners and grantors, and treat such beneficiaries as the direct owners of an undivided interest in the Litigation Trust Assets (other than the Litigation Trust Assets allocable to the Litigation Trust Reserve), consistent with their economic interests therein, for all U.S. federal income tax purposes.  The Litigation Trustee will not be in a position to provide guidance regarding the value of a beneficiary's allocable share of Litigation Trust Assets after taking account of any associated obligations to Holders of Disputed Claims, and Litigation Trust Beneficiaries should consult their tax advisors regarding this point.  Holders are also urged to consult their tax advisor regarding any subsequent year's adjustments for the elimination of obligations to Holders of Disputed Claims and their replacement with a smaller amount of Allowed Claims that are then paid out of the Litigation Trust Assets.

Taxable income or loss allocated to Litigation Trust Beneficiaries will be treated as income or loss with respect to such Holder's undivided interest in the Litigation Trust Assets, and not as income or loss with respect to its prior Allowed Claim. The character of any income and the character and ability to use any loss will depend on the particular situation of the beneficiary.

The U.S. federal income tax obligations of a Holder that is subject to U.S. federal income tax with respect to its Litigation Trust Interest are not dependent on the Litigation Trust distributing any cash or other proceeds. Thus, such a Holder may incur a U.S. federal income tax liability with respect to its allocable share of the Litigation Trust's income even if the Litigation Trust does not make a concurrent distribution to the Holder. In general, a Distribution of cash by the Litigation Trust will not be separately taxable to a Litigation Trust Beneficiary since the beneficiary is already regarded for federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Litigation Trust).

## G.    Withholding on Distributions and Information Reporting

All Distributions to Holders of Allowed Claims under the Plan are subject to any applicable tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the applicable withholding rate (currently 24%). Backup withholding generally applies if the Holder: (a) fails to furnish its social security number or other taxpayer identification number; (b) furnishes an incorrect taxpayer identification number; (c) fails properly to report interest or dividends; or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax, but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the Distributions contemplated by the Plan would be subject to these Treasury Regulations.

4818-3242-6191 v.6

## 9.    ALTERNATIVE TO CONFIRMATION OF THE PLAN

The Debtors believe that the Plan affords Holders of Claims and Interests the potential for the greatest recovery on those Claims and Interests and is therefore in the best interests of such Holders.  If the Plan is not confirmed, the only alternative near-future outcome for the Debtors is the liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code.  In a chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtors.  It is impossible to predict with precision how the proceeds of the liquidation would be distributed among Holders of Allowed Claims against the Debtors.

The Debtors believe, however, that creditors would receive less value in the event that the Debtors are liquidated under chapter 7.  In addition, the Debtors believe that, in a liquidation under chapter 7, the value of the Debtors' estates will be substantially eroded before creditors receive any Distribution, as a result of additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees.  The assets available for Distribution to creditors will be reduced by such additional expenses and by Claims, some of which will be entitled to priority.

The Liquidation Analysis, prepared by the Debtors with their restructuring advisors, is premised upon a hypothetical liquidation in a chapter 7 case.  In the Liquidation Analysis, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate estimated realizable value of their assets, and the extent to which such assets are subject to liens and security interests.  The likely form of any liquidation would be the wind-down and sale of individual assets.

Based on this analysis, it is likely that a chapter 7 liquidation of the Debtors' assets would produce less value for Distribution to creditors than that recoverable under the Plan.  Therefore, the Debtors submit that the projected recoveries available to Holders of Claims and Holders of Interests in a chapter 7 liquidation are likely to be lower than those available under the Plan.

4818-3242-6191 v.6

## 10.   DEBTORS' RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the only other alternative described herein.  **Therefore, the Debtors recommend that all Holders of Claims entitled to vote on the Plan vote to accept it.**

4818-3242-6191 v.6

Dated: November 20, 2020
New York, New York

Respectfully submitted,

**LSC COMMUNICATIONS, INC.**
**(for itself and on behalf of each of the Debtors)**

By: */s/ Andrew B. Coxhead*
      Name:  Andrew B. Coxhead
      Title:   Chief Financial Officer and Treasurer

*/s/ Brian D. Glueckstein*
Andrew G. Dietderich
Brian D. Glueckstein
Alexa J. Kranzley
Christian P. Jensen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:    (212) 558-4000
Facsimile:    (212) 558-3588
E-mail:      dietdericha@sullcrom.com
             gluecksteinb@sullcrom.com
             kranzleya@sullcrom.com
             jensenc@sullcrom.com

*Counsel to the Debtors*

4818-3242-6191 v.6

## Appendix A

**Debtors' Plan of Liquidation**

4818-3242-6191 v.6

## **Appendix B**

**Solicitation Procedures Order**

4818-3242-6191 v.6

## Appendix C

**Liquidation Analysis**

4818-3242-6191 v.6